# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DALONTA CRUDUP**<br>2300 McMahon Road<br>Apt. 2321<br>Silver Spring, MD 20902<br><br>and<br><br>**DONTREY BELL**<br>1520 Butler Street, SE<br>Apt. 101<br>Washington, DC 20020<br><br>and<br><br>**DAVID  BURNS**<br>6006 Clay Street, NE<br>Apt. 101<br>Washington, DC 20019<br><br><br>On behalf of themselves and all others<br>similarly situated,<br><br>Plaintiffs,<br><br>  v.<br><br>**GOVERNMENT OF THE DISTRICT OF COLUMBIA,**<br><br>**SERVE:**<br>Mayor Muriel Bowser<br>Attorney General Karl Racine<br>Designee Darlene Fields<br>Civil Litigation Division, Ste 6000 South<br>441 4ᵗʰ Street, NW<br>Washington, DC 20001<br>202-724-6507<br><br>Defendant. | Civil Action No.:  20-1135 |

## CLASS ACTION

## COMPLAINT AND JURY DEMAND

## (§ 1983 Civil Rights Claims)

### Introduction

1.      Dalonta Crudup, Dontrey Bell, and David Burns (sometimes the "Named Plaintiffs"), on behalf of themselves and the classes defined below, bring this action against the Government of the District of Columbia (the "District" or the "District of Columbia") under 42 U.S.C.A. § 1983 for injuries they suffered during the Class Period because the District, through its policy of stopping, frisking and searching African American people (especially young African American men) looking for guns without reasonable suspicion or probable cause, fabricating facts to justify the stops, frisks and searches, and intentionally discriminating on the basis of race through its Gun Recovery, violated their Fourth and Fifth Amendment rights.

### Jurisdiction and Venue

2.      This Court has jurisdiction over the Named Plaintiffs' § 1983 claims under 28 U.S.C.A. §1331 and 28 U.S.C.A. §1343(3)-(4).

3.      Venue is proper in this jurisdiction pursuant to 28 U.S.CA. §1391(b) because the events or omissions underlying the claims occurred in this judicial district.

### Parties

4.       Named Plaintiffs and the members of the proposed classes are African American persons who were stopped, frisked and searched for guns by the District's Gun Recovery Unit without reasonable suspicion or probable cause, some of whom were arrested, charged or arrested and charged, and detained, and prosecuted in violation of their Second, Fourth, and Fifth Amendment rights.

5.      Defendant the Government of the District of Columbia is a municipal corporation capable of being sued under D.C. Code § 1-102.

6.      Chief Peter Newsham is not a defendant in this lawsuit, but Chief Peter Newsham is the policymaker for the District of Columbia's MPD (Metropolitan Police Department ("MPD"), a department of the government of the District of Columbia. Mayor Muriel Bowser appointed Chief Newsham Interim Chief of Police on September 15, 2016; he was named Chief of the Metropolitan Police Department on February 23, 2017 and sworn in on May 2, 2017. Chief Peter Newsham is not a defendant in this lawsuit.

7.      The Gun Recovery Unit is not a defendant but the Gun Recovery Unit is a special MPD police unit that focuses on the interdiction and recovery of illegal firearms, and the apprehension of individuals involved in illegal gun crime. The Gun Recovery Unit focuses its efforts almost exclusively on African Americans.

Factual Allegations

**The District and its War on Guns and Young African American Men Who Might Carry Them**

8.      In the hope of ending violent crime, the District of Columbia declared war on guns by enacting some of the strictest gun control measures in the country. Under this policy the District's gun control measures amounted to a total ban on the ownership by everyone except law enforcement officers. But, in 2007 the Supreme Court invalidated the District's approach by holding that the Second Amendment guarantees an individual right to keep and bear arms and that the core of the right is the right to self-defense. The District continued to deny handguns to people within its borders. In 2014 a district court Judge declared the District's gun laws a total ban on carrying guns outside the home and thus unconstitutional under the Second Amendment. The D.C. Council replaced the total ban with another total ban on carrying guns outside the home which the D.C. Circuit struck down in 2017. Disregarding these changes in the law the District through its Gun Recovery Unit has continued its practice and custom of treating African American people as though they all carry illegal handguns.

9.    Despite its laudable mission of ending gun violence, the District through its Gun Recovery Unit has taken a meat axe to a problem that calls for a scalpel because in its zeal to find and confiscate illegal guns the Gun Recovery Unit has declared war on the African American citizens in the District, especially young African American men.

10.    Moreover, the Gun Recovery Unit refuses to accept that changes in the law required by the Supreme Court and it continues to treat gun possession – especially gun possession by African Americans – as presumptively illegal.

11.    The District's Gun Recovery Unit relies on the latitude afforded by voluntary consent to facilitate both suspicionless "consented" searches and <u>Terry</u> seizures premised on purportedly reasonable suspicions. But in the particulars of its application, the District's policy perverts the logic underlying <u>Terry</u>.

12.    Moreover, the Gun Recovery Unit also carries out its mission by fabricating the reasonable suspicion or probable cause required by the Constitution to stop and frisk or search people whom the Gun Recovery Unit encounters.

13.    Because the Gun Recovery Unit operates mainly in African American areas and neighborhood the people whom the Gun Recovery Unit encounters are almost always African American and the people it stop and frisks or searches are almost 80% African American.

### Gun Recovery Unit

14.    The Gun Recovery Unit is a special MPD police unit that focuses on the interdiction and recovery of illegal firearms, and the apprehension of individuals involved in illegal gun crime. The Gun Recovery Unit's stated mission is to remove firearms from the streets of the District of Columbia, before they can be used in a violent crime.

15.    The Gun Recovery Unit consists at any one time of twenty to thirty officers and one or more detectives and about three sergeants.

16.     The Unit patrols seven days a week, 24 hours a day.

17.     The GRU reports to the Narcotics and Special Investigations Division. NSID falls under the Investigative Services Bureau which was headed by Chief Peter Newsham when he was Assistant Chief.

18.     The GRU completes a nightly report that documents all activity from the shift. The GRU also completes a monthly report documenting all activities for the month.

19.     The GRU patrol in "tactical" gear as the pictures show.



20.     The Gun Recovery Unit patrols the predominately African American areas of the District questioning people they encounter – virtually all of whom are African Americans - about whether they are carrying firearms, even though the Second Amendment and the laws of the District allow people to carry concealed handguns outside the home.

21.     One Gun Recovery Unit officer, Officer Katz, testifying in a motions hearing in Superior Court, described the job as being "about observations," specifically "how people react to [the Gun

Recovery Unit]." In particular, "[w]hen [Officer Katz] ask[s] people if they have a gun, [he is] looking for a reaction — based on [their] movements after that question."

22.     According to Officer Katz, "we ask everybody if they have a gun."

23.     In the absence of any particularized reports, evidence, or suspicions, the Gun Recovery Unit patrolling officers simply question every person they encounter who fits their "profile" of likely to carry a gun. They "employ[] a simple technique: they ask[] any individual they encounter[] if he or she ha[s] a gun and then watch[] to see if that individual engage[s] in what the officers perceive[] to be suspicious behavior."  If consent to question or search is refused, officers frequently construe citizens' varied reactions to their probes as rationalizing a Terry stop.

24.     The Gun Recovery Unit exploit the technical doctrine that police are free to engage citizens in consensual stops, ask them questions in consensual conversations, and make consensual searches of their persons and belongings.

25.     The District of Columbia Court of Appeals expressed concern that Officer Katz's mission may have clouded his perception of what they see.

> 26.     Officer Katz and his team were out looking for guns. To that end, Officer Katz asked everyone if they had a gun, and he looked for a "reaction — based on movements" after that question, and then he evaluated the physical response to that question to determine whether to investigate further. As noted in the recent stop and frisk civil litigation in New York City, "[r]ecent psychological research has . . . provided evidence that officers may be more likely to perceive a movement as indicative of criminality if the officer has been primed to look for signs that 'crime is afoot.'" "'[G]iven the nature of their work on patrol, officers may have a systematic tendency to see and report furtive movements where none objectively exist.'"

Robinson v. United States, 76 A.3d 329, 339 (D.C. 2013)(internal citations omitted).

27.     Having once stopped a person, and then having convinced themselves that the person's reaction to the encounter is "suspicious," the Gun Recovery Unit then bootstraps the "suspicious" behavior into a Terry "frisk" for weapons ostensibly for "the officers' safety."

28.     The Gun Recovery Unit's officers have all but candidly recognized that their policy amounts to statistical gamesmanship. In a prior case involving the same policy, Officer Katz, for example, noted that the unit's officers targeted a particular "high crime" area for patrols because it "was one of [the officer's] top-yielding gun areas as far as recovering firearms off of people" and stopped an individual for questioning without "any discussion among" the officers about the rationale for the stop, where neither Officer Katz nor the other officers "[saw] anything, initially, about him" to suggest he had a gun.

29.     As the D.C. Superior Court noted, like all officers in the District's Gun Recovery Unit, "[Officer Katz] asked [the individual] whether he had a weapon, not because he had any suspicion that he did, but because that's his job. He's a gun recover[er]—and he asks everyone. Apparently, he goes down the street asking everyone, do you have a gun."

30.     What these descriptions fail to mention is that almost all of the "everyones" the Gun Recovery Unit ask about weapons are African Americans, because the Gun Recovery Unit patrols almost exclusively in predominately African American neighborhoods.

31.     Members of the Gun Recovery Unit also have a practice of stopping people and then frisking them or searching them or their belongings without reasonable suspicion and without any objective facts indicating a person is armed.

32.     The Gun Recovery Unit also has a pattern or custom of stopping, frisking and searching people, especially young, African American men, without reasonable suspicion or probable cause and fabricating facts to justify the stops and frisks and searches. If the police find an illegal gun they arrest the person and fabricate facts in their "Gersteins" to justify the stop and frisks.

**The Gun Recovery Unit's operation in Deanwood on June 13, 2018 illustrates the Unit's practices**

33.     An illustrative example of Gun Recovery Unit's modus operandi of stop and frisk is the Gun Recovery Unit's operation in Deanwood on June 13, 2018.

34.     Several Gun Recovery Unit officers arrived in tactical gear in front of a barbershop where several African American men were sitting outside.

35.     As the officers got out of their vehicles, they told the men that they were interested in a car parked out front because it had overly tinted windows.

36.     But in fact, the officers staged a fake search and find operation. They searched a man who was ostensibly a member of the group but was in fact a "plant," put there by the Gun Recovery Unit so they could find a gun and thus manufacture reasonable suspicion to search the other men. Video posted in the Washington Post and online shows the ugly angry exchange that followed. https://www.youtube.com/watch?v=r_tWbmfGEhE&t=360s

37.     The Gun Recovery Unit also stop and frisk African American men and simply lie about the facts justifying the stop and frisks. The Gun Recovery Unit's stop and frisk of Mr. Crudup and the other Named plaintiffs falls into this category.

38.     Data released by the MPD indicate that about 80% of all stops made by the MPD are of African Americans.

39.     The Gun Recovery Unit of the D.C. police has a practice of subjecting individuals "who fit a certain statistical profile" to "intrusive searches unless they can prove their innocence" "[d]espite lacking any semblance of particularized suspicion when the initial contact is made."

40.     In its efforts to ferret out illegal firearms the District has implemented a "rolling roadblock." Officers randomly trawl "high crime" neighborhoods which are almost always African American neighborhoods asking occupants who fit a certain statistical profile—mostly males in their late teens to early forties—if they possess contraband.

41.     Despite lacking any semblance of particularized suspicion when the initial contact is made, the police subject these individuals to intrusive searches unless they can prove their innocence.

**District's gun control regime**

42.     The District of Columbia Court of Appeals, the highest "state" court in the District of Columbia, continues to hold that "there is no Second Amendment right to carry a concealed firearm in public." Dubose v. United States, 213 A.3d 599, 604 (D.C. 2019).

43.     The District's gun control regime rests on three primary statutes, (1) CPWL (carrying a pistol without a licenses); (2) UF (possessing a firearm without a license); and (3) UA ((possessing a firearm without a license).

## CPWL - total ban on the "open carry" of a hand gun outside of a person's homes or places of business

44.     The District's gun control regime currently allows people to obtain a license to carry a *concealed* handgun outside of their homes and places of business with some restrictions. D.C. Code § 22-4504(a).

45.     But, the District's gun control regime imposes a total ban on the "open carry" of a hand gun outside of a person's homes or places of business because the District will not issue licenses for "open carry."

46.     Thus, a person with a license may walk down the street carrying a loaded handgun providing no one can see it but the same person may not "open carry" a loaded handgun "outside [their] pants for all the honest world to feel."

## UF/ UA

47.     The "UF" statute provides that "[N]o person . . . in the District shall possess or control any firearm, unless the person . . . holds a valid registration certificate for the firearm." D.C. Code § 7-2502.01(a) (2015 Supp.).

48.     The "UA" statute provides that, "Furthermore, no person shall possess ammunition in the District unless he has a valid registration certificate for a firearm." D.C. Code § 7-2506.01(a)(3) (2015 Supp.).

### Total ban on carrying handguns in a vehicle

49.      The District's statute effectively imposes a total ban on carrying handguns in a vehicle.

### Reciprocity in Washington DC

50.      The District of Columbia does not have any reciprocity agreements with other states and currently will not honor any other states concealed carry license.

51.      Twenty one states honor a District of Columbia license to carry a handgun: Alabama, Alaska, Arizona, Arkansas, Idaho, Indiana, Iowa, Kansas, Kentucky, Michigan, Mississippi, Missouri, Nebraska, North Carolina, Ohio, Oklahoma, South Dakota, Tennessee, Utah, Vermont, and Virginia.

52.      Many people arrested for gun offenses in the District have licenses in other states or come from states which do not require licenses.

### Named Plaintiffs' Stop and Frisks and Prosecutions

### The stops and frisks of Messrs Cudrup, Bell, and Burns typify the stop and frisks made by the Gun Recovery Unit

53.      The stops and frisks of Messrs Cudrup, Bell, and Burns typify the stop and frisks made by the Gun Recovery Unit.

54.      Each is a young African American men, each was stopped by the Gun Recovery Unit when he was doing nothing more than walking down the street or sitting in a car, and in each case the Gun Recovery Unit attributed sinister dangerous significance to jittery nerves caused by fear of being accosted by numerous aggressive officers in tactical gear, and in each case the Gun Recovery Unit fabricated facts in a sworn narrative to justify the stop, frisk and searches and arrests knowing the narratives would be relied on by AUSAs making charging decisions and Judges making release/detention decisions.

### Stop and frisk of Mr. Crudup

55.      On Sunday January 12, 2020 at about 11:30 p.m. the then twenty four year old African American Dalonta Crudup was walking down the street in an African American area characterized by the Gun Recovery Unit as a high crimearea (walking southwest on the 2400 block of 14th Street in the District) where by definition the need for self-defense is greatest.

56.      A recent spate of shootings as well as a homicide had occurred in the area.

57.      Mr. Crudup had a virtually non-existent criminal history. He was on a scholarship  at a college in Kentucky. He lived with his mother in Silver Spring, Maryland while in the District of Columbia. Mr. Crudup had a concealed carry permit from Kentucky.

58.      Officer Choi and three other officers of the Gun Recovery Unit (Officer Minzak, Officer Joseph and Officer Laury) were cruising the streets in a vehicle when they turned into the 2400 block of 14th Street and they observed Mr. Crudup walking on the sidewalk with a black backpack in his right hand.

59.      Officer Choy testified under oath in a hearing in Superior Court that what drew the officers' suspicion was that Mr. Crudup was holding the backpack with his right hand, to his waist, but when Mr. Crudup observed the police, he looked over his shoulders, and then he put the backpack on both of his shoulders.

60.      According to the Gerstein1, Officer Laury got out of vehicle to talk to Mr. Crudup. Officer Laury identified herself to Mr. Crudup, asked Mr. Crudup whether he had any weapons on him, and Mr. Crudup replied "no". Officer Laury then asked if there was anything in Mr. Crudup's backpack.

---

[1] A "Gerstein" is a statement of facts intended to support probable cause for an arrest sworn to by the arresting officer under penalty of perjury. The purpose of a Gerstein is to support a prosecutor's request for a hold under D.C. Code § 23-1322(b) and (d);D.C. Code § 23-1331(3)(A).

61.     According to officers' sworn testimony, Mr. Crudup then took his backpack off and continued repeating "I don't have no weapons" and then shook his backpack a few times. When Mr. Crudup shook his backpack, officers said they could hear what seemed to be a hard object. Mr. Crudup then stated it was his phone that made the sound in his backpack. Officer Laury then told Mr. Crudup that she just saw Mr. Crudup with his phone in his hand and Mr. Crudup never placed the phone back in his backpack. Mr. Crudup then took his phone out of his front jacket pocket, not his backpack, and began calling for help.

62.     Officer Choy then tried to grab the bag from Mr. Crudup's immediate possession based, he swore, on safety concerns.

63.     Officer Choy touched the exterior part of the bag and immediately felt what he claimed he recognized to be more than two ounces of marijuana.

64.     When Officer Choy tried to remove the backpack from Mr. Crudup, Mr. Crudup immediately clenched onto the top hook part of the backpack as tightly as possible and would not let go.

65.     Officer Choy then further searched the backpack and observed a black in color pistol.

66.     Mr. Crudup was presented in Superior Court on January 13, 2020. Mr. Crudup was preventively detained pursuant to D.C. Code § 23-1322(b) on the basis of the probable cause statement in Officer Choy's Gerstein pending a preventive detention hearing.

67.     The Judge released Mr. Crudup into High Intensity Supervision custody placed on GPS monitoring. Mr. Crudup remained on GPS monitoring with HISP conditions of release until March 3, 2020 when the government dismissed the case.

68.     But the Gun Recovery Unit's version of events set forth in the Gerstein and Officer Choy's testimony at the Superior Court hearing was fabricated to freate justification for the stop, frisk and search.

69.     The government indicted Mr. Crudup and an AUSA contacted Mr. Crudup's counsel with a plea offer. Mr. Crudup's counsel responded with an email rejecting the offer because of defects in the stop as shown on the BWC. Fifteen minutes later the AUSA emailed back saying the government was dismissing the case.

70.     These facts and the narrative the officers wove from them in sworn statements and sworn testimony are fabrications.

71.     In fact, a large group of officers just walked up to Mr. Crudup and one asked him if he had any weapons.

72.     Mr. Crudup lifts his shirt to show his waistband to show he has nothing stuck in his pants.

73.     The officers back him up against a fence and then tell him it's suspicious the way he's standing against the fence.

74.     The officer then touches the bag and claims to feel what he claims is more than two ounces of marihuana (possession of two ounces is legal under District law).

75.     Mr. Crudup had admitted to smoking marijuana but that is not a crime.

76.     One of the officers claimed to hear a hard object rattling inside.

77.     Mr. Crudup yells "illegal search" and the officers pull the bag away from him.

### Stop and frisk of Mr. Bell

78.     On Monday, April 29th, 2019, at approximately 10:00 p.m. Dontrey Bell was in a parking lot at the 1500 block of Butler Street, S.E. in the District.

79.     Meanwhile, some of the same members of the Gun Recovery Unit (including Officer Choi) were patrolling in the 7th District when they turned into a parking lot of the 1500 block of Butler Street, S.E., when they saw a group of African American young men hanging out in front of 1558 Butler Street SE.

80.     According to the <u>Gerstein</u>, four of the officers - Officer Choy, Officer Minzak, Officer
Anderson and Officer Rogers -got out of their vehicle to make contact with the group, and,
According to the <u>Gerstein</u>, Mr. Bell "took unprovoked flight up the stairs of 1558 Butler Street
S.E.

81.     According to the <u>Gerstein</u>, Officers gave chase and Defendant Bell was stopped on the top
floor of the apartment building. Officer Anderson then asked Defendant Bell if he had any
weapons on him at which time Defendant Bell dropped his hands to his sides. Defendant Bell was
also looking down and taking deep breaths with a blank stare on his face while Officer Anderson
was talking to him. Based on Defendant Bell's nervousness and actions, a pat down for weapons
was conducted. Officer Anderson felt a hard metal object in Defendant Bell's back left pants
pocket which he immediately recognized to be a firearm.

82.     But, these facts are a fabrication.

83.     There was no crowd. The Gun Recovery Unit officers jumped out of their vehicle to run
up the steps, and then the Gun Recovery Unit officers stopped, grabbed and searched Mr. Bell
without Mr. Bell's saying a word.

84.     The officers say they found a gun on Mr. Bell.

85.     On April 30, 2019 Mr. Bell was presented on a charge of CPWL in Superior Court.

86.     Mr. Bell was preventively detained pursuant to D.C. Code § 23-1322(b) on the basis of the
probable cause statement in Officer Minzak's <u>Gerstein</u> pending a preventive detention hearing.

87.     The Judge found probable cause at the hearing based on the officers' fabricated testimony
but the Judge released Mr. Bell into High Intensity Supervision custody and placed him on GPS
monitoring pending the action of the Grand Jury.

88.     A docket entry on 9/11/2019 reads: "Counsel represented that upon further review of the
Body Worn Camera Video he noted some issues that could prove to be dispositive."

89.     On 10/3/2019 the Judge granted the government's motion to dismiss without prejudice.

## Stop and Frisk of David Burns

90.     According to the Gerstein, on February 12, 2018 at about 10:30 p.m. the then 26 year old African American David Burns was sitting in a car with his girlfriend (also African American) in the rear parking lot of 2660 Douglas Pl S.E. in the District smoking a cigarette when several Gun Recovery Unit members in three separate cars (Officer Anderson driver, Officer Henderson front seat passenger, and Officer Joseph Officer Wright driver, Officer Ashley front seat passenger, Officer Hiller and Detective Del Po) rolled into the lot.

91.     According to the Gerstein, Officer Joseph approached the passenger side of the vehicle and started talking to Mr. Burns. He asked the Mr. Burns and his girlfriend whether they had any weapons, to which they said no. Officer Joseph then asked if he could take thirty seconds of their time to check and make sure, and asked to see their waistbands. Another officer, Officer Wright, then approached the vehicle and asked Mr. Burns if he could talk to him and asked him to step out of the car.

92.     According to the Gerstein, because Mr. Burns looked nervous and puzzled, Officers Joseph and Wright escorted him out of the vehicle by controlling both hands believing that he might be armed, and Officer Wright patted him down and felt what he believed was a firearm on his right thigh.

93.     On February 2, 2018 Mr. Burns was presented on a charge of CPWL in Superior Court. Mr. Burns was preventively detained pursuant to D.C. Code § 23-1322(b) on the basis of the probable cause statement in Officer Sherman's Gerstein pending a preventive detention hearing. Mr. Burns waived the preliminary hearing and the Judge released Mr. Burns pending the action of the Grand Jury. Eventually after Mr. Burns filed a motion to suppress the government moved to dismiss the indictment which the Judge granted on April 8, 2018.

94.     The facts present by the officers are a fabricated over-exaggeration. Mr. Burns' behavior was typical of an African American man whose vehicle was swarmed by several police vehicles blocking his vehicle in, who jumped out of their vehicles and swarmed Mr. Burns and his lady companion,  approached by officers who swarmed the car and questioned him and his companion.

### MPD mounted almost insurmountable barriers to obtaining data about stop and frisks

95.     In March 2016, the District of Columbia enacted the Neighborhood Engagement Achieves Results (NEAR) Act of 2016.

96.     One of its key provisions required the D.C. Metropolitan Police Department (MPD) to collect detailed and comprehensive data about stops and frisks the police carry out on the streets of the District. The stop-and-frisk data collection provision called for police officers to collect 14 categories of data for every stop in D.C. including reason for stop, duration for stop, whether stop resulted in arrest, and race and/ or ethnicity of person stopped, and whether the stop resulted in a search.

97.     The D.C. Council allocated funding for data collection to begin in October 2016.

98.     The collection of this data is crucial to ensuring that the police do not unfairly and unconstitutionally focus on people of color when conducting these stops.

99.     But, FOIA requests filed by local watchdog groups in 2017 showed that the data collection requirement had not yet been implemented and so the District and the MPD was not collecting the data about stops and frisks the MPD carry out on the streets of the District.

100.    Over the following year, officials from Mayor Bowser's office and MPD responded to oversight inquiries by the D.C. Council with a shifting and contradictory parade of excuses, the release of recycled and incomplete pre-NEAR data, and even a false claim that the NEAR Act had been "fully implemented."

101.    In fact, in early 2018, the mayor's office released a report stating the NEAR Act had been "fully implemented" when it had not.

102.    In fact, based on Council testimony by top D.C. officials in February 2018 and press statements from MPD in March 2018, it became clear that, two years on, the NEAR Act Stop & Frisk Data collection requirement still had not been implemented, that the District had not touched the money the Council allocated for implementation of the NEAR Act Stop & Frisk Data collection requirement, and the District was no closer to collecting the NEAR Act Stop & Frisk Data than when the Act was passed.

### Traffic Arrest Patterns Raise Particularly Serious Questions about Racial Bias

103.    Meanwhile, the need for the data points required by the NEAR Act has remained acute.

104.    Although African Americans make up forty-seven percent of D.C.'s population, they remain the subjects of the vast majority of all stops, frisks, and uses of force in the District.

105.    A February 2018 investigative report from WUSA9 analyzed pre-NEAR Act data and found that approximately eighty percent of the stops involved a black subject.

106.    In the meantime the data points that the MPD should have been collecting pursuant to the stop-and-frisk data collection provision of the Near Act was being lost because MPD refused to collect it as required.

107.    Some of the data points were available in other media such as in the narrative section in the MPD's databases and in BWC footage.

108.    But, efforts by the ACLU to harvest BWC footage to collect data points about race in stop and frisks revealed the MPD was erecting bureaucratic and financial barriers to citizens' obtaining the data.

109.   "Even if we had the capacity to review 31,000 body-worn camera videos, and even if every traffic stop is just five minutes, that's more than 2,600 hours of footage to get information that could have easily been indicated with a checkbox on a form," an ACLU lawyer said.

110.   The MPD, although willing to produce some of the data points in response to FOIA requests for BWC footage, imposed charges which made obtaining the data points from BWC footage an illusory remedy.

111.   "Over the past three years, an untold amount of information about how policing is conducted in the District has been lost due to the District's stubborn disregard for a law that passed unanimously in the Council," said Nassim Moshiree, Policy Director, ACLU-DC. "One month's worth of data has shown a stark racial disparity in who is being stopped in the District."

112.   Finally in September 2019 the MPD released NEAR Act Stop & Frisk Data which was collected for a four-week period from July 22 to August 18, 2019.

113.   The data indicated that during the period MPD officers conducted 11,600 stops across the city, both of motorists and others. For every 100 stops conducted, the department reported that 60% resulted in a traffic ticket and 20% led to an arrest. The remaining 20% were said to have been stopped as part of an investigation, which can range from someone acting erratically to someone matching the description of a criminal suspect.

114.   Of all stops recorded in the four-week period, 70% were of African Americans, 15% of whites and 7% of Hispanics. African Americans currently make up just under half of the city's population.

115.   The average duration of non-ticket stops (20.7 minutes) was almost twice as high as the duration of ticket stops.

116.    The ACLU found similar racial disparities in arrest data (including certain types of stops resulting in "citations") for the years 2013 to 2017 it obtained from MPD through an open records request.

117.    From 2013 to 2017, African American individuals composed 47% of D.C.'s population but 86% of its arrestees. During this time, African American people were arrested at 10 times the rate of white people. searches were more likely to be conducted in the police districts encompassing Wards 7 and 8 than anywhere else in the city — 20% and 35% the Sixth and Seventh Districts, compared to 17% in the Fifth District (which includes Ward 5) and 4% in the Second District (which includes largely white Wards 2 and 3.)

118.    African American people are disproportionately arrested in over 90% of the District's census tracts, including the whitest parts of the city.

119.    Seventy-eight percent of all people arrested for driving without a permit were African American. That statistic is notable because in many cases, officers have no way of knowing whether a driver possesses a valid permit at the time they order the driver to pull over. As a result, the significant disparity in arrests for this offense may indicate a racial disparity in traffic stops.

## Substantive Allegations for Claims

## Claim 1

### Fourth Amendment Illegal Stop and Frisk Claim

120.    Named Plaintiffs adopt by reference the preceding paragraphs as if fully set forth herein.

121.    The District's Gun Recovery Unit during the Class Period had a pattern and practice of stopping and frisking African American people, especially young African American men, and then searching them, to recover guns, without reasonable suspicion or probable cause to justify the stops or frisks or searches.

122.     Named Plaintiffs were stop and frisked and searched without reasonable suspicion or probable cause to justify the stops or frisks or searches because Gun Recovery Unit had a pattern and practice or custom of stopping, frisking and searching people it encountered without reasonable suspicion or probable cause to justify the stops or frisks or searches and the Chief of Police knowlingly acquiesced in the stops, frisks and searches.

123.     Stopping, frisking and searching Named Plaintiffs' and the other Stop and Frisk Class members pursuant to its pattern or custom violated their 4th Amendment rights because the stops, frisks and searches were without reasonable suspicion of probable cause.

124.     The moving force of the constitutional violations was the Gun Recovery Unit's pattern and practice or custom.

125.     Named Plaintiffs and the other Stop and Frisk Class members suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses that resulted from being stopped, frisked and searched without justification.

126.     The District is liable for the conduct of the Gun Recovery Unit because the Chief of Police, policymaker for the MPD, knew about and encouraged the Gun Recovery Unit to make the stops, frisks and searches without justification and either knew about and encouraged or acquiesced in the Gun Recovery Unit's fabrication of facts to justify the stops, frisks and searches (actually made without justification).

127.     Alternatively, the Chief of Police, policymaker for the MPD, knowingly ignored a practice on the part of the Gun Recovery Unit described herein that was consistent enough to create a custom.

128.     Alternatively, the fact that the government of the District of Columbia failed to "respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the

need will result in constitutional violations" was the moving force behind the Gun Recovery Unit's conduct described herein.

129.    Named Plaintiffs and the other class members are therefore entitled to the relief described herein.

## Claim 2

### Fifth Amendment claim against defendant for fabrication of evidence

130.    Named Plaintiffs adopt by reference the preceding paragraphs as if fully set forth herein.

131.    Members of the Gun Recovery Unit have a custom and pattern and practice of fabricating facts to justify the stops, frisks and searches of African American people, especially young African American men, to frisk and search them for guns.

132.    Members of the Gun Recovery Unit have a custom and pattern and practice of fabricating facts in <u>Gersteins</u> to justify the stops, frisks and searches of African American people, especially young African American men, to frisk and search them for guns, and to induce prosecutors to charge and detain and to prosecute them for gun offenses in the District of Columbia Superior Court.

133.    Members of the Gun Recovery Unit have a custom and pattern and practice of fabricating facts in oral statements to prosecutors in papering conferences to justify the stops, frisks and searches of African American people, especially young African American men, to frisk and search them for guns, and to induce prosecutors to charge and detain and to prosecute them for gun offenses in the District of Columbia Superior Court.

134.    Members of the Gun Recovery Unit know the prosecutors will rely on these fabricated facts have a custom and pattern and practice of fabricating facts.

135.    The District is liable for the conduct of the Gun Recovery Unit because the Chief of Police, policymaker for the MPD, knew about and encouraged the Gun Recovery Unit to make

the stops, frisks and searches without justification and either knew about and encouraged or acquiesced in the Gun Recovery Unit's fabrication of facts to justify the stops, frisks and searches (actually made without justification).

136.    Alternatively, the Chief of Police, policymaker for the MPD, knowingly ignored a practice on the part of the Gun Recovery Unit described herein of fabricating facts to justify the stops, frisks and searches that was consistent enough to create a custom.

137.    Alternatively, the fact that the government of the District of Columbia failed to "respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations" was the moving force behind the Gun Recovery Unit's conduct described herein.

138.    As a direct and proximate result of this conduct, Named plaintiffs and absent class members suffered loss of liberty and physical injuries and emotional distress.

139.    Named Plaintiffs and the other class members are therefore entitled to the relief described herein.

## Claim 3

### § 1983 Liability of District of Columbia under the equal protection clause for the Gun Recovery Unit's stopping, frisking and searching African American people in a racially discriminatory manner

140.    Named Plaintiffs adopt by reference the preceding paragraphs as if fully set forth herein.

141.    The District is liable under the Equal Protection Clause for its policy through the Gun Recovery Unit of intentionally stopping, frisking and searching African American people in a racially discriminatory manner.

142.    Accordingly, Named plaintiffs Class are entitled to damages and other relief as set forth below.

143.    The District is liable for the conduct of the Gun Recovery Unit because the Chief of

Police, policymaker for the MPD, knew about and encouraged the Gun Recovery Unit to make

the stops, frisks and searches without justification and either knew about and encouraged or

acquiesced in the Gun Recovery Unit's fabrication of facts to justify the stops, frisks and searches

(actually made without justification).

144.    Alternatively, the Chief of Police, policymaker for the MPD, knowingly ignored a practice

on the part of the Gun Recovery Unit described herein of fabricating facts to justify the stops, frisks

and searches that was consistent enough to create a custom.

145.    Alternatively, the fact that the government of the District of Columbia failed to "respond to

a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the

need will result in constitutional violations" was the moving force behind the Gun Recovery Unit's

conduct described herein.

146.    As a direct and proximate result of this conduct, Named plaintiffs and absent class

members suffered loss of liberty and physical injuries and emotional distress.

147.    Named Plaintiffs and the other class members are therefore entitled to the relief described

herein.

## RULE 23 ALLEGATIONS

148.    Named Plaintiffs  on behalf of themselves and the classes defined below bring this action

under Rules 23(a) and 23(b)2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of

the following three classes:

**Fourth Amendment Stop, Frisk and Search Class:** Each person who: (1) in the period

beginning three years before the date of filing of the original complaint in this case and going

forward until the date this case is terminated; (2) was stopped, frisked, and searched in the District

of Columbia for violation of any of the District's gun control regime; (3) by the District's Gun

Recovery Unit ; (4) for conduct involving any of, or any combination of, carrying or possessing a pistol or unlicensed firearm or unlicensed ammunition outside their home or place of business; (5) including but not limited to such persons who were also arrested and/or arrested and detained (including subjected to conditions of release).

**Fabrication Stop, Frisk and Search Class:** Each person who: (1) in the period beginning three years before the date of filing of the original complaint in this case and going forward until the date this case is terminated; (2) was stopped, frisked, and searched in the District of Columbia for violation of any of the District's gun control regime; (3) by the District's Gun Recovery Unit ; (4) for conduct involving any of, or any combination of, carrying or possessing a pistol or unlicensed firearm or unlicensed ammunition outside their home or place of business; (5) including but not limited to such persons who were also arrested and/or arrested and detained (including subjected to conditions of release).

**Equal Protection Stop, Frisk and Search Class:** Each **African American** person who: (1) in the period beginning three years before the date of filing of the original complaint in this case and going forward until the date this case is terminated; (2) was stopped, frisked, and/or searched in the District of Columbia for violation of any of the District's gun control regime; (3) by the District's Gun Recovery Unit ; (4) for conduct involving any of, or any combination of, carrying or possessing a pistol or unlicensed firearm or unlicensed ammunition outside their home or place of business; (5) including but not limited to such persons who were also arrested and/or arrested and detained (including subjected to conditions of release).

149.    Certification of these classes under Federal Rule of Civil Procedure 23(b)(2) is appropriate, because the District of Columbia has a policy, pattern, and practice for each claim that has uniformly affected all members the class, and injunctive relief and declaratory judgment and a judgment against the District will benefit each and every plaintiff and class member.

150.    The classes are entitled to injunctive relief including sealing of their stop, arrest and prosecution records and declaring their arrests as legal nullities and the return of their property.

151.    The classes are also entitled to injunctive relief including but not limited to appointment of an outside monitor to monitor the conduct of the Gun Recovery Unit to ensure compliance with the Constitutional provisions on which Plaintiffs base their claims.

152.    Certification of the classes under Federal Rule of Civil Procedure 23(b)(3) is also appropriate, in that common questions of law and fact predominate over any individual questions, and class action treatment is superior for the fair and efficient adjudication of these class claims as detailed below.

153.    The classes are entitled to monetary relief.

154.    Regarding Named Plaintiffs and the other members of the classes defined above, there are no individual questions on the issue of liability, because all members of each of the classes were injured by the same policy and practices.

155.    Among the questions of law and fact common to the classes are:

1)  Whether the District's practices and customs decribed herein violate the Constitution;
2)  whether Named Plaintiffs and the members of the classes are entitled to equitable relief, and, if so, what is the nature of that relief; and
3)  whether a jury can determine the general damages for an entire class using a damages matrix on the basis of a trial using a sample of the class members.

156.    Each of the classes is both so numerous that joinder of all members is impracticable. The exact number of the classes members is unknown to plaintiffs at this time, but the MPD's website and its arrest booking database District of Columbia Superior Court's website show that hundreds and thousands of persons were stop, frisk and searched each year and the and online docketing system, CourtView, shows that each year over the last 3 years hundreds of people were arrested and prosecuted for violations of the District's gun control regime. The NEAR Act data from about

July 22 to August 18, 2019 provides further data about the Gun Recovery Unit's stop, frisk and searches of African Americans.

157.     Mr. Crudup, Mr. Bell, and Mr. Burns' claims are typical of the claims of the other members of the classes of which they are members and all other members of the classes were injured by exactly the same means, that is, by District's enforcement of its unconstitutional gun control regime.

158.     Mr. Crudup, Mr. Bell, and Mr. Burns on behalf of themselves and each of the classes of which they are members will fairly and adequately protect the interests of the members of the classes and have retained counsel who are competent and experienced in complex federal civil rights class action litigation and criminal defense law including the District's unconstitutional gun control regime.

159.     Mr. Crudup, Mr. Bell, and Mr. Burns on behalf of themselves and each of the classes of which they are members have no interests that are contrary to or in conflict with those of the members of each of the classes of which they are members.

## CLASS RELIEF DEMANDS

Mr. Crudup, Mr. Bell, and Mr. Burns as Named Plaintiffs on behalf of themselves and all other members of the classes of which they are members respectfully request that this Court grant the following relief:

**A.**              Enter judgment in their favor on all of their claims;

**B.**              Award Mr. Crudup, Mr. Bell, and Mr. Burns and the other members of the proposed classes nominal damages in connection with any declaration that the District's gun control regime during the Class Period was unconstitutional;

**C.**              Grant a jury trial on all claims so triable;

**D.**         Declare that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) and certifying the classes defined above, and designating  Mr. Crudup, Mr. Bell, and Mr. Burns' as the proper representative of each of the classes of which they are a member and appointing William Claiborne and Michael Bruckheim and Sweta Patel as class counsel;

**E.**         Declare that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b) (2) and 23(b)(3);

**F.**         Award  Mr. Crudup, Mr. Bell, and Mr. Burns and all other members of the classes defined above injunctive relief in the form of sealing their arrest records and prosecution records and declaring their arrests for violations of any of the District's gun control regime legal nullities, and ordering the return of their property and injunctive relief including but not limited to appointment of an outside monitor to monitor the conduct of the Gun Recovery Unit to ensure compliance with the Constitutional provisions on which Plaintiffs base their claims;

**G.**         Award all Named Plaintiffs and class members compensatory and consequential damages in an amount to be determined at trial;

**H.**         Award plaintiffs attorneys' fees and costs incurred in bringing this action under 42 U.S.C. § 1988 or as determined under the "common fund" rule; and

**I.**         Grant such other relief as this Court deems just and proper.

| Respectfully submitted, | Respectfully submitted, |
|---|---|
| /s/ William Claiborne<br>**WILLIAM CLAIBORNE**<br>D.C. Bar # 446579 | /s/ Michael Bruckheim<br>**MICHAEL BRUCKHEIM**<br>D.C. Bar # 455192 |
| Counsel for Plaintiffs | Counsel for Plaintiffs |
| 717 D Street, N.W | 401 E Jefferson St #201 |

| | |
|---|---|
| Suite 300<br>Washington, DC 20004-2815<br>Phone 202/824-0700<br>Email claibornelaw@gmail.com | Rockville, MD 20850<br>(ph) 240-753-8222<br>(fax) 240-556-0300<br>Email michael@brucklaw.com |
| Respectfully submitted,<br><br>/s/ Sweta Patel<br>SWETA PATEL<br>D.C. Bar # 1013010<br><br>1100 H Street, NW<br>Suite 830<br>Washington, DC 20005<br>(ph) 202-930-3464<br>(fax) 240-556-0300<br>Email: patel@brucklaw.com | |

## JURY DEMAND

Plaintiffs demand a jury of six as to all claims so triable.

/s/William Claiborne
WILLIAM CLAIBORNE
D.C. Bar # 446579
Counsel for Plaintiff and the classes