**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DALONTA CRUDUP**
2300 McMahon Road
Apt. 2321
Silver Spring, MD 20902

and

**DONTREY BELL**
1520 Butler Street, SE
Apt. 101
Washington, DC 20020

and

**DAVID BURNS**
6006 Clay Street, NE
Apt. 101
Washington, DC 20019

And

**JOEVANTAE RAMSEY**
3714      Commodore
Joshua Barney Drive,
NE, Washington, DC
20018

**Civil Action No.: 20-cv-01135 (TSC)**

On behalf of themselves and all
others similarly situated,

Plaintiffs

 v.

**GOVERNMENT OF THE
DISTRICT OF COLUMBIA,**

And
    MPD OFFICER SHERMAN ANDERSON (BADGE 7344)
    MPD OFFICER EDDIE CHOI(BADGE 10697)
    MPD OFFICER BRANDON JOSEPH(BADGE 8565)
    MPD OFFICER CHRISTINA LAURY (BADGE 10191)
    MPD OFFICER MARK MINZAK (BADGE 8289)
    MPD OFFICER JUSTIN ROGERS (BADGE 9156)
    MPD OFFICER IATEZAZ TARIQ (BADGE 4771)
    MPD OFFICER NELSON TORRES (BADGE 9997)
    MPD OFFICER JOHNWRIGHT (BADGE 8616)
    in their Individual Capacities and Official Capacities as MPD Officers
    c/o Metropolitan Police Department
    300 Indiana Avenue, NW
    Washington, DC 20001

   Defendants.

## CLASS ACTION
## FIRST AMENDED COMPLAINT AND JURY DEMAND

### Introduction

      Dalonta Crudup, Dontrey Bell, David Burns, and Joevantae Ramsey (sometimes the "Named Plaintiffs"), on behalf of themselves and the classes defined below, by and through counsel Michael Bruckheim, and the law office of Bruckheim & Patel, LLC, bring this action against the Government of the District of Columbia (the "District" or the "District of Columbia") and the named Metropolitan Police Department (MPD) Officer Defendants in their individual and official capacities under 42 U.S.C.A. § 1983 for injuries they suffered during the Class Period because the District, through its policy of stopping, frisking and searching African American people (especially young African American men) looking for guns without reasonable suspicion

or probable cause, fabricating facts to justify the stops, frisks and searches, and intentionally discriminating on the basis of race through its Gun Recovery, violated their Fourth and Fifth Amendment rights.

## Jurisdiction and Venue

1.     This Court has jurisdiction over the Named Plaintiffs' § 1983 claims under 28 U.S.C.A. §1331 and 28 U.S.C.A. §1343(3)-(4).

2.     Venue is proper in this jurisdiction pursuant to 28 U.S.CA. §1391(b) because the events or omissions underlying the claims occurred in this judicial district.

## Parties

3.     Named Plaintiffs and the members of the proposed classes are African American persons who were stopped, frisked and searched for guns by the District's GRU without reasonable suspicion or probable cause, some of whom were arrested, charged or arrested and charged, and detained, and prosecuted in violation of their Fourth, and Fifth Amendment rights.

4.     Defendant the Government of the District of Columbia is a municipal corporation capable of being sued under D.C. Code § 1-102.

5.     Chief Peter Newsham is not a defendant in this lawsuit, but Chief Peter Newsham is the policymaker for the District of Columbia's MPD (Metropolitan Police Department ("MPD"), a department of the government of the District of Columbia. Mayor Muriel Bowser appointed Chief Newsham Interim Chief of Police on September 15, 2016; he was named Chief of the Metropolitan Police Department on February 23, 2017 and sworn in on May 2, 2017.

6.     The GRU ("GRU") is not a defendant but the GRU is a special MPD police unit that focuses on the interdiction and recovery of illegal firearms, and the apprehension of

individuals involved in illegal gun crime. The GRU focuses its efforts almost exclusively on African Americans.

7.      Defendant Sherman Anderson was employed as an MPD officer, acting within the scope of his employment, and under color of law, in connection with the events and allegations described herein.

8.      Defendant Eddie Choi was employed as an MPD officer, acting within the scope of his employment, and under color of law, in connection with the events and allegations described herein.

9.      Defendant Brandon Joseph was employed as an MPD officer, acting within the scope of his employment, and under color of law, in connection with the events and allegations described herein.

10.      Defendant Christina Laury was employed as an MPD officer, acting within the scope of his employment, and under color of law, in connection with the events and allegations described herein.

11.      Defendant Mark Minzak was employed as an MPD officer, acting within the scope of his employment, and under color of law, in connection with the events and allegations described herein.

12.      Defendant Justin Rogers was employed as an MPD officer, acting within the scope of his employment, and under color of law, in connection with the events and allegations described herein.

13.      Defendant Iatezaz Tariq was employed as an MPD officer, acting within the scope of his employment, and under color of law, in connection with the events and allegations described herein.

14.     Defendant Nelson Torres was employed as an MPD officer, acting within the scope of his employment, and under color of law, in connection with the events and allegations described herein.

15.     Defendant John Wright was employed as an MPD officer, acting within the scope of his employment, and under color of law, in connection with the events and allegations described herein.

## Factual Allegations

### The District and its War on Guns and Young African American Men Who Might Carry Them

16.     The MPD's Gun Recovery Unit (GRU) operates with an asserted purpose of removing illegal firearms from the streets of the District of Columbia.

17.     The GRU, however, is not deployed generally throughout *all* neighborhoods of Washington, D.C., which has a residential population that is approximately 43% White. The GRU is mainly deployed in Black or African-American neighborhoods.

18.     While communities in D.C., understandably seek relief and protection from gun related violence, the predominantly Black neighborhoods targeted by the GRU find themselves burdened by another armed force operating lawlessly and terrorizing civilians, the MPD's own Gun Recovery Unit.

19.     The District, through the GRU and in its zeal to find and confiscate illegal guns, has prosecuted a war on the African American citizens in the District, especially young African American men.

20.     The District, through the GRU, established practices and procedures of several armed officers surrounding African American suspects without reasonable suspicion of a crime.

21.     This illegal policy attempts to intimidate suspects into "consenting" to a search that otherwise

5

lacks reasonable suspicion for a stop.

22.     Moreover, the GRU also carries out its mission by fabricating the reasonable suspicion or probable cause required by the Constitution to stop and frisk or search people whom the GRU encounters.

### GUN RECOVERY UNIT

23.     The GRU is a special MPD police unit that focuses on the interdiction and recovery of illegal firearms, and the apprehension of individuals involved in illegal gun crime. The GRU's stated mission is to remove firearms from the streets of the District of Columbia, before they can be used in a violent crime.

24.     As detailed herein, its approaches to citizens are aggressive.

25.     The GRU consists at any one time of twenty to thirty officers and one or more detectives and about three sergeants.

26.     The GRU reports to the Narcotics and Special Investigations Division (NSID). NSID falls under the Investigative Services Bureau which was headed by Chief Peter Newsham when he was Assistant Chief.

27.     The District of Columbia does not deploy the GRU uniformly across the neighborhoods of the District of Columbia.

28.     As a matter of policy, practice and/or custom, the GRU discriminatorily targets neighborhoods in which African-Americans or persons of color predominantly reside.

29.     In a related matter, in connection with "Felon In Possession" gun prosecutions, Mayor Muriel E. Bowser and D.C. Police Chief Peter Newsham working with then U.S. Attorney for the District of Columbia jointly rolled out an initiative in February, 2019, to prosecute certain gun offenses in federal court, which would subject defendants to much

more severe penalties than if prosecuted in local courts. As it turns out, the "citywide" initiative, by design, targeted only predominantly Black neighborhoods (i.e., Police District 5, 6, or 7). This targeting was nominally justified by federal authorities as "focusing on the MPD districts that had the highest incidents of violent crime." Declaration of John Crabb, Jr. at 4, *United States v. John Victor Reed*, No. 19-cr-00093 (D.D.C. July 3, 2020), ECF No. 48-3. In reality, this was a race-based discriminatory deployment of law enforcement resources.

30.     District of Columbia officials, after over a year of such prosecutions now assert that they are shocked to learn that communities of color were discriminatorily targeted. Critically, however, they do now acknowledge that such targeting of law enforcement resources - - even nominally focused on high crime areas - - is discriminatory. D.C. Attorney General Karl Racine in a statement stated "Our office was not consulted on this policy before it was rolled out and did not learn about its discriminatory application until the USAO's [recent] public court filing." D.C. Council member Charles Allen has also acknowledged that the application of law enforcement resources in such a manner "exclusively and, now we know, by design – targets District residents of color via specific police districts."

31.     GRU officers, likewise, are deployed in a targeted and discriminatory manner, in neighborhoods of color.

32.     The GRU further refines the civilians it targets, "mostly males in their late teens to early forties." *See, e.g., United States v. Gross*, 784 F.3d 784, 789 (D.C. Cir. 2015) (Brown, J., concurring).

33.     The manner of GRU officers' deployment and approach to targeted civilians is highly aggressive and forceful.

34.     The GRU are deployed in a manner calculated to convey force and authority well beyond that of an ordinary officer deployed in uniform, with a sidearm, and potentially with a similarly presented partner.

35.     When engaging civilians, GRU officers typically deploy with numerosity of force, with several officers.

36.     Rather than patrolling in a standard uniform, the GRU patrols in "tactical" gear as reflected in the following the pictures.



37.     Weapons are on display when GRU officers approach and engage civilians.

38.     The GRU's forceful and aggressive use of "jump outs" is widely known.

39.     The GRU goes far beyond mere assertive police tactics to convey its force and authority.

40.      The GRU has cultivated and developed itself as an aggressive force to which

compliance is required upon question or request.

41.     The photo below depicts members of the Gun Recovery Unit posing, in what appears

to be a station house, proudly gathered around the GRU's flag.



42.     The banner flag of the GRU reflects the intentionally cultivated image of their

authority that they project to the Black community.

43.     The following image depicts the GRU's banner and message:



44.     This is the message the GRU sends to the community at large. The flag includes prominent identification of the NSID and the "Gun Recovery Unit" of "Washington, D.C."

45.     The centerpiece of the GRU's logo is a skull and crossbones, also known as the "Death's Head" symbol. The Death's Head symbol has historically been used to convey death, danger and lawless piracy. Military units have adopted the image as a logo to denote their ferocity and ruthlessness.

46.     The GRU's logo has modified the traditional Death's Head by adding a bullet hole, quite literally, dead-center in the forehead of the skull.

47.     Above the skull's head are two handguns and handcuffs on either side, depicting the weapons and restraints used by the GRU against civilians.

48.     The ribbon displays the slogan, "VEST UP ONE IN THE CHAMBER," a rallying cry to GRU officers to have their weapons readied for a swift killing.

49.     The MPD admitted in a statement that the above-referenced photo was publicly posted to a Twitter account by a GRU officer.

50.     Law for Black Lives, the community group that filed a complaint about the GRU

posted a petition that stated "The use of this logo is part of a broader campaign designed to inflict terror on low-income communities of color. For the longest, community members have voiced their fear of the Gun Recovery Unit and concern with their policing tactics."

51.    This is the well-known and apparently sanctioned reputation of the GRU, which is understood and implicitly conveyed every time a GRU member approaches a citizen.

52.    Their aggressively forceful reputation is, similarly, advanced through community knowledge of their sheer aggressiveness, including their jump outs.

53.    As a matter of policy and practice, the GRU does not require its officers to possess reasonable articulable suspicion in order to approach and engage civilians.

54.    The policy is so overt that it has been repeatedly acknowledged by District of Columbia courts.

55.    In *United States v. Gross*, 784 F.3d 784 (D.C. Cir. 2015), D.C. Circuit Judge Janice Rogers Brown accurately described the GRU's practice. "Officers randomly trawl high crime neighborhoods asking occupants who fit a certain statistical profile—mostly males in their late teens to early forties—if they possess contraband. Despite lacking any semblance of particularized suspicion when the initial contact is made, the police subject these individuals to intrusive searches unless they can prove their innocence." 784 F.3d at 789 (J. Brown, concurring).

56.    The GRU's racial profiling and tactics reflect a systematic devaluation of Black lives and experiences. As Judge Brown wrote, "As a thought experiment, try to imagine this scene in Georgetown. Would residents of that neighborhood maintain there was no pressure to comply, if the District's police officers patrolled Prospect Street in tactical gear, questioning each person they encountered about whether they were carrying an illegal firearm?" 784

F.3d at 790.

57.    The GRU is boldly overt that they do not require reasonable articulable suspicion before targeting a civilian. In another reported case, GRU officer Jordan Katz attested that he and other GRU officers had targeted a neighborhood ostensibly because it was high crime. Katz stopped an individual and demanded "do you have a gun?" Katz acknowledged that he had not seen "anything that would make me think that [the individual] had a gun." As the D.C. Superior Court noted, like all officers in the District's GRU, "[Officer Katz] asked [the individual] whether he had a weapon, not because he had any suspicion that he did, but because that's his job. He's a gun recover[er]—and he asks everyone. Apparently, he goes down the street asking everyone, do you have a gun." *See Robinson v. United States*, 76 A.3d 329 (D.C. 2013).

58.    In court filings, the District of Columbia claims that the GRU's policy, practice and custom of engaging targeted civilians in the absence of reasonable articulable suspicion is permissible under a narrow constitutional doctrine authorizing voluntary consent by an individual to be questioned.

59.    In application, the GRU's practices go far beyond what is permissible within the existing legal Fourth Amendment framework.

60.    The GRU has a pattern or custom of stopping, frisking and searching people, especially young, African American men, without reasonable suspicion or probable cause.

61.    The GRU's tactic of demanding that young men of color submit to a search is so pervasive that many persons know they must raise their shirts *upon approach* so GRU officers can visually search their bodies.

62.    Officers themselves know that even if nominally permissive words may be used to

"ask" if someone is carrying a gun or to "consent" a search, there is little choice in the matter.

63.     Officers celebrate their abusive authority over young black men.

64.     The following is a photograph of a t-shirt worn by an MPD officer working the Seventh District.



65.     "Let me see that waistband jo" are the words on this officer's t-shirt, referencing a formulation of officer's pervasive "request" for a "consensual" search. The letters jo are an abbreviation for "jump out," one means among many by which officers convey that any appearance of "choice" in the matter is mere window-dressing.

66.     The remainder of the image on this 7D officer's t-shirt includes a grim reaper wearing an MPD badge while holding an assault rifle. The letter "O" in the word "powershift" has been replaced by a Sun Cross, a racist hate symbol.

67.     D.C.'s Seventh District is 92% Black/African American.

68.    The picture of the officer was taken at D.C. Superior Court in June, 2017, at which the officer reportedly brazenly wore this t-shirt in his official capacity on at least three observed occasions. On information and belief, he consorted with other MPD officers wearing this shirt and none filed a complaint. The representations in the shirt are, in fact, a reflection of normal police operations, including in particular those of the GRU.

69.    The t-shirt reflects how openly and notoriously and well-known it is that when the MPD asks a young Black man to show his waistband, or whether he possesses guns and would he mind if officers searched him, there is no real choice in the matter.

70.    While officers may formulate a request for a search in words nominally providing cover as a consensual request, the GRU is a police force to which a person cannot say no.

71.    As Judge Brown wrote, "viewing such an encounter as consensual is roughly equivalent to finding the latest Sasquatch sighting credible." *Gross*, 784 F.3d at 790.

72.    It is a fact of life, a pervasive reality of existence, for young men of color in the neighborhoods targeted by the GRU that they or those whom they know will inevitably be subjected to such demands by the GRU.

73.    A reasonable person, particularly a person of color, innocent of any crime, knows compliance with any "request" of a GRU member may be compelled, with dangerous or forceful consequences.

74.    If a civilian refuses to be questioned or searched, the GRU will compel the search anyways justifying the compelled search based on natural reactions to the aggressive officer approach or based on fabrications.

75.     In this way, GRU officers bootstrap the "suspicious" behavior into a *Terry* "frisk" for weapons ostensibly for "the officers' safety."

76.      The GRU candidly acknowledges their tactics. GRU Officer Katz testified that the GRU's approach is "about observations," specifically "how people react to [the Gun Recovery Unit]." In particular, "[w]hen [Officer Katz] ask[s] people if they have a gun, [he is] looking for a reaction – based on [their] movements after that question." *Robinson*, 76 A.3d at 332.

77.      Members of the GRU also have a practice of stopping people and then frisking them or searching them or their belongings without reasonable suspicion and without any objective facts indicating a person is armed.

78.      The District of Columbia Court of Appeals expressed concern that this approach - - even as benignly described by GRU Officer Katz - - may be rife with bias that causes constitutional rights violations.

> Officer Katz and his team were out looking for guns. To that end, Officer Katz asked everyone if they had a gun, and he looked for a "reaction — based on movements" after that question, and then he evaluated the physical response to that question to determine whether to investigate further. As noted in the recent stop and frisk civil litigation in New York City, "[r]ecent psychological research has . . . provided evidence that officers may be more likely to perceive a movement as indicative of criminality if the officer has been primed to look for signs that 'crime is afoot.'" "'[G]iven the nature of their work on patrol, officers may have a systematic tendency to see and report furtive movements where none objectively exist.'"

*Robinson v. United States*, 76 A.3d 329, 339 (D.C. 2013)(internal citations omitted).

79.      Sometimes the best evidence of a GRU officer's approach, the stop and request for a search, is from body worn camera (BWC) footage.

80.      BWC is preserved and retained in the event of an arrest.

81.      If police categorize an encounter as involving "voluntary cooperativeness of an individual" not only will the BWC not be marked and preserved, but under MPD General Orders it is optional for the officer to even document the encounter.

82.     Whistleblower and MPD Sergeant Charlotte Djossou, in fact, complained to command staff that NSID officers at roll call were openly conversing about ways to violate BWC orders/directives.

83.     Djossou is a 15-year veteran of the MPD, previously honored for her service by Chief Newsham.

84.     Djossou attested to the policy, practice, or custom of racially targeting Black men in January 16, 2020, testimony before the D.C. Council.

85.     Djossou told the Council that when she was assigned to the Narcotics Special Investigation Division (NSID), she complained and "reported its illegal tactics" to supervisors, including that they were "violating 4th Amendment rights." She was met with retaliation.

86.     Djossou then escalated her complaints and in June, 2018, later met with Assistant Chief Robert Contee and told him and other command officials that during roll-call and elsewhere, NSID Officers were being instructed to "target" large groups of people "without probable cause." She attested that she was, thereafter, subject to further retaliation, including by Chief Contee himself.

87.     Contee is the Assistant Chief of the MPD's Investigative Services Bureau which oversees and includes the NSID.

**The GRU's operation in Deanwood on June 13, 2018 illustrates the Unit's practices**

88.     An illustrative example of GRU's modus operandi of stop and frisk is the GRU's operation in Deanwood on June 13, 2018.

89.     Several GRU officers arrived in tactical gear in front of a barbershop where several African American men were sitting outside.

90.     As the officers got out of their vehicles, they told the men that they were interested in a car parked out front because it had overly tinted windows.

91.     But in fact, the officers staged a fake search and find operation. They searched a man who was ostensibly a member of the group but was in fact a "plant," put there by the GRU so they could find a gun and thus manufacture reasonable suspicion to search the other men.

92.     Reflecting widespread knowledge of the GRU's aggressive and unlawful stop and frisk or search tactics, as well as notice to municipality, on June 24, 2018, Advisory Neighborhood Commissioner Anthony Lorenzo Green sent a complaint to Police Chief Newsham and to Mayor Bowser decrying the incident, the GRU's stop and frisk tactics, and making clear that these tactics were viewed as racially discriminatory.

93.     The GRU's stop and frisk tactics are perhaps the most notorious owing to that unit's aggressiveness and their pervasive presence intentionally targeting Black neighborhoods.

94.     The MPD, department-wide, engages in racially discriminatory practices regarding stops and frisks.

**MPD mounted almost insurmountable barriers to obtaining data about stop and frisks**

95.     With consciousness of its guilt and manifesting grossly negligent supervision of its police force in terms of the racially discriminatory and disparate practices department-wide for stops and frisks, the MPD has sought to avoid disclosure even of basic statistics regarding its practices.

96.     In March 2016, the District of Columbia enacted the Neighborhood Engagement Achieves Results (NEAR) Act of 2016.

97.     One of its key provisions required the D.C. Metropolitan Police Department (MPD) to collect detailed and comprehensive data about stops and frisks the police carry out on the

streets of the District.

98.     The stop-and-frisk data collection provision called for police officers to collect 14 categories of data for every stop in D.C. including reason for stop, duration for stop, whether stop resulted in arrest, and race and/ or ethnicity of person stopped, and whether the stop resulted in a search.

99.     The D.C. Council allocated funding for data collection to begin in October 2016, funding the endeavor at one hundred percent (100%) of the MPD's own projected cost for the data collection.

100.    The collection and disclosure of this data is crucial to ensuring that the police do not unfairly and unconstitutionally focus on people of color when conducting these stops.

101.    But, FOIA requests filed by local watchdog groups in 2017 showed that the data collection requirement had not yet been implemented.

102.    The District and the MPD were not collecting the data about stops and frisks carried out by MPD in the District.

103.    Over the following year, officials from Mayor Bowser's office and MPD responded to oversight inquiries by the D.C. Council with a shifting and contradictory parade of excuses and the release of recycled and incomplete pre-NEAR data.

104.    MPD promulgated a false claim that the NEAR Act had been "fully implemented."

105.    In early 2018, the mayor's office released a report stating the NEAR Act had been "fully implemented" when it had not.

106.    Based on Council testimony by top D.C. officials in February 2018 and press statements from MPD in March 2018, it became clear that, two years on, the NEAR Act Stop & Frisk Data collection requirement still had not been implemented.

107.    As of March, 2018, the District had not touched the money the Council allocated for

implementation of the NEAR Act Stop & Frisk Data collection requirement.

108.    As of March, 2018, the District was no closer to collecting the NEAR Act Stop & Frisk Data than when the Act was passed.

109.    Pressed at a D.C. Council oversight hearing on March, 29, 2018, Police Chief Newsham admitted that the MPD was "guilty" of not undertaking the data collection mandate of the NEAR Act. In Newsham's words, "[T]o the extent there has been a delay to this data piece and not a complete understanding of the necessary infrastructure changes that would be required, um, we're guilty."

110.    As data has dripped out, it has confirmed the extraordinary racial disparities in the MPD's stop and frisk practices.

111.    It has also established that the District and the MPD have been misrepresenting and/or underreporting the vast extent of its stop and frisk operations. In February, 2019, testifying regarding the failure to comply with the NEAR Act, Chief Newsham attested that based on a one-year study, the MPD was conducting approximately 1,000 stop and frisks per year.

112.    Finally, in September, 2019, the District released some data encompassing the period of July 22, 2019 through August 18, 2019. During that period the MPD conducted 1,470 frisks or protective pat downs. Extrapolating that figure annually, the MPD is reporting the conduct of approximately 19,000 stop and frisk per year (approximately an 1800% increase from the annual number referenced in Chief Newsham's testimony from seven months prior).

113.    A staggering ninety-three percent (93%) of the frisks were conducted on Black persons.

114.    During that same period, of the 4,278 non-ticket (i.e., non-traffic) stops conducted, eighty-seven percent (87%) were conducted on Black individuals. *Id.*

115.    The reported data for stops by the NSID, generally, during the period of August 1,

2019 through January 31, 2020, is even higher, with 88% of persons in documentable stops being Black and 94% of persons with documentable searches being Black. As per MPD's reporting requirements, no data is required to be recorded for "field contacts" that are categorized by officers as through voluntary cooperation.

116.    Meanwhile, the need for the data points required by the NEAR Act has remained acute. The data produced from the MPD for that one period confirmed and, indeed, was worse that what local watchdogs had discerned from best effort analysis with available limited data.

117.    A February 2018 investigative report from WUSA9 analyzed pre-NEAR Act data and found that approximately eighty percent of the stops involved a black subject.

118.    The local ACLU, which sought to construct an analysis through a time-consuming review of body worn camera footage in the absence of data collection and reporting by the MPD, was advised by the District that it would impose financial charges for the video that made obtaining the data points from BWC footage an illusory remedy.

119.    The ACLU found similar racial disparities in arrest data (including certain types of stops resulting in "citations") for the years 2013 to 2017 it obtained from MPD through an open records request.

120.    From 2013 to 2017, African American individuals composed 47% of D.C.'s population but 86% of its arrestees. During this time, African American people were arrested at 10 times the rate of white people. searches were more likely to be conducted in the police districts encompassing Wards 7 and 8 than anywhere else in the city — 20% and 35% the Sixth and Seventh Districts, compared to 17% in the Fifth District (which includes Ward 5) and 4% in the Second District (which includes largely white Wards 2 and 3.)

121.    African American people are disproportionately arrested in over 90% of the District's census tracts, including the whitest parts of the city.

122.    Seventy-eight percent of all people arrested for driving without a permit were African American. That statistic is notable because in many cases, officers have no way of knowing whether a driver possesses a valid permit at the time they order the driver to pull over. As a result, the significant disparity in arrests for this offense may indicate racial discrimination even in traffic stops.

123.    As additional data has been produced from the NEAR Act, the racial disparity is clear. During the period of July 22, 2019 to December 31, 2019, 8,036 reported stop and frisks were done over that five month period. Every day in the District of Columbia, two (2) White persons are stopped and frisk on average. On average, forty-five (45) Black persons are stopped and frisked every day in D.C. Just two percent (2%) of the searches or frisks turned up a gun or other weapon. Police found weapons on Black persons at about the same rate as White.

124.    The District of Columbia acting through the Mayor's office and the MPD, having been forced to finally disclose stop and frisk data required by the NEAR Act in September, 2019, pledged at that time to hire outside and independent researchers to conduct scientifically valid analysis of the NEAR Act data using "methodologies for discerning racial discrimination in policing."

125.    Reflecting continued failure to supervise, they have yet to do so.

126.    Department-wide discriminatory outcomes permeate all aspects of law enforcement by the MPD. While studies show that marijuana use is equally prevalent among Whites and Blacks, a recent analysis by *The Washington Post* found that "African Americans still account for just under 90 percent of those arrested on all pot-related charges… even as they make up 45 percent of the city's population." Paul Schwartzman and John D. Harden, *D.C. Legalized Marijuana, But One Thing Didn't Change: Almost Everyone Arrested on Pot Charges is Black*, The Washington Post, Sept. 15, 2020.

127.    Given the sharply and discriminatorily targeted enforcement of the GRU, on information and belief, the statistics for the GRU's reported stops and frisk are even more extreme than the Department generally. That is, presuming, that the GRU is in fact reporting its sweeping practices of stopping Black persons in a manner consistent with reporting requirements.

128.    As discussed herein, the GRU's practices are to stop and frisk unlawfully, in the absence of reasonable articulable suspicion, including stops and frisks on the discriminatory basis of color or race.

### Named Plaintiffs' Stop and Frisks and Prosecutions

### The stops and frisks of Messrs Crudup, Bell, Burns, and Ramsey typify the stop and frisks made by the GRU

129.    The stops and frisks of Messrs Crudup, Bell, Burns, and Ramsey typify the stop and frisks made by the GRU.

130.    Each is a young African American man, each was stopped by the GRU when he was doing nothing more than walking down the street or sitting in a car, and in each case the GRU fabricated facts in a sworn narrative to justify the stop, frisk and searches and arrests knowing the narratives would be relied on by AUSAs making charging decisions and Judges making release/ detention decisions.

### Stop and frisk of Dalonta Crudup

131.    On Sunday January 12, 2020 at about 11:30 p.m. Dalonta Crudup was walking alone in the 2400 block of 14th Street, NE in Washington, DC.

132.    This area is an African-American neighborhood that has been dubbed a "high crime area" by MPD.

133.    Mr. Crudup is an African-American male, 23 year of age at the time.

134.    He was wearing a coat, appropriate for the evening and a hooded sweatshirt.

135.     Mr. Crudup was wearing a backpack with one strap over his shoulder.

136.     Officer Choi and three other officers of the GRU (Officer Minzak, Officer Joseph and Officer Laury) were cruising the streets in a vehicle when they turned into the 2400 block of 14th Street.

137.     The vehicle officers were using was an unmarked vehicle, that is, it was not a police cruiser and did not display logos, signs or insignias announcing that it was a police vehicle. Nor did the vehicle have emergency equipment and lights distinguishing it as a police vehicle. The vehicle was a Chevy Malibu.

138.     The officers' vehicle approached Mr. Crudup from behind him.

139.     Mr. Crudup was walking on the sidewalk. To his left were apartment buildings with a waist-high fence on the property line at the edge of the sidewalk.

140.     Officers were not responding to any call for service.

141.     Officers did not have a lookout and were seeking to match an individual with a recently reported crime.

142.     Officers in the approaching and moving vehicle, collectively, only had the opportunity to view Mr. Crudup for just a moment.

143.     Officers had, in fact, just entered the block, the 2400 block of 14th Street, when they observed Mr. Crudup walking.

144.     The officers drove up and stopped just behind Crudup.

145.     All four officers jumped out of their vehicle.

146.     Each of the officers was dressed in full tactical gear and displayed firearms and handcuffs.

147.     As he was the only person walking on the sidewalk, and given the jumping out of four officers of the GRU jumping out to target him, Mr. Crudup knew what he had to do.

148.    It is well known in the neighborhoods that they patrol, that when the GRU jumps out a young Black man needs to lift up his shirt and show his waistband. There is not a choice in the matter.

149.    At the same time Officer Laury says to him, "I'm Officer Lyon, you don't got no weapons on you?" Mr. Crudup lifted his waistband to submit to the visual search by GRU that is a standard part of growing up Black in the neighborhoods in which the GRU patrol.

150.    That did not satisfy the GRU.

151.    Mr. Crudup was now stopped, and he turned to his right.

152.    Mr. Crudup was standing with the fence blocking movement to his rear.

153.    The four officers formed a semi-circle in front and around him.

154.    Office Laury asked Mr. Crudup, "Nothing in your bag?" to which he responded, "weed."

155.    Officer Laury asked if he would mind if she checked his bag, and Mr. Crudup refused consent for the bag search.

156.    Officer Laury then asked "You said what?" To which Mr. Crudup responded, "Can't check it."

157.    Officer Laury then insisted, "would you mind just opening it?"

158.    Mr. Crudup was not free to leave.

159.    After officers pressed him verbally further, Mr. Crudup pivoted and took steps slowly backwards on the sidewalk away from the officers that were in the way of his path.

160.    As Mr. Crudup stepped backwards slowly, Officer Choi extended his arm to block his movement, touching him to further physically convey that he was not free to leave.

161.    The officers were physically and intentionally intimidating, pressing Mr. Crudup with his back up against the fence.

162.    As a "request" from the GRU to "consent" to a search is not a request at all, notwithstanding Mr. Crudup's clear statement that he did not consent to a backpack search, the officers persisted and insisted in an effort to intimidate verbal consent.

163.    Officer Choi said again, "you mind if we check for weapons?" Mr. Crudup shook his head no and said "I don't have no weapons. Can't check it."

164.    At this point, officers have surrounded Mr. Crudup and are about or less than an arm's length distant at most. Mr. Crudup, is now backed against the fence, with his hands on either side of him holding the top rail of the fence as officer encroach closer and closer.

165.    Manufacturing a basis to "justify" a compelled search, Officer Laury then says, "You see the way you are acting is real strange, the way you are bent back across the fence back here."

166.    Officers are now perhaps one foot away from Mr. Crudup, officers use their numerosity to surrounded him on all sides (left, front and right).

167.    Mr. Crudup is not only not free to leave, but officers intimidatingly encroach even closer.

168.    There was no objectively reasonable basis to suspect Mr. Crudup was in possession of contraband. Indeed, Officer Choi testified at the preliminary hearing and admitted that, upon observation and approach, officers did not see a bulge or anything illegal on Mr. Crudup.

169.    Mr. Crudup repeated his refusal: "You all can't check me, you can't check my backpack."

170.    Officer Choi told Mr. Crudup his backpack looks heavy. Mr. Crudup shook it with both hands to show its not really that heavy.

171.    Officer Choi then stated "I heard an object inside."

172.    Having conducted an illegal stop, Officer Choi then took the backpack and conducted an illegal search, a pat down of the exterior of the bag.

173.    Officer Choi then claimed that he felt more than two ounces of marijuana through the fabric of the backpack.

174.    When Officer Choi tried to remove the backpack from Mr. Crudup, Mr. Crudup immediately clenched onto the top hook part of the backpack as tightly as possible and would not let go.

175.    Officer Choi then further searched the backpack and observed a black in color pistol.

176.    Mr. Crudup was presented in Superior Court on January 13, 2020. Mr. Crudup was preventively detained pursuant to D.C. Code § 23-1322(b) on the basis of the probable cause statement in Officer Choi's Gerstein pending a preventive detention hearing.

177.    The Judge released Mr. Crudup into High Intensity Supervision custody placed on GPS monitoring. Mr. Crudup remained on GPS monitoring with HISP conditions of release until March 3, 2020 when the government dismissed the case.

178.    The government indicted Mr. Crudup and an AUSA contacted Mr. Crudup's counsel with a plea offer. Mr. Crudup's counsel responded with an email rejecting the offer because of defects in the stop as shown on the BWC. Fifteen minutes later the AUSA emailed back saying the government was dismissing the case.

179.    These facts and the narrative the officers wove from them in sworn statements and sworn testimony are fabrications.

180.    A Gerstein is a statement of probable cause, sworn under oath.

181.    At a preliminary hearing, witnesses testify under oath as to probable cause for the charged offense.

182.    Officer Choi swore under oath at the preliminary hearing that Mr. Crudup's actions in switching his backpack to both shoulders was suspicious.  This statement was fabricated.

183.    Officer Choi swore in his Gerstein that Mr. Crudup's actions in backing up to the fence was a cause of "concern" for the officers because he was trying to hide his backpack. This statement was fabricated.

184.    In fact, the officer exited their vehicle and all approached Mr. Crudup at the same time.

185.    The officers backed Mr. Crudup up against the fence.

186.    Officer Choi then swore under oath that Mr. Crudup's actions were "suspicious."

187.    Mr. Crudup did not consent to the encounter with the officers.

188.    The officers surrounded Mr. Crudup without reasonable suspicion of a crime, and then grabbed his bag to search it without consent.

189.    The actions by the GRU were done in accordance with the custom, policy and procedures of MPD to manufacture suspicion and arrests of African American men who otherwise were not engaged in suspicious activity.

**Stop and frisk of Dontrey Bell**

190.    On Monday, April 29th, 2019, at approximately 10:00 p.m. Dontrey Bell was in a parking lot at the 1500 block of Butler Street, S.E. in the District.  Dontrey Bell is an African-American male.

191.    Meanwhile, some of the same members of the GRU (including Officers Choi and Minzak) were patrolling in the 7th District when they turned into a parking lot of the 1500 block of Butler Street, S.E., when they saw a group of African American men in front of 1558

Butler Street SE.

192.   According to the Gerstein, four officers - Officer Choi, Officer Minzak, Officer

Anderson and Officer Rogers -got out of their vehicle to make contact with the group.  Mr. Bell

took unprovoked flight up the stairs of 1558 Butler Street, NE.

193.   According to the Gerstein, Officers gave chase and Mr. Bell was stopped on the top

floor of the apartment building. Officer Anderson then asked Mr. Bell if he had any weapons

on him at which time Mr. Bell dropped his hands to his sides.

194.    Based on Mr. Bell's "nervousness" and actions, a pat down for weapons was

conducted.

195.    Mr. Bell did not consent to any search or patdown.

196.    Officer Anderson felt a hard metal object in Mr. Bell's back left pants pocket which

he immediately recognized to be a firearm.

197.   These facts, as sworn in the Gerstein, are fabrications.

198.   When the GRU officers exited their vehicle, there was no crowd.

199.   When the GRU officers, exited their vehicle, Mr. Bell was nowhere in sight.

200.   The GRU officers entered a building and ran up the steps.

201.   Mr. Bell was at the top of the steps.  He wasn't doing anything other than standing

there.

202.   The GRU officers surrounded him and backed him against the wall.

203.   The GRU officers grabbed Mr. Bell and searched him without his consent.

204.   The officers say they found a gun on Mr. Bell.

205.   On April 30, 2019 Mr. Bell was presented on a charge of CPWL in Superior Court.

206.   Mr. Bell was preventively detained pursuant to D.C. Code § 23-1322(b) on the basis of

the probable cause statement in Officer Minzak's Gerstein pending a preventive detention hearing.

207.     The Judge found probable cause at the hearing based on the officers' fabricated testimony but the Judge released Mr. Bell into High Intensity Supervision custody and placed him on GPS monitoring pending the action of the Grand Jury.

208.     On 10/3/2019 the Judge granted the government's motion to dismiss without prejudice.

209.     The actions by the GRU were done in accordance with the custom, policy and procedures of MPD to manufacture suspicion and arrests of African American men who otherwise were not engaged in suspicious activity.

**Stop and Frisk of David Burns**

210.     On February 12, 2018 at about 10:30 p.m, David Burns was sitting in a car with his girlfriend in the rear parking lot of 2660 Douglas Pl S.E. in the District.

211.     Mr. Burns and his girlfriend are American-American.

212.     Mr. Burns was smoking a cigarette when several GRU members in three separate cars (Officer Anderson driver, Officer Henderson front seat passenger, and Officer Joseph Officer Wright driver, Officer Ashley front seat passenger, Officer Hiller and Detective Del Po) rolled into the lot.

213.     According to the Gerstein, Officer Joseph approached the passenger side of the vehicle and started talking to Mr. Burns.

214.     He asked Mr. Burns and his girlfriend whether they had any weapons, to which they said no.

215.     Officer Joseph then asked if he could take thirty seconds of their time to check and

make sure, and asked to see their waistbands.

216.    Before they could answer, Officer Wright, then approached the vehicle and ordered Mr. Burns to step out of the car.

217.    The officer then physically opened the vehicle door. Burns reacted with puzzlement, asking why he was doing that.

218.    Responding to Mr. Burns' obvious nervousness and puzzlement at being accosted by armed police officers for no reason, the officers concluded that they had a basis to seize Mr. Burns.

219.    Officers Joseph and Wright pulled Mr. Burns out of the vehicle.

220.    The officers discovered a firearm on Mr. Burns' person.

221.    On February 2, 2018 Mr. Burns was presented on a charge of CPWL in Superior Court. Mr. Burns was preventively detained pursuant to D.C. Code § 23-1322(b) on the basis of the probable cause statement in the Gerstein pending a preventive detention hearing.

222.    Mr. Burns waived the preliminary hearing and the Judge released Mr. Burns pending the action of the Grand Jury.

223.    After Mr. Burns filed a motion to suppress evidence, the government moved to dismiss the indictment which the Judge granted on April 8, 2018.

224.    The facts that were sworn to under oath in the Gerstein were fabricated.

225.    Mr. Burns was not engaged in any activity that would generate a reasonable suspicion of a crime.

226.    The officers had no basis to suspect him of a crime.

227.    All the officers were armed and in uniform.

228.    The officers manufactured the "nervousness" of Mr. Burns by surrounding Mr.

Burns' vehicle for no reason, and ordering him to exit.

229.    The actions by the GRU were done in accordance with the custom, policy and procedures of MPD to manufacture suspicion and arrests of African American men who otherwise were not engaged in suspicious activity.

**Stop and Frisk of Joevantae Ramsey**

230.    On June 4, 2019, Mr. Ramsey was standing on the sidewalk outside of his home at the time, which was 4505 Douglas Street, NE Washington, DC.

231.    Mr. Ramsey is an African-American male.

232.    Around 2:00 p.m. on that day, he was talking on the phone with a friend.

233.    Police officers from the GRU and other MPD units pulled up in front of his house in a white Impala.  These MPD officers were Wright, Torres and Tariq.

234.    At this time, Mr. Ramsey was approximately 7-8 feet from his front door.

235.    The police were still inside their vehicle when one officer asked "What's going on?"

236.    Not wishing to engage in a consensual encounter with these officers, Mr. Ramsey responded, "Nothing, I am going in the house."

237.    There was no further communication between the officers and Mr. Ramsey.

238.    Mr. Ramsey walked toward his house with his back to the officers.  The officers exited their vehicle and rushed toward Mr. Ramsey.

239.    The officers were armed and dressed in full tactical gear.

240.    At this time, there was no reasonable suspicion that Mr. Ramsey had committed a crime.

241.    Mr. Ramsey entered his house and closed the front door.

242.    The officers…without a warrant…pushed the front door open.

243.    Mr. Ramsey attempted to lock the door, but the officers forced their way through the door and seized Mr. Ramsey.

244.    The police officers did not yell "police" or "stop" prior to forcing themselves into Mr. Ramsey's home.

245.    Following the warrantless seizure inside Mr. Ramsey's home, they discovered a firearm and placed him under arrest.

246.    Based upon this unconstitutional seizure of Mr. Ramsey, these officers applied for a search warrant of Mr. Ramsey's home, which uncovered more contraband.

247.    On June 5, 2019, Mr. Ramsey was presented in courtroom C10 in the District of Columbia Superior Court.

248.    The government presented the Gerstein to the presiding judge, and asked for a hold. The judge granted a hold based upon the alleged facts in the Gerstein.

249.    Many facts in the Gerstein were fabricated.

250.    Mr. Ramsey was detained following his preliminary hearing on June 7, 2019.

251.    Mr. Ramsey's attorney filed a motion to suppress evidence, which was opposed by the government.

252.    Mr. Ramsey was indicted on three counts on September 25, 2019.

253.    Mr. Ramsey's trial date was set for October 7, 2019.

254.    On October 2, 2019, the government filed a motion to dismiss the indictment.

255.    Mr. Ramsey was released on October 2, 2019 after being incarcerated for 119 days.

256.    In the Gerstein, Officer Tariq swore under oath that the officers were looking for a vehicle with individuals believed to be in possession of firearms.

257.    Officer Tariq described an SUV that was believed to contain the individuals.

258.    The officers pursued the SUV but lost sight of it.

259.    The officers then observed Mr. Ramsey.  Officer Tariq swore that Mr. Ramsey was "one of the individuals Officers were looking for."

260.    This statement was a fabrication.

261.    There was no SUV near Mr. Ramsey when officers encountered him.

262.    There was no description of the occupants of the vehicle.

263.    There was no description of an individual matching Mr. Ramsey's description.

264.    Mr. Ramsey's name was not broadcast as a suspect or person of interest.

265.    Mr. Ramsey was not observed in possession of any firearms prior to the officers' search for the mysterious SUV.

266.    The officers had no evidence whatsoever that tied Mr. Ramsey to the SUV.

267.    Based upon the officers' prior knowledge of Mr. Ramsey, they forced their way into his house without a warrant and without any suspicion of a crime.

268.    Officer Tariq fabricated Mr. Ramsey's status as a "suspect" to justify the officers' illegal entry into his home and to ensure that probable cause would be found and that Mr. Ramsey would be incarcerated.

269.    Due to the officers' fabrications under oath and unconstitutional actions, Mr. Ramsey was incarcerated for 119 days.

270.    The actions by the GRU and MPD officers against Mr. Ramsey were done in

accordance with the custom, policy and procedures of MPD to manufacture suspicion and arrests of African American men who otherwise were not engaged in suspicious activity.

## Unconstitutional Policies of the MPD

271.    The Fourth Amendment prohibits officers from conducting stops and frisks without a reasonable articulable suspicion of criminal conduct; frisking persons without a reasonable belief that they are armed or presently dangerous; and searching and seizing persons without probable cause. Constitutional principles of equal protection of the law, as applied within the District of Columbia including through the Due Process Clause of the Fifth Amendment, bars police officers from targeting persons for stops and frisks on the basis of race or color.

272.    The MPD's Gun Recovery Unit (GRU) maintains a policy, practice and/or custom of conducting stops and frisks in the absence of reasonable articulable suspicion of criminal conduct, including engaging in racial profiling and/or targeting on the basis of race and/or color.

273.    The GRU also has a policy, practice and/or custom of coercive and aggressive tactics and shows of authority that render meaningless in application the possibility of voluntary consent by those targeted by the unit for approach and/or "voluntary" consent to be stopped or frisked.

274.    The municipality and Chief Newsham have failed to adequately and properly screen, train, supervise, monitor and/or discipline GRU officers and have encouraged or sanctioned or failed to rectify the MPD and GRU's custom and practice of unconstitutional stops and frisks.

275.    The degree of failure to properly supervise the conduct of stops and frisks is so

severe that, even at the grossest level, the municipality and Chief Newsham have falsely reported or underreported the annual quantity of stops and frisks by a factor of 1,800 percent.

276.    For circumstances described above, the municipality and its Police Chief have known or should have known of the pervasive unconstitutional and racially discriminatory practices with respect to the GRU's stop and frisk activities.

277.    The inadequate screening, training and supervision of the GRU is a direct and proximate cause of its unconstitutional stop and frisk practices.

278.    By failing to properly screen, train, and supervise GRU officers the District and Police Chief Newsham have acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the GRU.

279.    By failing to properly train and supervise MPD officers, department-wide, in the conduct of lawful stop and frisks, the District and Chief Newsham have acted recklessly and with deliberate indifference of the constitutional rights of those who would come into contact with the GRU, among the most aggressive units in the MPD.

## RULE 23 ALLEGATIONS

280.    Named Plaintiffs  on behalf of themselves and the classes defined below bring this action under Rules 23(a) and 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following two classes:

> **Injunctive Relief Class:** Each person who has been or will be subjected by GRU officers to the policy, practice and/or custom of illegally stopping and/or frisking persons: (a) in the absence of the reasonable articulable suspicion of criminal activity that is required by the Fourth Amendment to the United States Constitution,

including but not limited to those persons who have been stopped, or stopped and frisked, (b) in a manner that discriminates on the basis of race and/or color in violation of the equal protection of the law.

**Damages Class**: Each person within the injunctive relief class definition who has been subjected to such violations as set forth in the injunctive relief class definition in the period beginning three years before the date of filing of the original complaint in this case and going forward until the date this case is terminated.

281.    Certification of these classes under Federal Rule of Civil Procedure 23(b)(2) is appropriate, because the District of Columbia has a policy, pattern, and practice for each claim that has uniformly affected all members the class, and injunctive relief and declaratory judgment and a judgment against the District will benefit each and every plaintiff and class member.

282.    Certification of the classes under Federal Rule of Civil Procedure 23(b)(3) is also appropriate, in that common questions of law and fact predominate over any individual questions, and class action treatment is superior for the fair and efficient adjudication of these class claims.

283.    Regarding Named Plaintiffs and the other members of the classes defined above, there are no individual questions on the issue of liability, because all members of each of the classes were injured by the same policy and practices.

284.    Among the questions of law and fact common to the classes are:

1) Whether the GRU engages in a policy, practice and/or custom of conducting stops and frisks in the absence of reasonable articulable suspicion of criminal conduct;
2) Whether the GRU engages in profiling or discrimination on the basis of race or color in targeting the individuals or groups it stops and frisks;
3) Whether the GRU, incidental to such stops and frisks and in general, acts in a

        manner that undermines voluntary consent;

4) Whether the District of Columbia and Chief Newsham have failed to adequately and properly screen, train, supervise, monitor or discipline GRU officers or the GRU, and whether those failures have caused the constitutional violations against class members;

5) Whether the District of Columbia and Chief Newsham have failed to adequately and properly screen, train, supervise, or monitor the conduct of stop and frisk activities by the MPD department-wide or the GRU in particular, and whether those failures have caused the constitutional violations against class members;

6) Whether the District of Columbia and Chief Newsham have encouraged ,sanctioned, and/or failed to rectify the unconstitutional stops and frisks by members of the GRU or the Department in general, and whether such acts and omissions have caused the constitutional violations against class members.

285. Each of the classes is both so numerous that joinder of all members is impracticable. The exact number of the classes members is unknown to plaintiffs at this time. NEAR Act data indicates, District-wide, there are approximately 19,000 stop and frisks per year, a substantial portion of which occur within the police districts focused on by the GRU. Given the size of the GRU, twenty to thirty officers at any time, and their practices, sufficient numerosity exists.

286.  Plaintiffs, including those within the class, as well as the Black residents of the neighborhoods targeted by the GRU, continue to face the imminent likelihood of being subject to the GRU's unconstitutional stop and frisk practices.

287.  Mr. Crudup, Mr. Bell, Mr. Burns and Mr. Ramsey's claims are typical of the claims of the other members of the classes of which they are members and all other members of the classes were injured by exactly the same means, that is, by the challenged stop and frisk practices.

288.  Mr. Crudup, Mr. Bell, Mr. Burns, and Mr. Ramsey on behalf of themselves and each of the classes of which they are members will fairly and adequately protect the interests of the members of the classes and have retained counsel who are competent and experienced in complex federal civil rights class action litigation and criminal defense law.

289.     Mr. Crudup, Mr. Bell, Mr. Burns, and Mr. Ramsey on behalf of themselves and each of the classes of which they are members have no interests that are contrary to or in conflict with those of the members of each of the classes of which they are members.

### Substantive Allegations for Claims

### Claim 1
### Fourth Amendment Illegal Stop and Frisk Claim
### (Class Claims Pursuant to 42 U.S.C. § 1983 Against the District of Columbia for Violations of the Fourth Amendment)

290.     Plaintiffs adopt by reference the allegations in paragraphs 1 - 289 as if fully set forth herein.

291.     The District's GRU has and does maintain a policy, practice and/or custom of illegally stopping and frisking or searching persons (or their possessions) in the absence of reasonable articulable suspicion of criminal activity, as required by the Fourth Amendment to the United States Constitution, including but not limited to persons who have been stopped, or stopped and frisked, on the basis of race and/or color in violation of the Equal Protection Clause, the Due Process Clause, and equal protection of the law.

292.     The District and its Chief of Police have had notice of this practice and have knowingly ignored this practice, which is consistent enough as to constitute custom.

293.     The District and its Chief of Police have failed to respond to the need for oversight of the District's and the GRU's stop and frisk practices in such a manner as to constitute deliberate indifference to the risk that constitutional violations will result.

294.     As a consequence, GRU officers have violated the constitutional rights of the class members by subjecting each to stops and/or frisks in the absence of reasonable articulable suspicion in violation of the Fourth Amendment and 42 U.S.C. § 1983.

295.     Named Plaintiffs and the other Class members suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses that resulted from being stopped, frisked and searched without justification.

296.    Named Plaintiffs and the other class members are therefore entitled to the relief described herein.

**Claim 2**
**Stop and Frisks on the Basis of Race and/or Color**
**(Class Claims Pursuant to 42 U.S.C. § 1983 Against the District of Columbia for Violations of the Equal Protection Clause and the Due Process Clause)**

297.    Plaintiffs adopt by reference the allegations in paragraphs 1- 296 as if fully set forth herein.

298.    The District's GRU has and does maintain a policy, practice and/or custom of illegally stopping and frisking or searching persons (or their possessions) in the absence of reasonable articulable suspicion of criminal activity, as required by the Fourth Amendment to the United States Constitution, including but not limited to persons who have been stopped, or stopped and frisked, on the basis of race and/or color in violation of the Fifth Amendment and equal protection of the law.

299.    The District and its Chief of Police have had notice of this practice and have knowingly ignored this practice, which is consistent enough as to constitute custom.

300.    The District and its Chief of Police have failed to respond to the need for oversight of the District's and the GRU's stop and frisk practices in such a manner as to constitute deliberate indifference to the risk that constitutional violations will result.

301.    As a consequence, GRU officers have violated the constitutional rights of the class members by subjecting each to stops and/or frisks in the absence of reasonable articulable suspicion in violation of the Equal Protection Clause, the Due Process Clause, and 42 U.S.C. § 1983.

302.    Named Plaintiffs and the other Class members suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses that resulted from being stopped, frisked and searched without justification.

303.     Named Plaintiffs and the other class members are therefore entitled to the relief described herein.

**Claim 3**
**Individual Claims of Dalonta Crudup pursuant to 42 U.S.C. § 1983 against Officers Choi, Joseph, Laury, and Minzak in their individual and official capacities**

304.     Plaintiffs adopt by reference the allegations in paragraphs 1-303 as if fully set forth herein.

305.     42 U.S.C. § 1983 provides that "[e]every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress."

306.     Under the Fourth Amendment to the United States Constitution, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend 4.

307.     Defendants Choi, Joseph, Laury and Minzak are "persons" within the meaning of 42 U.S.C. § 1983 and at all times relevant to this action have acted under the color of District of Columbia law.

308.     Defendants Choi, Joseph, Laury and Minzak violated Mr. Crudup's Fourth Amendment rights to be free from unreasonable searches or seizures and to be secure in their effects by stopping and searching Mr. Crudup without reasonable suspicion while acting under color of District law and in performance of their official duties within the ordinary course and scope of their employment.

309.     As a direct and proximate result of Defendants Choi, Joseph, Laury and Minzak's conduct, Mr. Crudup has been injured in several respects, including, without limitation, suffering from an illegal search that resulted in the loss of his freedom, and suffering all attributable to the deprivation of his constitutional and statutory rights guaranteed by the Fourth Amendment to the U.S. Constitution and protected under 42 U.S.C. § 1983.

310.     Defendants Choi, Joseph, Laury and Minzak's conduct was willful, malicious, reckless, and deliberately indifferent to Mr. Crudup's constitutional and statutory rights guaranteed by the Fourth   Amendment to the U.S. Constitution and protected under 42 U.S.C. § 1983.

**Claim 4**
**Individual Claims of Dontrey Bell pursuant to 42 U.S.C. § 1983 against Officers Choi Anderson, Rogers, and Minzak in their individual and official capacities**

311.     Plaintiffs adopt by reference the allegations in paragraphs 1-310 as if fully set forth herein.

312.     42 U.S.C. § 1983 provides that "[e]every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress."

313.     Under the Fourth Amendment to the United States Constitution, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend 4.

314.    Defendants Choi, Anderson, Rogers and Minzak are "persons" within the meaning of 42 U.S.C. § 1983 and at all times relevant to this action have acted under the color of District of Columbia law.

315.    Defendants Choi, Anderson, Rogers and Minzak violated Mr. Bell's Fourth Amendment rights to be free from unreasonable searches or seizures and to be secure in their effects by stopping and searching Mr. Bell without reasonable suspicion while acting under color of District law and in performance of their official duties within the ordinary course and scope of their employment.

316.    As a direct and proximate result of Defendants Choi, Anderson, Rogers and Minzak's conduct, Mr. Bell has been injured in several respects, including, without limitation, suffering from an illegal search that resulted in the loss of his freedom, and suffering all attributable to the deprivation of his constitutional and statutory rights guaranteed by the Fourth Amendment to the U.S. Constitution and protected under 42 U.S.C. § 1983.

317.    Defendants Choi, Anderson, Rogers and Minzak's conduct was willful, malicious, reckless, and deliberately indifferent to Mr. Bell's constitutional and statutory rights guaranteed by the Fourth  Amendment to the U.S. Constitution and protected under 42 U.S.C. § 1983.

**Claim 5**
**(Individual Claims of David Burns against pursuant to 42 U.S.C. § 1983 against Officers Joseph and Wright in their individual and official capacities**

318.    Plaintiffs adopt by reference the allegations in paragraphs 1-317 as if fully set forth herein.

319.    42 U.S.C. § 1983 provides that "[e]every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory or the District of Columbia,

subjects or causes to be subjected, any citizen of the United States…to the deprivation of any

rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

injured in an action at law, suit in equity or other proper proceeding for redress."

320.    Under the Fourth Amendment to the United States Constitution, "[t]he right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures, shall not be violated."  U.S. Const. Amend 4.

321.    Defendants Joseph and Wright are "persons" within the meaning of 42 U.S.C. § 1983

and at all times relevant to this action have acted under the color of District of Columbia law.

322.    Defendants Joseph and Wright violated Mr. Burns' Fourth Amendment rights to be free

from unreasonable searches or seizures and to be secure in their effects by stopping and searching

Mr. Burns without reasonable suspicion while acting under color of District law and in

performance of their official duties within the ordinary course and scope of their employment.

323.    As a direct and proximate result of Defendants Joseph and Wright's conduct, Mr. Burns

has been injured in several respects, including, without limitation, suffering from an illegal

search that resulted in the loss of his freedom, and suffering all attributable to the deprivation of

his constitutional and statutory rights guaranteed by the Fourth Amendment to the U.S.

Constitution and protected under 42 U.S.C. § 1983.

324.    Defendants Joseph and Wright's conduct was willful, malicious, reckless, and

deliberately indifferent to Mr. Burns' constitutional and statutory rights guaranteed by the Fourth

Amendment to the U.S. Constitution and protected under 42 U.S.C. § 1983.

**Claim 6**
**(Individual Claims of Joevantae Ramsey pursuant to 42 U.S.C. § 1983 against**
**Officers Wright, Torres, and Tariq in their individual and official capacities**

325.    Plaintiffs adopt by reference the allegations in paragraphs 1-324 as if fully set forth herein.

326.    42 U.S.C. § 1983 provides that "[e]every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress."

327.    Under the Fourth Amendment to the United States Constitution, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend 4.

328.    Defendants Wright, Torres and Tariq are "persons" within the meaning of 42 U.S.C. § 1983 and at all times relevant to this action have acted under the color of District of Columbia law.

329.    Defendants Wright, Torres and Tariq violated Mr. Ramsey's Fourth Amendment rights to be free from unreasonable searches or seizures and to be secure in their effects by bursting into Mr. Ramsey's home and searching Mr. Ramsey without reasonable suspicion while acting under color of District law and in performance of their official duties within the ordinary course and scope of their employment.

330.    As a direct and proximate result of Defendants Wright, Torres and Tariq's conduct, Mr. Ramsey has been injured in several respects, including, without limitation, suffering from an illegal search that resulted in the loss of his freedom, and suffering all attributable to the deprivation of his constitutional and statutory rights guaranteed by the Fourth Amendment to the U.S. Constitution and protected under 42 U.S.C. § 1983.

331.    Defendants Wright, Torres and Tariq's conduct was willful, malicious, reckless, and deliberately indifferent to Mr. Ramsey's constitutional and statutory rights guaranteed by the Fourth Amendment to the U.S. Constitution and protected under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Honorable Court grant the following relief:

A.    Enter judgment in their favor on all of their claims;

B.    Injunctive relief and equitable relief as deemed necessary and appropriate to prevent recurrence of the constitutional violations, including but not limited to appointment of an outside monitor to monitor the conduct of the GRU to ensure compliance with the Constitutional provisions on which Plaintiffs base their claims;

C.    Injunctive and equitable relief as deemed necessary to prevent future harm from occurring as a consequence of the violations, including sealing all arrest and prosecution records created as a consequence of the illegal stop and/or frisk; and entry of an order declaring all such arrests a legal nullity; and an order to return any property held as a consequence of the underlying violations;

D.    Compensatory damages against the District of Columbia and identified individual defendants for violations of federal rights pursuant to 42 U.S.C. § 1983, in an amount appropriate to the proof adduced at trial;

E.    An award of Plaintiffs' reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 or as determined under the "common fund" rule;

F.    Punitive damages against all named individual defendants.

G.    Such other and further relief, including all appropriate equitable relief, as to the Court may seem just and proper.

## PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE

Respectfully submitted,

BRUCKHEIM & PATEL, LLC

By:    /s/ Michael Bruckheim /s/_____
       MICHAEL BRUCKHEIM [455192]
       401 East Jefferson Street

Suite 201
Rockville, Maryland 20850
 (ph): 240-753-8222
 (fax): 240-556-0300
(E-mail): Michael@brucklaw.com
Attorney for Plaintiffs