## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DALONTA CRUDUP, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br> Defendants. | Civil Action No. 20-1135 (TSC) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

## INTRODUCTION

Members of the Gun Recovery Unit (GRU) of the Metropolitan Police Department (MPD) work in high crime areas with the goal of removing illegal guns from the street, to reduce gun violence. Here, plaintiffs admit that they were illegally carrying firearms in high crime areas but allege that the recoveries of those firearms by GRU officers were the result of unconstitutional stops and searches. Plaintiffs further allege that GRU has a policy of engaging in unconstitutional stops and searches and that its unconstitutional policy is applied disproportionately against African Americans. Plaintiffs' claims have no merit and should be dismissed.

First, plaintiffs fail to allege that they were subject to unconstitutional stops and searches. In each case, as shown in part by the "Gersteins" incorporated into the First Amended Complaint, the officers had reasonable suspicion to support the stops and searches.

1

Second, even assuming plaintiffs' individual claims survive, plaintiffs fail to allege that the District of Columbia (the District) should be held liable for any unconstitutional acts under 42 U.S.C. § 1983 (Section 1983). Plaintiffs do not allege (1) that there was an official policy directing officers to conduct unconstitutional searches, (2) that a final policymaker adopted the unconstitutional acts as policy, (3) that there was a custom or practice to conduct unconstitutional searches, or (4) that the alleged custom or practice of conducting unconstitutional searches stemmed from a final policymaker's deliberate indifference towards properly training officers.

Third, plaintiffs fail to allege a violation of their equal protection rights. Plaintiffs allege that GRU had a policy of engaging in unconstitutional stops and searches. But the Amended Complaint contains only conclusory allegations regarding the racial identity of individuals subjected to unconstitutional stops and searches by GRU. Plaintiffs cite statistics concerning *citywide* stops by MPD when GRU is composed of only 20 to 30 officers who work in high crime areas, making any comparison inapplicable.

Finally, even if plaintiffs have alleged a claim against the individual officers, the officers are entitled to qualified immunity. The issue here is whether, considering the circumstances the officers faced, the officers were reasonably mistaken that they had reasonable suspicion for the stop. If plaintiffs' conduct did not give rise to reasonable suspicion then, at the very least, these were close calls that demonstrate why qualified immunity exists, and why it should protect the individual defendants from liability in this case. Plaintiffs' First Amended Complaint should be dismissed.

## BACKGROUND

### I.   Plaintiffs' Arrests for Illegally Possessing Firearms in Public

Plaintiffs are four African American males. None of them dispute that they were in possession of a firearm without a license. As explained below, that is where the similarities end.

#### A.   The Arrest of Dalonta Crudup

On January 12, 2020, GRU Officers Mark Minzak, Brandon Joseph, Christina Laury and Eddie Choi were on patrol in the 2500 block of 14th Street, Northeast because of several recent shootings and a homicide in that area. *United States v. Crudup*, Statement of Probable Cause by Officer Eddie Choi at 1 (Jan. 13, 2020) (Crudup Gerstein), Ex. 1. The officers were dressed in casual attire wearing outer vests that stated "POLICE." *Id.*

At 11:30 p.m., they observed an individual (Dalonta Crudup) walking on the sidewalk in the same direction that they were driving but ahead of them. Am. Compl. [14] ¶¶ 136–38. He was walking holding a backpack in front of him near his waist. Crudup Gerstein at 1. Crudup then turned, saw the police officers in a car driving towards him, and immediately put his backpack around both shoulders. *Id.* Based on Crudup's reaction, the officers stopped and exited their vehicle. *Id.*

Officer Laury approached Crudup and asked if he had any weapons. Am. Compl. ¶ 149; Crudup Gerstein at 1. Crudup denied having any weapons. *Id.* Officer Laury next asked Crudup what was in his bag. Am. Compl. ¶ 154; Crudup Gerstein at 1. Crudup said his bag contained marijuana. *Id.* During Crudup's exchange with

Officer Laury, Officer Choi observed Crudup turning his body to keep his backpack out of the direct sight of Officer Laury. Crudup Gerstein at 1. Officer Laury asked Crudup if they could search his backpack, which remained on both shoulders. Am. Compl. ¶ 155; Crudup Gerstein at 1. Crudup refused. *Id.* The officers then indicated to Crudup they were concerned about the heaviness of Crudup's backpack. Am. Compl. ¶ 170; Crudup Gerstein at 1. Crudup again denied having a weapon and to prove to the officers that his backpack did not have a weapon in it, he shook his bag. *Id.* When Crudup shook his bag, the officers heard a hard object inside. Am. Compl. ¶ 171; Crudup Gerstein at 1. The officers knew the object was not Crudup's phone because his phone had just been in his hands. Crudup Gerstein at 1. Officer Choi then reached for Crudup's backpack and as soon as he felt it, he could tell that it contained a large amount of marijuana. Am. Compl. ¶¶ 172–73; Crudup Gerstein at 1. Officer Choi proceeded to search the inside of the backpack. Am. Compl. ¶ 175; Crudup Gerstein at 1.

Inside the bag, Officer Choi discovered a .380 caliber handgun with six rounds of ammunition in the magazine, a firearm magazine loaded with eleven rounds, and more than 4 1/2 ounces of marijuana. Crudup Gerstein at 2. On Crudup's person, the officers found 1 1/2 ounces of marijuana, a scale and $399. *Id.*

Crudup was arrested for carrying a pistol without a license, possession with intent to distribute while armed, unregistered ammunition, and possession of a large capacity ammunition feeding device. Crudup Gerstein at 2. On March 3, 2020, the U.S. Attorney dismissed the case against Crudup. Am. Compl. ¶ 177.

### B.    The Arrest of Dontrey Bell

On April 29, 2019, GRU Officers Michael Ashley, Justin Rogers, Eddie Choi and Mark Minzak were on patrol in MPD's Seventh District near the 1500 block of Butler Street, Southeast. *United States v. Bell*, Statement of Probable Cause by Officer Mark Minzak at 1 (Apr. 29, 2019) (Bell Gerstein), Ex. 2. The officers were dressed in casual attire wearing outer vests that stated "POLICE." *Id.*

At 10:00 p.m., they observed a group of individuals in front of an apartment building. Am. Compl. ¶ 190; Bell Gerstein at 1. The officers stopped and exited their vehicle so that they could talk with the group. Am. Compl. ¶ 192; Bell Gerstein at 1. As the officers were getting out of the car, one member of the group (Dontrey Bell) ran unprovoked into the apartment building and up the stairs. Am. Compl. ¶¶ 192–93; Bell Gerstein at 1. The officers pursued him. *Id.* When the officers reached the top of the stairs, Bell was breathing heavily with a "blank stare" on his face. Bell Gerstein at 1. Based on Bell's nervousness and actions, the officers patted him down for weapons. *Id.* They found a revolver in Bell's pants pocket, and he was arrested for carrying a pistol without a license. *Id.* On October 3, 2019, the court granted the U.S. Attorney's motion to dismiss the case against Bell without prejudice. Am. Compl. ¶ 208.

### C.    The Arrest of David Burns

On February 2, 2018, GRU Officers Sherman Anderson, Alton Henderson and Brandon Joseph were on patrol in MPD's Seventh District near 2660 Douglas Place, Southeast. *United States v. Burns*, Statement of Probable Cause by Officer Sherman

Anderson at 1 (Feb. 13, 2018) (Burns Gerstein), Ex. 3. The officers were wearing vests that stated "POLICE." *Id.*

At around 10:30 p.m., they observed a man (David Burns) and a woman sitting inside of a parked car. Am. Compl. ¶¶ 210–11; Burns Gerstein at 1. Burns was in the front passenger seat. Am. Compl. ¶ 213. The officers stopped their car and began to back up so that they could speak with Burns and the woman. Burns Gerstein at 1. As they were backing up, Burns was looking down and his hands were at his waistband. *Id.* Officer Joseph approached Burns and asked if he had any guns in the car. Am. Compl. ¶ 214; Burns Gerstein at 1. Burns said no, and Officer Joseph asked if the officers could take 30 seconds to check. *Id.* Both Burns and the woman began to act nervously when Officer Joseph asked whether he could check if there were any guns in the car. Burns Gerstein at 1. Officer Wright then approached and asked if Burns would mind stepping out of the car so that they could talk. *Id.* Officer Joseph again asked Burns if he had a gun, and this time Burns did not answer and looked at Officer Joseph with a puzzled face. *Id.* The officers then escorted Burns out of the car and patted him down for weapons. *Id.* They found a handgun with 12 rounds of ammunition in the magazine in Burns's right pants leg. *Id.*

Burns was arrested for carrying a pistol without a license and was indicted. Burns Gerstein at 2; Am. Compl. ¶¶ 221–23. On April 8, 2018, the court granted the U.S. Attorney's motion to dismiss the indictment. Am. Compl. ¶ 223.

### D.     The Arrest of Joevantae Ramsey

On June 4, 2019, GRU officers John Wright, Nelson Torres and Iatezaz Tariq were on patrol and were pursuing individuals in an SUV who were believed to have firearms. Am. Compl. ¶¶ 256–58. The officers lost sight of the SUV, but then observed Joevantae Ramsey outside of his house. *Id.* ¶¶ 230–34. The officers thought that Ramsey was one of the individuals they were pursuing. *Id.* ¶ 259. After seeing the officers, Ramsey turned and went towards the house. *Id.* ¶¶ 234–36. The officers pursued Ramsey into his house where they discovered a firearm. *Id.* ¶ 245. He was arrested. *Id.*

On September 25, 2019, Ramsey was indicted on three counts. Am. Compl. ¶ 252. On October 2, 2019, the U.S. Attorney moved to dismiss the indictment. *Id.* ¶ 254.

## II.     Plaintiffs' Lawsuit

On April 30, 2020, plaintiffs Crudup, Bell and Burns filed an initial Complaint against the District of Columbia. Compl. [1]. On September 30, 2020, plaintiffs filed their First Amended Complaint, adding plaintiff Joevantae Ramsey and claims against Officers Sherman Anderson, Eddie Choi, Brandon Joseph, Christina Laury, Mark Minzak, Justin Rogers, Iatezaz Tariq, Nelson Torres and John Wright. *See generally* Am. Compl.

In Count 1 of the Amended Complaint, plaintiffs allege that GRU employs an official policy of stopping and searching individuals without reasonable suspicion in violation of their rights under the Fourth Amendment. *Id.* ¶¶ 290–96. Plaintiffs rely

on eight specific allegations to support their claim that such a policy exists:  (1) the U.S. Attorney's decision to prosecute gun crimes from certain city wards in federal court, *id.* ¶¶ 29–30; (2) comments made by D.C. Circuit Judge Janice Rogers Brown in a 2015 concurring opinion, *id.* ¶¶ 32, 55–56, 71; (3) undated pictures of unidentified GRU officers wearing certain clothing and displaying a flag, *id.* ¶¶ 36–50, 64–69; (4) a 2013 D.C. Court of Appeals opinion discussing the conduct of one non-party GRU officer in 2011, *id.* ¶¶ 57, 76, 78; (5) the statements of non-party MPD Sergeant Charlotte Djossou, *id.* ¶¶ 82–86; (6) a claim that GRU officers planted an undercover officer with a firearm in a group of men standing outside of a barber shop in Deanwood in 2018, so that they could "find" the firearm and use it as a basis to search everyone in the group, *id.* ¶¶ 88–94; (7) data concerning stops made by MPD officers citywide, *id.* ¶¶ 95–128; and (8) the allegedly unconstitutional stops and searches of the plaintiffs.

In Count 2, plaintiffs allege that the unconstitutional policy of GRU identified in Count 1 also violates their equal protection rights, as applied through the Due Process Clause of the Fifth Amendment. *Id.* ¶¶ 297–303. Plaintiffs imply that citywide statistics on stops and searches, *see id.* ¶¶ 95–128, show that the 20 to 30 officers of the GRU are those who stop and search African Americans at a higher rate than others in the communities they patrol. *See id.* ¶¶ 297–303.

In Counts 3 through 6, plaintiffs assert claims under Section 1983 against the respective GRU officers who arrested them, alleging that the stops and searches violated their Fourth Amendment rights. Am. Compl. ¶¶ 311–31. Although the

individual facts and circumstances differ, each plaintiff alleges that GRU officers did not accurately represent what occurred to manufacture reasonable suspicion for the stops and searches. *Id.* ¶ 179 (Crudup); *id.* ¶ 197 (Bell); *id.* ¶ 224 (Burns); *id.* ¶ 249 (Ramsey).

## LEGAL STANDARD

In considering a motion to dismiss, a court "must treat the complaint's factual allegations as true and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotations omitted). "It need not accept as true, however, 'a legal conclusion couched as a factual allegation' or an inference unsupported by the facts set forth in the Complaint. *Mills v. Hayden*, 284 F.Supp.3d 14 (D.D.C. 2018) (quoting *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006)).

Generally, a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Equal Employment Opportunity Comm'n v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997). But "there are some narrow exceptions in which a court may, if it chooses, consider extrinsic documents, such as documents the authenticity of which are not disputed by the parties; … official public records; … documents central to the plaintiff's claim; [and] … documents sufficiently referred to in the complaint without turning the 12(b)(6) motion into a motion for summary judgment." *Newman v. Lehman Bros. Holdings Inc.*, 901 F.3d 19, 25 (1st Cir. 2018) (internal quotations omitted); *see, e.g.*, *Shetty v.*

*JP Morgan Chase Bank NA*, 703 F. App'x 599, 599 (9th Cir. 2017) (finding that district court did not abuse its discretion in considering public records and bankruptcy court documents when deciding motion to dismiss without converting it to a motion for summary judgment).

## ARGUMENT

### I.     Plaintiffs Fail To Allege That Their Fourth Amendment Rights Were Violated Because the Officers Had Reasonable Suspicion To Stop and Search Them (Counts 3-6).

Plaintiffs allege they were stopped and frisked in violation of their Fourth Amendment rights and bring Section 1983 claims against the District and various individually named defendants from the MPD's GRU unit. *See* Am. Compl. ¶¶ 304–31. Because plaintiffs do not sufficiently allege a violation of their Fourth Amendment rights, these claims should be dismissed.[1]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. However, consistent with the Fourth Amendment, a police officer may briefly stop someone to investigate if he has "a reasonable suspicion, grounded in specific and articulable facts" that criminal activity may be afoot. *United*

---

[1]     In the Amended Complaint, plaintiffs arrange their claims so that the claims against the District come *before* their claims against the individual defendants. But if plaintiffs have failed to allege that their constitutional rights were violated, then they have necessarily failed to allege that a municipal policy caused the (non-existent) violations of their rights. Thus, defendants first explain why plaintiffs have failed to allege a violation of their individual rights before explaining why, even assuming plaintiffs' rights have been violated, they have not alleged that the District is liable for any unconstitutional acts.

*States v. Abdus-Price*, 518 F.3d 926, 929 (D.C. Cir. 2008). The reasonable suspicion standard is "not a particularly high bar" and "requires only a minimal level of objective justification." *Id.* When assessing whether the standard has been met, courts should consider the "totality of the circumstances" and not engage in a "divide-and-conquer analysis" that examines whether each fact is "susceptible to an innocent explanation." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Accordingly, "[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct." *Id.* at 277.

Further, courts have consistently held that, while not independently sufficient to support a finding of reasonable suspicion, an individual's presence in a high crime area and an individual's flight from police are important factors to consider. As the U.S. Supreme Court explained:

> An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a *Terry* analysis. In this case, moreover, it was not merely respondent's presence in a high crime area that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus,

11

> the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

*Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000) (internal citations omitted); *see also United States v. Bridges*, 382 F. Supp. 3d 62, 67–68 (D.D.C. 2019) (finding "that the combination of circumstances in this case—the defendant's presence in a high crime area … and his flight from police as they got out of the car—were sufficient to give rise to the reasonable suspicion needed to justify a *Terry* stop under *Wardlow*"); *United States v. Tuten*, 293 F. Supp. 2d 30, 32 (D.D.C. 2003) (finding that officers had "ample" reason to stop defendants where he "was located in a high-crime area, made furtive gestures by turning away, and fled aggressively in response to the police presence").

Here, plaintiffs' Fourth Amendment claims should be dismissed because no named plaintiff suffered a constitutional violation. Plaintiffs' respective claims are addressed below.

### A.    MPD Had Reasonable Suspicion To Stop and Search Plaintiff Crudup.

Plaintiff Crudup alleges that GRU officers stopped and searched him without reasonable suspicion. He is wrong. When examined in totality, Crudup's actions gave the officers sufficient suspicion to stop and search him.

Crudup was in a high crime area. Am. Comp. ¶ 132. In response to seeing police officers, he immediately switched the location of his backpack from the front of his body to over both of his shoulders. Am. Compl. ¶ 182; Crudup Gerstein at 1. Based upon his actions, the officers decided to conduct a brief investigation. Notably, "a seizure does not occur simply because a police officer approaches an individual and

asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' … the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *California v. Hodarie*, 499 U.S. 621, 628 (1991)).

Officer Laury approached Crudup and asked if he had any weapons. Am. Compl. ¶ 149. Officer Laury did not order Crudup to lift his waistband; Crudup voluntarily lifted his waistband to show Officer Laury that he did not have a weapon in that location. *See id.* Officer Laury then asked Crudup what was in his backpack. *Id.* ¶ 154. Crudup told her that he had marijuana in his backpack. *Id.* Importantly, marijuana was the *only* item Crudup said was in the backpack. While possession of less than 2 ounces of marijuana in the District is not a crime, Crudup gave no indication that he possessed marijuana only for personal use, and given that he was storing marijuana in a backpack, it would have been reasonable to infer that he may have been in possession of more than 2 ounces. It is well-established that an officer's suspicion that an individual is involved in the sale of drugs can support a protective frisk.[2]

---

[2]     *See United States v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006) ("an individual's involvement with drug transactions or distribution can support reasonable suspicion to frisk that individual for weapons"); *United States v. Bustos–Torres*, 396 F.3d 935, 943 (8th Cir. 2005) ("[b]ecause weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction"); *United States v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004) ("officers who stop a person who is reasonably suspected of carrying drugs are entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions, and to take reasonable measures to protect themselves") (internal quotation marks omitted).

Although the officers likely would have been justified in patting Crudup down as soon as he admitted to having marijuana in his backpack, they did not search him until they gathered more information. After Crudup admitted to having marijuana in his backpack, the officers commented on the apparent weight of Crudup's bag, which at that time remained on Crudup's shoulders. Am. Compl. ¶ 170. Unsolicited, Crudup took his backpack off his shoulders and shook it for the officers in an apparent attempt to demonstrate that the bag was not actually heavy. *Id.* However, despite his earlier claim that he had only marijuana in his backpack, when Crudup shook his bag, it was clear to the officers that a heavy object was in the bag. *Id.* ¶ 171. The officers had just observed Crudup place his cellphone in his jacket pocket, and therefore knew that the object in his bag was not his phone. Crudup Gerstein at 1.

Based on Crudup's presence in a high crime area, his admission to having drugs in his backpack, and his false statement that he had only marijuana in his bag, the officers were justified in conducting a pat-down search for their protection as well as patting down Crudup's backpack. *United States v. Wills*, 316 F. Supp. 3d 437, 445 (D.D.C. 2018); *see also United States v. Leo*, 792 F.3d 742, 749 (7th Cir. 2015) ("Leo concedes that, under *Terry*, the officers lawfully could have patted down the backpack to search for weapons."). When Officer Choi conducted a pat down of the exterior of Crudup's backpack, he immediately felt an amount of marijuana that was more than 2 ounces; in fact, Crudup had more than 4 ounces in his bag. Crudup Gerstein at 1–2. At that point, Officer Choi was fully justified in conducting a search of the interior of Crudup's bag. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (when a police

14

officer who is conducting a lawful pat-down search for weapons feels something that is plainly contraband, the object may be seized even though it is not a weapon).

Crudup cannot deny that the discovery of an unlicensed pistol in his backpack, among other things, falls squarely under D.C. Code § 22-4504, which prohibits carrying a concealed weapon without a license. Here, Crudup's claim should be dismissed because the officers had sufficient legal cause to stop, search and arrest him. As a result, Crudup has failed to allege a violation of his Fourth Amendment rights and Count 3 should be dismissed.

## B.   MPD Had Reasonable Suspicion To Stop and Search Plaintiff Bell.

Plaintiff Bell alleges that GRU officers stopped and searched him without reasonable suspicion. He, too, is wrong. When examined in totality, Bell's actions gave the officers sufficient suspicion to stop and pat him down for weapons.

The officers' interaction with Bell began when Bell was standing outside of an apartment building. Am. Compl. ¶¶ 191–92. After seeing the officers, Bell fled unprovoked into the building and up the stairs. *Id.* ¶ 192. Bell does not allege that he lived in the apartment building or had any reason to be there other than to avoid an interaction with the police. *Id.* Importantly, the officers did not simply rely on Bell's running away to justify their pat-down search. Once the officers caught up to Bell at the top of the stairs, they did not immediately stop and search him. *Id.* ¶ 193. First, they asked him if he had any weapons. *Id.* Bell dropped his hands to his sides and did not answer. *Id.* According to Officer Minzak, Bell at that time was "taking deep breaths with a blank stare on his face." Bell Gerstein at 1. Based on Bell's unprovoked

15

flight, his lack of responsiveness and his blank stare, the officers had a reasonable basis to be concerned for their safety, and their search was justified. *See Wardlow*, 528 U.S. at 125 ("[f]light, by its very nature, is not going about one's business; in fact, it is just the opposite"). As a result, Bell has failed to allege a violation of his Fourth Amendment rights and Count 4 should be dismissed.[3]

### C.   MPD Had Reasonable Suspicion To Stop and Search Plaintiff Burns.

Plaintiff Burns alleges that GRU officers stopped and searched him without reasonable suspicion. He, too, is wrong. When examined in totality, Burns's actions gave the officers sufficient suspicion to stop and search him for weapons.

When the officers first encountered Burns, he was in a vehicle. *See United States v. Bullock*, 510 F.3d 342, 344–45 (D.C. Cir. 2007) (highlighting the "inordinate risk confronting an officer as he approaches a person seated in an automobile") (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977)). Burns was looking down and his hands were at his waistband. Burns Gerstein at 1. The officers did not search Burns based on that conduct alone. *Id.* After observing Burns's hand movements, the officers asked if he had any weapons, and while Burns said no, when the officers asked if he would mind if they checked the car to be sure, Burns became visibly nervous. *Id.*; *see Wardlow*, 528 U.S. at 125 ("[n]ervous, evasive behavior is another pertinent factor in determining reasonable suspicion").

---

[3]      Although Bell contends that Officer Minzak's statements are "fabrications," *see* Am. Compl. ¶ 197, his allegation is conclusory. Bell alleges no facts that would allow the Court to infer that Officer Minzak intentionally fabricated the facts in the Statement of Probable Cause. *See* Bell Gerstein at 1.

Burns's nervousness at the suggestion that the officers might test his assertion that he did not have a weapon is significant. In response to Burns's reaction, the officers asked again whether Burns had a gun. Burns Gerstein at 1. In response to being asked again, Burns no longer gave an immediate "no" but instead paused and gave the officers a puzzled look. *Id.* Burns's increasing nervousness, his presence in a vehicle, his hesitation when asked again if he had a gun, and his puzzled look in response to being asked whether he had a gun gave the officers sufficient concern for their safety to pat Burns down for weapons. *See Wardlow*, 528 U.S. at 124–25. Because the officers had reasonable suspicion for the search, Burns has failed to allege a violation of his Fourth Amendment rights and Count 5 should be dismissed.[4]

### D.   MPD Had Reasonable Suspicion To Stop and Search Plaintiff Ramsey.

Ramsey alleges that GRU officers stopped and searched him without reasonable suspicion. He is wrong. When examined in totality, Ramsey's actions gave the officers sufficient suspicion to stop and search him.

Officers were looking for a vehicle with individuals believed to be in possession of firearms. Am. Compl. ¶¶ 256–57. Officer Tariq was able to locate the vehicle but subsequently lost sight of it. *Id.* ¶ 258. Before losing sight of the vehicle, Officer Tariq was able to determine that Ramsey was one of the vehicle's occupants. *Id.* ¶ 259. Officer Tariq knew Ramsey from previous encounters. *Id.* ¶ 267. When Officer Tariq

---

[4]    Although Burns contends that Officer Anderson's statements are "fabrications," *see* Am. Compl. ¶ 224, his allegation is conclusory. Burns alleges no facts that would allow the Court to infer that Officer Anderson intentionally fabricated the facts in the Statement of Probable Cause. *See* Burns Gerstein at 1.

approached Ramsey's house and called out to him, asking "what's was going on?", Ramsey denied anything was going on, and retreated into his home. *Id.* ¶¶ 233–36. Based on these circumstances, including that Ramsey was a suspect in an ongoing investigation, the officers could reasonably believe that if they did not pursue Ramsey into the home and search him, Ramsey could destroy evidence. *United States v. Johnson*, 802 F. 2d 1459, 1462 (D.C. Cir. 1986) (the need to preserve evidence that may be lost or destroyed if a search is delayed has long been recognized as an exigent circumstance permitting the warrantless entry of premises). Because the officers had sufficient legal cause for the search, Ramsey has failed to allege a violation of his Fourth Amendment rights and Count 6 should be dismissed.[5]

## II.   Plaintiffs Fail To Allege That the Purported Fourth Amendment Violations Were Caused by a Municipal Policy, Custom or Practice (Count 1).

Local governments, including the District, are "persons" for purposes of Section 1983, but municipal liability cannot be predicated on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690–91 (1978). Rather, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 691).

The D.C. Circuit has identified four ways official municipal policy can be demonstrated:   (1) express municipal policy; (2) actions of a final municipal

---

[5]    Although Ramsey contends that Officer Tariq's statements are "fabrications," *see* Am. Compl. ¶¶ 260, 268, his allegation is conclusory. Ramsey alleges no facts that would allow the Court to infer that Officer Tariq intentionally fabricated testimony.

"policymaker"; (3) persistent conduct by non-policymakers (*i.e.*, "custom" with force of law); and (4) "deliberate indifference" to a risk of constitutional injury. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306–07 (D.C. Cir. 2003) (citations omitted). Each theory has its own "elements," which a Section 1983 plaintiff bears the burden of pleading in accordance with *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015). Additionally, under any theory, a municipal liability claim separately requires proof of causation—specifically, an "affirmative link" between the alleged municipal policy and the alleged constitutional violation, "such that [the former] was the moving force behind the [latter]." *Baker*, 326 F.3d at 1306. The plaintiffs here fail to allege any viable theory of municipal liability.

### A.  Plaintiffs Fail To Identify an Official Policy.

Although plaintiffs generically allege that their stops were caused by a "policy," they make no attempt to identify any express policy concerning unconstitutional stops and searches. Am. Compl. ¶¶ 271–79, 290–96. For example, in *Monell*, the City of New York had an express policy requiring pregnant women to take unpaid leaves of absence before such leaves were required for medical reasons. 436 U.S. at 661. Plaintiffs here do not identify an express policy; therefore, they cannot rely on the express policy theory of liability.

### B.  Plaintiffs Fail To Identify Any Actions by an Official Policymaker.

Municipal liability may exist when a final policymaker either sets the unconstitutional policy or adopts the actions of his subordinates as official policy. *See*

*Sheller-Paire v. Gray*, 888 F. Supp. 2d 34, 40–41 (D.D.C. 2012) (granting motion to dismiss because "the plaintiff has not alleged that a final policymaker acted or adopted the actions of subordinates"). "[A] final decision maker typically must be at least an agency head or the governing body of an agency." *Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 91 (D.D.C. 2011) (internal citations omitted). "If an official's discretionary decisions are constrained by policies not of that official's making, then those policies—rather [than] the official's departure from them—are the act of the municipality." *Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 75 (D.D.C. 2011) (emphasis and internal citations omitted).

"[W]hen determining whether a municipal employee—even the head of an agency—has final policymaking authority, courts in this District look for 'specific provisions in the D.C. Code' that 'grant[ ] the director authority to promulgate rules for the administration of his respective department with regard to the [specific] conduct at issue.'" *Ryan v. District of Columbia*, 306 F. Supp. 3d 334, 342–43 (D.D.C. 2018).

Plaintiffs allege that "Chief Peter Newsham is the policymaker for the District of Columbia's [MPD]." Am. Compl. ¶ 5. But plaintiffs fail to identify any provisions in the D.C. Code that identify Chief Newsham as the official responsible for setting policies concerning stops and searches by GRU. *See Triplett v. District of Columbia*, 108 F.3d 1450, 1451 (D.C. Cir. 1997) (holding that Director of the District's Department of Corrections was not final decision maker); *Coleman*, 828 F. Supp. 2d at 91–92 (holding that Fire Chief of the Fire and Emergency Medical Services

Department was not final policymaker). For that reason alone, any attempt to establish liability under the final policymaker theory should fail.

However, even assuming Chief Newsham does qualify as a final policymaker, plaintiffs do not allege *any* connection between Chief Newsham and the stop and search policies of GRU. They do not allege that he had any awareness of the policy, let alone that he adopted the actions of GRU officers who were allegedly performing unconstitutional stops and searches. Absent such a connection, plaintiffs cannot pursue liability under the final decisionmaker theory.

### C. Plaintiffs Fail To Allege That the Purported Violations of Their Rights Were Caused by a Custom or Practice.

Plaintiffs next allege that municipal liability should exist because the allegedly unconstitutional stops and searches rose to the level of "custom or practice." *See* Am. Compl. ¶¶ 272–73, 291–92.

"When a plaintiff seeks to establish municipal liability in the absence of an explicit policy, he must allege 'concentrated, fully packed, precisely delineated scenarios as proof that an unconstitutional policy or custom exists.'" *Ryan*, 306 F. Supp. 3d at 342–43 (quoting *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013)). "To clear this high hurdle, plaintiffs ordinarily couch 'custom or practice' liability on allegations of practices so persistent and widespread as to practically have the force of law." *Id.*

In addition to identifying many specific examples, plaintiffs must allege that the final policymaker was "faced with actual or constructive knowledge that its agents will probably violate constitutional rights." *Warren*, 353 F.3d at 39; *see also*

21

*Hurd v. District of Columbia*, 427 F. Supp. 3d 21, 34 (D.D.C. 2019) ("[P]laintiffs must demonstrate that a municipality was aware of constitutional violations taking place"); *Sheller-Paire*, 888 F. Supp. 2d at 40–41 ("[P]laintiff does not point to any indication that a final policymaker had actual knowledge or any basis for concluding that plaintiff was being discriminated against based on race or disability"). That is because a "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by [a municipality] itself to violate the Constitution." *Connick*, 563 U.S. at 61–62.

As alleged, plaintiffs' claims of an unconstitutional custom or practice fall well short of the mark.

### 1. The U.S. Attorney's "Felon in Possession" Gun Prosecutions Have Nothing To Do with GRU Policies.

In 2018, the U.S. Attorney's Office for the District of Columbia (USAO) modified its approach to prosecuting cases when a felon is accused of being in possession of a handgun, and the USAO began prosecuting more cases in federal court instead of D.C. Superior Court. Declaration of John Crabb ¶ 9, Criminal Action No. 19-93, *United States v. Reed* (D.D.C. July 3, 2020), Dkt. No. 48-3. The USAO focused its initiative on high crime areas, which were in Wards 5, 6 and 7. *Id.*

As alleged by plaintiffs, D.C. Attorney General Karl Racine and Ward 6 Councilmember Charles Allen expressed concern over whether the initiative was applied in a discriminatory manner. Am. Compl. ¶ 30. Plaintiffs then make a leap in logic and allege that "GRU officers, likewise, are deployed in a targeted and discriminatory manner, in neighborhoods of color." *Id.* ¶ 31. But the charging

22

decisions of a federal law enforcement agency to prosecute cases in federal or local court plainly have no relevance to whether a small number of MPD officers were engaging in unconstitutional stops and searches, and certainly could not have put Chief Newsham on notice that GRU officers were engaging in unconstitutional stops and searches. The Court should disregard these irrelevant allegations.

2.   **D.C. Circuit Judge Janice Rogers Brown's Concurring Opinion in 2015 Did Not Hold That GRU Was Engaging in Unconstitutional Stops and Searches.**

Plaintiffs rely heavily on the D.C. Circuit's opinion in *United States v. Gross*, 784 F.3d 784 (D.C. 2015), *see* Am. Compl. ¶¶ 32, 55–56, 71, but plaintiffs mischaracterize the substance of that decision. When read in context, *Gross* does not support plaintiffs' claim that GRU had a custom or practice of performing unconstitutional stops and searches.

In *Gross*, the D.C. Circuit examined whether a GRU officer effected a seizure of the defendant and concluded that he had not, affirming the district court's decision to deny the defendant's motion to suppress. 784 F.3d at 788. Contrary to plaintiffs' suggestions, the majority opinion in *Gross* never addresses GRU policies or procedures; the opinion only addresses whether Gross was unlawfully seized and concludes that he was not. *Id.* at 785–88. In a concurring opinion, Judge Janice Rogers Brown agreed that affirmance was required under controlling D.C. Circuit precedent but noted that she "continue[s] to think this is error." *Id.* at 789 (Brown, J., concurring). Without citation to evidence in the record, Judge Brown offered her understanding of the methods employed by GRU and the constitutionality of those

methods. *Id.* at 789–91. Judge Brown's understanding of GRU policies seems to have been based solely on *Robinson v. United States*, 76 A.3d 329 (D.C. 2013). However, as explained below, *Robinson* was addressing the conduct of one GRU officer in 2011. *Robinson*, 76 A.3d at 332. The conduct of one officer in 2011 hardly evidences a "widespread and persistent" practice in 2018.

Given the narrow scope of the D.C. Circuit's holding in *Gross*, the lack of support for Judge Brown's assertions regarding GRU policies (beyond *Robinson*) and the fact that *Gross* itself predates the arrests of plaintiffs by several years, this opinion provides no support for plaintiffs' theory of a custom or practice, nor did it serve to place Chief Newsham on notice of the customs or practices of GRU in 2018.

### 3. Pictures of GRU Officers Are Not Probative of Any Custom or Practice.

Plaintiffs' Amended Complaint includes several cherry-picked, undated photographs of a small number of unidentified GRU officers. *See* Am. Compl. ¶¶ 36–50, 64–69. Plaintiffs seem to suggest that the Court should infer that, if the officers at one point took a group picture with certain insignia, or wear "tactical" gear, then they must also have been performing "widespread and persistent" unconstitutional stops and searches. *Id.* ¶¶ 34–53. Plaintiffs' attempt to use character evidence to explain away the glaring omissions in their municipal liability claims should be rejected.

Even assuming plaintiffs are correct that the pictures in the Amended Complaint reflect, at most, decorum that could be misinterpreted as inconsistent with best practices, it would be entirely unreasonable to infer any particular conduct from

such pictures, let alone to infer "widespread and persistent" unconstitutional acts throughout the putative class period. Under plaintiffs' reasoning, those pictures would seemingly evidence any and all alleged unconstitutional acts by GRU officers. Given the complete lack of connection between the pictures and specific examples of unconstitutional stops and searches, the Court should disregard them when considering whether plaintiffs have alleged a custom or practice of unconstitutional stops and searches.

In addition, plaintiffs fail to allege that Chief Newsham was aware of the photographs or that GRU officers were displaying certain insignia or flags. Absent actual or constructive knowledge by Chief Newsham, neither the photographs nor the insignia can support a finding of custom or practice, even if conduct could be inferred from those items (which it cannot).

### 4. The D.C. Court of Appeals' Discussion in 2013 of One GRU Officer's Actions in 2011 Is Not Probative of Custom or Practice in 2018.

As with their treatment of *Gross*, plaintiffs mischaracterize the D.C. Court of Appeals' decision in *Robinson* in an attempt to shoehorn it into their custom or practice theory. *See* Am. Compl. ¶¶ 57, 76, 78.

In *Robinson*, members of GRU were on patrol during the night of November 30, 2011. 76 A.3d at 332. One GRU officer testified that a common question he posed to individuals was whether they have a gun. *Id.* at 333, 338. The officer said he generally asks everyone that question. *Id.* The defendant, Robinson, did not answer the officer's inquiry. *Id.* at 332–33. Subsequently, the officer concluded that

Robinson's lack of answer to his question combined with Robinson's hand gestures provided enough suspicion to search him. *Id.* at 333. The D.C. Court of Appeals held that, on those facts, the officer lacked reasonable suspicion to conduct a search. *Id.* at 340–41. But nothing in *Robinson* suggests that any GRU officer intentionally conducted a search despite knowing that he or she lacked reasonable suspicion, or that GRU officers had a policy or custom of performing stops and searches without reasonable suspicion. The GRU officer in *Robinson* made a judgment call as to whether reasonable suspicion existed, and he concluded that it did. The D.C. Court of Appeals held that he was mistaken. But one officer's reasonable mistake *in 2011* is not evidence of a widespread and pervasive unconstitutional practice in 2018.

### 5. The Statements of Sgt. Charlotte Djossou Contradict Plaintiffs' Allegations and Confirm That MPD Had a Strict Policy Against Tactics Meant To Avoid the Reasonable Suspicion Standard.

Plaintiffs allege that the statements of MPD Sgt. Charlotte Djossou support their claims. Am. Compl. ¶¶ 82–86. They do not. Instead, Sgt. Djossou's statements demonstrate that MPD supervisors quickly and forcefully denounced in 2015 any efforts by officers to avoid constitutional requirements. *See* Complaint, *Djossou v. District of Columbia*, No. 2020 CA 004292 B (D.C. Super. Ct. Oct. 9, 2020) (Djossou Complaint).

According to Sgt. Djossou, in June 2015, she was informed that officers were being instructed to search individuals without probable cause, which she reported to her supervisor, Lt. Mustafa Haamid. Djossou Compl. ¶¶ 17–18. Lt. Haamid told Sgt.

Djossou that such instructions should not be given, and that he would report the issue to Commander Robin Hoey. *Id.* ¶¶ 18–19. On the very next day,

> Commander Hoey sent out an email demanding that all the officers cease those practices. He emphasized that the "jump out style tactics" that focused on minorities were contrary to policy and the directives of the Chief of Police. Commander Hoey emphasized that the [Narcotics and Special Investigations Division (NSID)] "was created to counter this type of activity and no one will put this very good and productive unit in jeopardy by doing things that the [Chief of Police] says [MPD] will never do again. Further anybody who has knowledge of this should bring to my attention and those folks will be removed from this unit. Officials better not be conducting these."

Djossou Compl. ¶ 20. Commander Hoey is still with NSID.[6]

Sgt. Djossou also alleges that in 2018 she heard an officer describe an approach he "intended" to implement, which Sgt. Djossou was concerned would result in unconstitutional stops or searches. *Id.* ¶¶ 29–31. She alerted her supervisors and does not allege that her supervisors failed to take action or that any unconstitutional stops or searches actually occurred. *Id.* ¶¶ 29–34. Sgt. Djossou does not allege that she informed Chief Newsham or that she was aware of Chief Newsham having knowledge of such occurrences. *Id.*

Over a more than 15-year career with MPD, Sgt. Djossou alleges that she observed two incidents of conduct that concerned her regarding potential unconstitutional stops and searches. *Id.* ¶¶ 17, 29–30. She acknowledges that, in 2015, her supervisor clearly and unambiguously informed NSID officers that the

---

[6]  *See Commander Robin Hoey*, Metro. Police Dep't, Wash., D.C., https://mpdc.dc.gov/biography/commander-robin-hoey (last visited Nov. 16, 2020).

tactics she was concerned about were not to occur and that anyone found engaging in such tactics would be removed from the unit. *Id.* ¶ 20. Sgt. Djossou does not allege that she was aware of unconstitutional stops or searches actually happening as a result of these alleged instances in 2015 or 2018.

At the very least, even assuming that Sgt. Djossou's allegations could support a claim that "some" unconstitutional acts may have occurred (they cannot), her allegations do not support plaintiffs' claim that the unconstitutional stops and searches rose to the level of custom or practice, and certainly do not show that Chief Newsham had knowledge of the custom or practice.

### 6. Plaintiffs' Allegations Concerning the Deanwood Barbershop Incident Are Wholly Unsubstantiated.

Plaintiffs also allege that an incident outside of a barbershop in 2018 provides an example of the allegedly unconstitutional stops and searches performed by GRU. Am. Compl. ¶¶ 88–94. But the event plaintiffs describe bears no resemblance to the alleged custom or practice that forms the basis of their lawsuit.

Plaintiffs allege that GRU officers planted an undercover officer with a gun in a group of men gathered outside of a barbershop, and then "discovered" the gun on the undercover officer to manufacture reasonable suspicion to search other individuals in the group. *Id.* ¶¶ 89–91. Even though plaintiffs have no proof that this incident occurred beyond hearsay statements of someone who was apparently not even there, *see id.* ¶ 92 (citing letter from Advisory Neighborhood Commissioner Anthony Lorenzo Green), assuming it did occur as plaintiffs allege, it would not be

evidence of the custom or practice alleged by *these* plaintiffs.[7] Plaintiffs each allege that they were minding their own business when GRU officers stopped and searched them without reasonable suspicion. None of them allege that GRU officers relied on a planted undercover officer to manufacture reasonable suspicion, which is a fundamentally different practice than that alleged by plaintiffs.

Even assuming the Deanwood incident occurred as alleged by plaintiffs, it provides no support for their custom or practice theory in this case because it involves entirely different alleged conduct.

### 7. Citywide Data on All Stops and Searches Is Not Probative of Whether GRU Is Engaging in Unconstitutional Stops and Searches.

Plaintiffs also rely upon data collected by MPD concerning citywide stops and searches. Am. Compl. ¶¶ 95–128. According to plaintiffs, the data shows that African Americans are stopped citywide at a greater rate than non-African Americans. *See, e.g., id.* ¶ 123. Even assuming the data provides insight into *who* is stopped, it says nothing about *how* they were stopped. To support plaintiffs' custom or practice claim, the data would have to show that the stops were conducted in the absence of reasonable suspicion. But nothing alleged in the Amended Complaint would support an inference as to what percentage of those stops were unconstitutional, and there is

---

[7] Chief Newsham directly and unequivocally rejected the claim that any undercover officers were "planted" at the barbershop. *See* Jack Pointer, *DC Police Chief Defends Last Month's Stop-and-Frisk Incident in Northeast*, WTOP (July 12, 2018), https://wtop.com/dc/2018/07/dc-police-chief-defends-last-months-stop-and-frisk-incident-in-northeast/.

certainly nothing to justify inferring from the data that unconstitutional stops were "widespread and pervasive."

As alleged by plaintiffs, GRU officers are "mainly deployed in Black or African-American neighborhoods," and are "not deployed generally throughout *all* neighborhoods of Washington, D.C." *Id.* ¶ 17 (emphasis in original). But that assertion by plaintiffs should preclude them from relying on the proffered data to show an unconstitutionally discriminatory custom or practice of GRU officers specifically. To the extent plaintiffs seek to draw support for their custom or practice claim from a statistical disparity, they would need to allege that the percentage of African Americans stopped and searched by *GRU officers* specifically is higher than the percentage of African Americans who live in the communities patrolled by GRU.

In sum, outside of their own individual allegations, plaintiffs fail to identify a single example of GRU officers performing an unconstitutional stop or search, or to provide any relevant comparator statistics. Even assuming plaintiffs' individual claims have merit, four examples of unconstitutional activity are hardly sufficient to allege a custom or practice sufficient to support municipal liability. *See Carter v. District of Columbia*, 795 F.2d 116, 123 (D.C. Cir. 1986) (rejecting 13 alleged incidents as evidence of a policy and stating that "if the evidence plaintiffs presented here were adequate to make out a § 1983 case, then practically every large metropolitan police force, it would seem, could be targeted for such liability").

**D.** **Plaintiffs Fail To Allege That the Purported Violations of Their Rights Were Caused by Deliberate Indifference.**

In very rare situations, municipal liability may exist because of a failure of the final policymaker to properly train employees. However, to allege a failure-to-train claim, plaintiffs must clear a "high hurdle" because "[a] policy of inadequate training is far more nebulous" than an explicit municipal policy, and a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61 (citations and internal quotation marks omitted).

Plaintiffs must allege facts showing that the District's purported failure to train "amount[ed] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 563 U.S. at 61 (alteration in original) (citations omitted). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* "Ordinarily, to establish deliberate indifference, a plaintiff must allege a pattern of constitutional violations by inadequately trained employees that are similar to the instant violation." *Id.* at 62. Such a pattern demonstrates a "continued adherence to an approach that [the municipality] know[s] or should know has failed to prevent ... [unconstitutional] conduct by employees," and thus "may establish the conscious disregard for the consequences of [its] action—the 'deliberate indifference'—necessary to trigger municipal liability." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997). Therefore, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to

demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62.

Here, plaintiffs' failure-to-train claim fails for the same reasons that their custom or practice claim fails. A failure-to-train claim generally requires plaintiffs to show (1) a pattern of similar constitutional violations, (2) that the final policymaker was aware of the pattern of similar constitutional violations, and (3) that the final policymaker failed to properly train employees despite awareness of the constitutional violations. As explained above, plaintiffs have failed to identify any examples of allegedly similar constitutional violations, and they have failed to allege that Chief Newsham was aware of any pattern of violations. Plaintiffs have also failed to identify any deficiencies in MPD training on searches and seizures. For those reasons, the Court should reject plaintiffs' failure-to-train theory of liability.

## III.  Plaintiffs Fail To Allege a Fifth Amendment Violation of Their Equal Protection Rights and Cannot Establish Municipal Liability Under Section 1983 (Claim 2).

Plaintiffs' equal protection claim also fails on the merits.[8] The basis for the claim is the allegation that the "GRU has and does maintain a policy, practice and/or custom of illegally stopping and frisking or searching persons … in the absence of reasonable articulable suspicion of criminal activity … including … persons who have been stopped, or stopped and frisked, on the basis of race and/or color … ." Am. Compl. ¶ 298. However, plaintiffs have not adequately alleged a discriminatory effect or a

---

[8]    To the extent plaintiffs' equal protection claim relies on a viable theory of municipal liability, it fails for the same reasons as explained in Section II.

discriminatory intent; both are required to sustain a Section 1983 claim for violations of plaintiffs' equal protection rights. *See Smith v. Henderson*, 54 F. Supp. 3d 58, 68–69 (D.D.C. 2014).

A.    **Plaintiffs Fail To Allege Discriminatory Effect Because Their Cited Statistics Are Irrelevant.**

"To advance an equal protection claim, a plaintiff must assert facts that support the allegation that the government intentionally treated him differently from others who were similarly situated and that there is no rational basis for the difference in treatment." *Jones v. Nat'l Council on Disability*, 66 F. Supp. 3d 94, 103 (D.D.C. 2014). By citing a range of statistics, plaintiffs attempt to show that the GRU's activities have resulted in a race-based discriminatory effect.[9] But "[s]tatistics to prove discrimination come in infinite variety and their usefulness depends on all of the surrounding facts and circumstances." *Boykin v. Gray*, 987 F. Supp. 2d 14, 19 (D.D.C. 2013) (quoting *Gallagher v. Magner*, 619 F.3d 823, 837 (8th Cir. 2010)). Just as none of plaintiffs' statistics suffice to demonstrate the existence of a municipal policy, custom or practice, *see* above at 29–30, so too do they fail to establish disparate impact. To begin with, all of plaintiffs' cited statistics apply to NSID or MPD as a whole, rather than GRU specifically; nonetheless plaintiffs conclude that "on information and belief, the statistics for the GRU's reported stops and frisk[s] are

---

[9]    Plaintiffs do not attempt to rely on anecdotal evidence that the GRU treated individual comparable non-African Americans more favorably than African Americans. *See, e.g.*, *United States v. Barry*, Magistrate Case No. 18-00111, 2019 WL 2396266, at *4 (D.D.C. June 5, 2019); *Jones*, 66 F. Supp. 3d at 103; *United States v. Khanu*, 664 F. Supp. 2d 28, 31–33 (D.D.C. 2009).

even more extreme than [MPD] generally." *See* Am. Compl. ¶ 127. And while plaintiffs' proposed damages class spans from April 4, 2017 through the present, *id.* ¶ 280,[10] the proffered statistics are applicable only to small subportions of that period, if a date range is specified at all. *See id.* ¶¶ 112 (between July 22, 2019 and August 18, 2019), 115 (between August 1, 2019 and January 31, 2020), 117 (data date range unspecified), 120 (through unspecified date in 2017), 123 (between July 22, 2019 and December 31, 2019). On these bases alone plaintiffs' statistics should be rejected as inapplicable.

Even if plaintiffs' citations pertaining to MPD could be applied to the GRU in particular, and further assumed to apply to the entire class period, they are still an inadequate basis for alleging disparate impact. Plaintiffs may use statistics to demonstrate disparate impact, but irrelevant statistics obtained by "analytical cherry picking" are insufficient. *Boykin*, 987 F. Supp. 2d at 20 (quoting *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1087 (D.C. Cir. 2011)).

Here, plaintiffs present a handful of metrics to allege, generally, that greater numbers of African Americans than persons of other races are stopped and frisked by MPD. *See* Am. Compl. ¶¶ 113–15, 117, 120–21, 123.[11] But the equal protection

---

[10]     Plaintiffs have not specified any date range for the putative injunctive relief class. *Id.*

[11]     Plaintiffs have not shown why data pertaining to traffic stops and arrests for marijuana-related offenses, Am. Compl. ¶¶ 122, 126, is relevant to the GRU's work in "interdiction and recovery of illegal firearms, and the apprehension of individuals involved in illegal gun crime." *Id.* ¶ 23.

allegations in this case center on "a policy, practice and/or custom of illegally stopping and frisking or searching persons … in the absence of reasonable articulable suspicion of criminal activity … ." *Id.* ¶ 298. Plaintiffs' statistics are inapplicable because they do not demonstrate how many members of various races are "illegally stop[ed] and frisk[ed] or search[ed] … in the absence of reasonable articulable suspicion of criminal activity." *Id.* Plaintiffs cannot simply compare the numbers of African Americans stopped and frisked with the population of the District as a whole, or even the population of particular wards, because that baseline is not specific enough to demonstrate a racial difference in the precise treatment plaintiffs allege they have suffered. *See Gilani v. Matthews*, 843 F.3d 342, 348–49 (8th Cir. 2016); *Chavez v. Ill. State Police*, 251 F.3d 612, 643 (7th Cir. 2001); *see also United States v. Armstrong*, 517 U.S. 456, 469–70 (1996) (rejecting as unsubstantiated the assumption that all crime is committed evenly across racial groups in analyzing statistical evidence). "To do so ignores a crucial characteristic of the law of disparate impact, which is its focus on facially neutral policies that systematically exert discriminatory effects within the population to which they apply." *Boykin*, 986 F. Supp. 2d at 20 (emphasis omitted).

   In other words, if plaintiffs allege there is a GRU policy of conducting illegal stops and frisks, plaintiffs have provided *no* evidence that such a policy is applied in a racially discriminatory manner, that is, applied to African Americans disproportionately but not to persons of other races. Without appropriate comparator evidence, plaintiffs' claim of disparate impact cannot stand. *See Richards v.*

*Gelsomino*, 814 F. Appx. 607, 610–11 (D.C. Cir. 2020); *see also Armstrong*, 517 U.S. at 465 (requiring showing that comparators were treated differently for selective prosecution claim). In essence, "[b]ecause discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." *McCleskey v. Kemp*, 481 U.S. 279, 297 (1987). Plaintiffs' statistical evidence here does not meet that standard and should therefore be rejected.

B.   <u>Plaintiffs Have Not Shown Intentional Discrimination on the Basis of Race.</u>

Even if plaintiffs had successfully pled the existence of a disparate impact, that is not enough for an equal protection claim; plaintiffs must also show an invidious discriminatory purpose. *See Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 42 (D.C. Cir. 2016); *United States v. Johnson*, 40 F.3d 436, 439 (D.C. Cir. 1994) ("It is not enough that a law impacts members of different races differently *in effect*—it must have been passed at least in part with that *purpose*.") (emphasis in original); *Smith*, 54 F. Supp. 3d at 69 ("Run-of-the-mill disparate impact—that is, the fact that a policy disproportionately hurts a certain group—does not clear this hurdle.") (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977)).

As discussed, plaintiffs have failed to show that the District had a policy, custom or practice of intentional discrimination. *See* above 18–32; *see also Smith*, 54 F. Supp. 3d at 73 (rejecting unsourced rumors about discriminatory remarks by government official as double hearsay and inadmissible as evidence of racial

discrimination). And in each of the specific encounters plaintiffs allege they had with the individual GRU officers, plaintiffs do not contend that any officer evinced any racial animus whatsoever towards plaintiffs, or otherwise acted with racially discriminatory intent. *See* Am. Compl. ¶¶ 129–270; *see also id.* ¶¶ 189, 209, 229, 270 (conclusory statements that each action was done "in accordance with the custom, policy and procedures of MPD to manufacture suspicion and arrests of African American men who otherwise were not engaged in suspicious activity"). And plaintiffs' proffered statistics do not provide evidence of racial animus among the individual GRU officer defendants: "[S]tatistical evidence must be directly related to the issues facing the decision-maker" and an equal protection plaintiff must offer "evidence that the decisionmakers in *his* case acted with a discriminatory purpose." *Khanu*, 664 F. Supp. 2d at 33–34 (emphasis in original) (internal quotation omitted) (citing *McCleskey*, 481 U.S. at 292); *see also United States v. Dixon*, 486 F. Supp. 2d 40, 46 (D.D.C. 2007) ("[T]he Court could not draw conclusions (or even reasonable inferences) regarding the motivating reasons for the actions of the specific MPD officers involved in this case by considering general MPD data … .").

Plaintiffs additionally make many generalized claims about a culture of assertiveness within the GRU, but none of these scattershot allegations have any bearing on whether any member of the GRU acted with a racially discriminatory purpose in conducting stops. *See* Am. Compl. ¶¶ 33–52; *see also id.* ¶¶ 64–68 (allegations pertaining to t-shirt worn by an unidentified MPD officer in Superior Court, not while conducting stops and frisks). In fact, taken as a whole, all of

plaintiffs' non-conclusory allegations regarding the GRU show a "zeal to find and confiscate illegal guns," *id.* ¶ 19, consistent with the GRU's mission of "interdiction and recovery of illegal firearms, and the apprehension of individuals involved in illegal gun crime," *id.* ¶ 23, rather than racial discrimination. GRU members patrol areas of the city in which illegal firearms are more often found, *see Gross*, 784 F.3d at 789–90 (Brown, J., concurring); *Robinson*, 76 A.3d at 339–40, and "[t]he affected area is indeed disproportionately African American." *Kingman Park*, 815 F.3d at 42. "But so are many parts of the District." *Id.* The GRU's logical, legitimate and non-discriminatory reason for patrolling the areas it does, combined with plaintiffs' failure to show a discriminatory impact, means plaintiffs' equal protection claim fails. *Id.*; *see also Johnson*, 40 F.3d at 441.

## IV.   The Individual Defendants Are Entitled to Qualified Immunity.

Even if plaintiffs properly alleged violations of the Fourth and Fifth Amendments, their claims should be dismissed because each of the individual defendants are entitled to qualified immunity. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658 (2012)). To defeat the second prong of a claim of qualified immunity, a plaintiff must show that the hypothetical constitutional infringement violated clearly established statutory rights of which a reasonable person would have known. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam); *see also Dukore v. District*

*of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015) (noting that plaintiff bears the burden of showing that the constitutional right in question was clearly established). Crucially, the "clearly established law" must not be defined "at a high level of generality," and instead must address the particular facts and circumstances of the individual case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *see also Wesby*, 138 S. Ct. at 590 ("[T]he crucial question [is] whether the official acted reasonably in the particular circumstances that he or she faced.") (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). In sum, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986)).

Plaintiffs do not rely on "controlling authority" or "a robust consensus of cases of persuasive authority" to show that the challenged conduct of the GRU officers violates the Constitution. *Wesby*, 138 S. Ct. at 589–90. Instead, the principal case they cite in the Amended Complaint *affirmed* that the GRU's tactics were constitutional. *Gross*, 784 F.3d at 787–88; *see also id.* at 789 (Brown, J., concurring) ("Our case law considers such [GRU] policy consistent with the Fourth Amendment."). And *Robinson*, in which the D.C. Court of Appeals found that a 2011 search by non-defendant GRU officers violated a defendant's Fourth Amendment rights, 76 A. 3d 329, does not contribute to "a robust consensus of cases." *Wesby*, 138 S. Ct. at 589–90. Instead, that case held that the defendant there, who was visibly drunk and made "back-and-forth, side-to-side hand motions," had not acted in a way

that gave rise to particularized suspicion. *Robinson*, 76 A.3d at 340. As the Supreme Court has stated, "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present." *Anderson v. Creighton*, 483 U.S. 635, 541 (1987). This is particularly the case given that "reasonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' and that 'the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).

Even if the individual officers in plaintiffs' particular circumstances here were mistaken as to the existence of probable cause, any such mistake was reasonable given the holding in *Gross* and "in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Id.* As such, each individual GRU officer is entitled to qualified immunity, and the claims against them should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant defendants' motion and dismiss plaintiffs' Amended Complaint with prejudice.

Dated:  November 16, 2020.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Duane Blackman*
DUANE BLACKMAN*
RICHARD SOBIECKI [500163]
BRENDAN HEATH [1619960]
Assistant Attorneys General
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
Phone: (202) 805-7640; (202) 805-7512;
(202) 442-9880
Fax: (202) 703-0646
duane.blackman@dc.gov; richard.sobiecki@dc.gov;
brendan.heath@dc.gov

*Counsel for the District of Columbia Defendants*

---

*     Admitted to practice only in the State of New York. Practicing in the District of Columbia under the direct supervision of Fernando Amarillas, a member of the D.C. Bar, pursuant to LCvR 83.2(f).