# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DALONTA CRUDUP,** *et. al.* | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Case No.: 20-cv-01135 (TSC)** |
| **v.** | : | |
| | : | |
| | : | |
| **GOVERNMENT OF THE DISTRICT** | : | |
| **OF COLUMBIA,** *et. al.,* | : | |
| | : | |
| **Defendants.** | : | |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs, by and through undersigned counsel Michael Bruckheim, Sweta Patel, the law office of Bruckheim & Patel, and Carl Messineo respectfully submits this Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint. Plaintiffs respectfully request this Court to deny Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.  In support thereof, Plaintiffs state the following:

### STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. And "[s]econd, only a complaint that states a

plausible claim for relief survives a motion to dismiss." *Id*. at 679, citing *Twombly*, 550 U.S. at 556.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). Therefore, when considering a motion to dismiss, a court must construe a complaint liberally in the plaintiff's favor. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Nevertheless, the court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept plaintiff's legal conclusions. *Id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*,

226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*,

117 F.3d 621, 624–25 (D.C. Cir. 1997).

## ARGUMENT

**I.    EXTRINSIC EVIDENCE CANNOT BE RELIED UPON FOR THE TRUTH OF THE MATTER ASSERTED OR AS FACT SUPPORTING THE MOTION TO DISMISS**

In support of its motion to dismiss, the Government references three Statements of

Probable Cause or *Gerstein* statements, attaching a copy of each to its motion. The Government

asks the Court to receive each of these out-of-court statements for the truth of the matter asserted

in order to resolve disputed facts in its favor.

The Government's invitation should be declined, as clearly violative of the requirement

that the Court treat the complaint's factual allegations as true and grant the Plaintiffs the benefit

of all inferences derived from the averments.

A *Gerstein* statement is not the same as a sworn affidavit of an individual person as may

be received as evidence, even were this on motion for summary judgment. The *Gerstein* is

written by one officer but composed based on hearsay information from multiple witnesses and

other officers. It fails the essential requirement as admissible evidence, to be based on personal

knowledge.  Fed. R. Evid. 602 ("Need for Personal Knowledge"). A *Gerstein* cannot be admitted

as evidence at a trial because it is hearsay. Each officer or witness must testify to their personal

knowledge of allegations contained therein, subject to cross-examination and impeachment. At a

trial, the presentation of testimony occurs after the discovery process, which is essential for

developing the factual bases and testing the truth of the allegations asserted.

The untested hearsay *Gerstein* statements serve a very limited and particular function

within criminal procedure. They are used to make pretrial detention decisions, which

"traditionally have been decided by a magistrate in a non-adversary proceeding on hearsay and written testimony" using "informal modes of proof." *Gerstein v. Pugh*, 420 U.S. 103, 120 (1975); *United States v. Edwards*, 430 A.2d 1321, 1334 (D.C. 1981) (at such proceedings, information presented by the government "may be by proffer and 'need not conform to the rules pertaining to the admissibility of evidence in a court of law.'") (quoting D.C. Code § 23-1322(c)(5) (1973 ed)).

Averments and claims in *Gerstein* constitute an initial government statement, but are often revealed to be unreliable or false through discovery and examination. For instance, body-worn camera that each officer wears during an arrest provide a far more reliable and accurate depiction of events as compared to a statement recounting multiple officers' allegations that are not recorded real-time but documented farther in-time from the event in question.

Although referenced by Plaintiffs in the First Amended Complaint, it is clear that Plaintiffs did not rely on the *Gerstein* statements as central to their claims or as presenting the truth. Plaintiffs drew attention to the false statements contained in these statements and in doing so, pled the averments therein to be disputed. Am Comp. ¶¶ 179, 197 ("These facts, as sworn to in the Gerstein, are fabrications."), 260.

The Ninth Circuit has warned expressly against the use of documents referenced in a complaint for the truth of the matter averred therein, particularly where the averments relate to disputed facts.

"[I]t is improper to assume the truth of an incorporated [by reference] document if such assertions only serve to dispute facts stated in a well-pleaded complaint. This admonition is, of course, consistent with the prohibition against resolving factual disputes at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018).

"If defendants are permitted to present their own version of the facts at the pleading stage – and district courts accept those facts as uncontroverted and true - - it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief. Such undermining of the usual pleading burdens is not the purpose of judicial notice or the incorporation-by-reference doctrine." *Id.*, 899 F.3d at 999.

The District defendant also referenced the civil complaint filed in *Djossou v. District of Columbia*, No. 2020 CA 004292 B (D.C. Super. Ct. Oct. 9, 2020). Def's Memo 26 – 28. The referenced *Djousou* complaint, from which cherry-picked excerpts are reported by the District, was filed *after* the filing of the First Amended Complaint on September 30, 2020. Plainly, the *Djousou* complaint was not incorporated by reference in the Plaintiff's pleading.

No express request is made by the District to take judicial notice of the Superior Court complaint, no copy of the document is submitted by the District, and even were judicial notice taken of the existence of said document in another court's files there is no basis for the Court to accept the truth of the matters asserted therein. As the D.C. Circuit has explained,

> This court has for various purposes taken judicial notice of court records from other cases. For example, in *Jankovic v. International Crisis Group*, 494 F.3d 1080 (D.C. Cir. 2007), a defamation case, we drew on a filing in an unrelated case as a record of what was said. *Id.* at 1088. But we did not, and could not, rely on it for the truth of the matter asserted. *Id.*; *see* 21B Fed. Prac. & Proc. Evid. § 5106.4 (2d ed.) ("[A] court cannot take judicial notice of the truth of a document simply because someone put it in the court's files.").

*Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017).[1]

---

[1] Generally, when a court relies upon matters outside the pleadings, a motion to dismiss must be treated as one for summary judgment, *see* Fed. R. Civ. P. 12(d), which requires notice to the parties and an opportunity to present evidence in support of their respective positions. *Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011). Where, as here, there has been no opportunity for essential discovery, the Court should deny any suggestion or consideration of summary judgment at this very early juncture. Fed. R. Civ. P. 56(d); *Hurd v. District of Columbia*, 864 F.3d 671, 687 (D.C. Cir. 2017); *Alston v. Johnson*, 208 F. Supp. 3d 293, 298 - 299 (D.D.C. 2016).

II.     **PLAINTIFFS HAVE PLEADED SUFFICIENT FACTS TO ALLEGE THAT THE OFFICERS VIOLATED THE PLANTIFFS' FOURTH AMENDMENT RIGHTS BECAUSE THEY DID NOT HAVE REASONABLE SUSPICION TO STOP AND SEARCH THE PLAINTIFFS.**

A.  **The officers willfully violated the Plaintiffs' Fourth Amendment rights when they stopped and searched Plaintiffs without reasonable suspicion.**

Plaintiffs have sufficiently alleged that their constitutional rights were violated.  To state a claim for false arrest under the Fourth Amendment, a plaintiff must allege that he "was arrested against his will and that the arrest was unlawful." *McCarthy v. Kleindienst*, 741 F.2d 1406, 1413 (D.C. Cir. 1984). An arrest is unlawful if it was conducted without probable cause, and "'[g]enerally, probable cause exists where the facts and circumstances within the arresting officer's knowledge, of which he had reasonably trustworthy information, are sufficient in themselves to warrant a reasonable belief that an offense has been or is being committed.'" *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 990 (D.C. Cir. 2014), quoting *Rucker v. United States*, 455 A.2d 889, 891 (D.C. 1983).

The Fourth Amendment of the United States Constitution guarantees the right of people to be secure in their persons and protects them against unreasonable searches and seizures by the police.  U.S. Const. Amend IV.

Warrantless seizures are presumptively unreasonable. *See Katz v. United States,* 389 U.S. 347, 357 (1967). There are very few exceptions to this time-honored rule. *See Id.* Courts cannot authorize an "on-the-street warrantless search of a person's effects based upon a police officer's suspicion or hunch." *United States v. Boswell,* 347 A.2d 270, 276 (D.C. 1975). Rather, when a person is arrested without a warrant, the government bears the burden of proving the propriety of such action if any evidence resulting from the seizure is to be used at trial. *See Malcolm v. United States,* 332 A.2d 917, 918 (D.C. 1975).

There are three types of permissible encounters between the police and citizens which do not violate the Fourth Amendment: (1) consensual encounters, which do not require any level of suspicion prior to initiation; (2) investigative detentions, which if nonconsensual, must be supported by a reasonable, articulable suspicion of criminal activity prior to initiation; and (3) arrest, which must be supported by probable cause prior to initiation. *Gordon v. United States*, 120 A.3d 73, 78 (D.C. 2015). Both investigative detentions and arrests are seizures under the Fourth Amendment; mere consensual encounters are not. *Id.*

Investigatory stops are only permitted if a reasonably prudent officer, with the facts available at the time of the stop, would view the information as logically inferring that the stop was justified. *See Coolidge v. New Hampshire,* 403 U.S. 443, 455 (1971). This is an objective test, and cannot be judged by the subjective "intuition" or "good faith efforts" of the officer involved in the stop. *See e.g., Terry v. Ohio*, 392 U.S. 1 (1968). The Supreme Court has repeatedly concluded that the courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu,* 534 U.S. at 273, 122 S.Ct. 744 (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). An officer's "inchoate and unparticularized suspicion or hunch of criminal activity" is insufficient to justify a stop. *Illinois v. Wardlow,* 528 U.S. 119, 123–24, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (quotation marks omitted); *accord Arvizu,* 534 U.S. at 274, 122 S.Ct. 744; *Terry,* 392 U.S. at 27, 88 S.Ct. 1868.

*Terry* recognized that the officer making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. *Adams v. Williams*, 407 U.S. 143, 146 (1972). When an officer is justified in believing that the individual, whose suspicious behavior he is investigating at a close range, is armed and presently dangerous, he

may conduct a limited protective search for concealed weapons. *Id*. Nothing in *Terry* can be understood to allow a generalized "cursory search for weapons…." *Ybarra*, 444 U.S. at 94. The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked. *Id*.

Under the plain-view doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. *See Horton v. California*, 496 U.S. 128, 136-137, 110 L. Ed. 2d 112, 110 S. Ct. 2301 (1990); *Texas v. Brown*, 460 U.S. 730, 739, 75 L. Ed. 2d 502, 103 S. Ct. 1535 (1983) (plurality opinion). If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object -- i. e., if "its incriminating character [is not] 'immediately apparent,'" *Horton*, *supra*, at 136 -- the plain-view doctrine cannot justify its seizure. *Arizona v. Hicks*, 480 U.S. 321, 94 L. Ed. 2d 347, 107 S. Ct. 1149 (1987).

When evidence is obtained because of a warrantless and unlawful stop and an unlawful search, it is considered the "fruit of the poisonous tree" and must be excluded at trial. *See Wong Sun v. United States,* 371 U.S. 471, 488 (1963). This rule applies with equal force to tangible evidence and statements of defendants. *See Oliver v. United States,* 656 A.2d 1159, 1172 (D.C. 1995) (citing *Wong Sun, supra*); *United States v. Crews,* 445 U.S. 463, 470-73 (1980); *Brown v. Illinois,* 422 U.S. 590, 601 (1975). The District of Columbia Court of Appeals has determined that, as a general rule, if a police officer's actions violate the Fourth Amendment, indirect fruits of illegal search or seizure should be suppressed when they bear sufficiently close relationship to underlying illegality. *Gordon v. United States*, 120 A.3d 73 (D.C. 2015). As stated by the DCCA in *In re K.H.*:

> Evidence derived, directly, from violation of a defendant's Fourth Amendment rights is subject to exclusion at the defendant's trial unless the prosecution demonstrates that the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the taint imposed upon that evidence by the original illegality.

14 A.3d 1087, 1092 (D.C. 2011) (internal citations omitted) (finding that the officer's unlawful entering of an apartment in violation of the defendant's Fourth Amendment rights required the suppression of evidence acquired inside of the apartment, the out-of-court identification of the defendant by the complainant as a result of a post-arrest photograph, and the defendant's custodial statements following his arrest).

### 1. Plaintiff Crudup

Mr. Crudup's Fourth Amendment rights were violated because the officers did not have the reasonable grounds to stop and frisk Mr. Crudup when no suspicion of criminal activity was present prior to the stop.

Officers first encountered Mr. Crudup, a 23-year old Black male, as he was walking alone in the 2400 block of 14th Street NE in a predominantly African-American neighborhood. Am. Comp. ¶¶ 131 - 133.

Mr. Crudup was dressed appropriate for the hour and weather, *id.*, ¶ 134, wearing a coat, a hooded sweatshirt, and with a backpack hanging off from one strap on his shoulder, *id.* ¶¶ 134 – 35. He was engaged in no suspicious behavior, officers were not responding to any call for service, nor did they have a lookout, nor were they seeking to match a person with a recently reported crime. *Id.* ¶¶ 140 – 41.

Officers were traveling in an unmarked Chevy Malibu. *Id.* ¶ 137. They turned onto the block and, approaching Mr. Crudup from behind, *id.* ¶ 138, in that moving vehicle, only had the opportunity to view Mr. Crudup for just a moment, *id.* ¶ 142.

Mr. Crudup was alone, the only person walking on the sidewalk. *Id*. ¶ 147. To his left was a barrier, a waist-high fence on the property line of a residential apartment building. *Id*. ¶ 139.

Each of the four officers jumped out of their vehicles, dressed in full tactical gear, displaying firearms and handcuffs, targeting Mr. Crudup. *Id.* ¶¶ 146 – 47.

Based on the officer's conduct, the immediate show of authority and force, including given the cultivated reputation of the GRU, Mr. Crudup was not free to leave at that moment. He was seized, in the absence of reasonable articulable suspicion.

Officer Laury [or Lyon] then said, "I'm Officer Lyon, you don't got no weapons on you?" *Id*. ¶149.  Although nominally phrased as an inquiry, this was in reality a directive. Officer Laury lacked reasonable articulable suspicion to believe Mr. Crudup was currently armed and dangerous. His directive was an unlawful search when he ordered Mr. Crudup to show his waist band and submit to a visual search of his person.

Mr. Crudup lifted his waistband to submit to the visual search by GRU that is a standard part of growing up Black in the neighborhoods in which the GRU patrols. *Id*. ¶ 149.

With Mr. Crudup physically stopped, standing along the long fence running along the property line abutting the sidewalk, the four officers formed a semi-circle in front and around Mr. Crudup. Mr. Crudup was physically surrounded and / or blocked. He was not free to leave, seized in the absence of the requisite reasonable articulable suspicion.

Officer Laury asked him, "Nothing in your bag?" To which Mr. Crudup responded, "Weed." *Id*. ¶ 154.

The District argues that admitting possession of marijuana gives rise to the reasonable articulable suspicion to search Mr. Crudup for weapons. District's Memo. 13. We set to the side

that, at this time, Mr. Crudup had already been unlawfully seized and his waistband visually searched. It is lawful under D.C. law to possess up to 2 ounces of marijuana for personal use. *See* D.C. Code § 48-904.01 (stating in pertinent part: "…it shall be lawful, and shall not be an offense under District of Columbia law, for any person 21 years of age or older to: possess, use, purchase, or transport marijuana weighing 2 ounces or less…[or]…[p]ossess, grow, harvest, or process, within the interior of a house or rental unit at constitutes such person's principal residence, no more than 6 cannabis plants…").

Any inference that Mr. Crudup was in possession of an unlawful quantity of marijuana is objectively unreasonable. Mr. Crudup's statement does not admit nor suggest an unlawful amount of marijuana. Nor is such inference made any less unreasonable by the fact that Mr. Crudup claimed the marijuana was inside his backpack. Were this sufficient as a legal matter, then the police could justify a frisk of *any* person on the presumption he or she is armed and dangerous if believed to be in possession of marijuana with any article of clothing, purse, handbag, suitcase, or backpack suitable to carry items in. The cases cited by the District do not apply to the facts of this case. Each of the cases referenced by the District involved particularized and often multiple indicia of drug trafficking not present herein.[2]

---

[2] In *Garcia* the court held that "an individual's known connection with drug transactions is a factor supporting" suspicion to frisk for weapons. *United States v. Garcia*, 459 F.3d 1059, 1065 (10th Cir. 2006). Police had no known connection to drug transactions for Mr. Crudup. Mr. Garcia, on the other hand, was frisked when present in the residence of a "violent street gang member" where "evidence indicated drug transactions were occurring" therein and in which were observed methamphetamines packaged for sale. *Id.* In *Bustos-Torres*, the police were deemed justified in conducting a pat down of a vehicle's passengers after officer had surveilled a drug trafficking area, observed a drug transaction involving one vehicle in a parking lot, and then observed the second vehicle apparently engaged in the same conduct. *United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005). *Jacob* did not involve a pat down. The court ruled officers were justified to order defendants out of a vehicle and placing in handcuffs during an investigation where defendant had checked into a hotel, paid cash, displayed identification from a state that was a source of narcotics into the area, where police knew the defendant had been

The District also argues that the later pat-down of Mr. Crudup's backpack was justified because based on Mr. Crudup's "claim that he had only marijuana in his backpack" and officer's belief when he shook the backpack "that a heavy object was inside." District's Mem. 14. This is disputed. Mr. Crudup did not state he *only* had marijuana in his backpack. Am Compl. ¶ 154. Even if the officer believed an additional object was in the backpack, the officer had no reasonable basis to believe such object was a weapon or contraband nor does the District so allege.

As reflected in the complaint, the unlawful search of the backpack occurred after officers physically blocked and made physical contact to prevent Mr. Crudup from leaving, Am. Comp. ¶ 160, after officers were physically and intentionally intimidating, pressing Mr. Crudup with his back up against the fence, *id.* ¶ 161, effectively demanding that they be permitted to search his bag, *id.* ¶ 163, disregarding Mr. Crudup's stated refusal to consent to search, *id.* ("Can't check it"), surrounding and encroaching on him, *id.* ¶ 166 – 67, disregarding another refusal, *id.* ¶ 169 ("You all can't check me, you can't check my bag"). At the time the protective search for weapons was done, the pat down of the backpack, officers had illegally seized Mr. Crudup and had no objectively reasonable articulable suspicion that he was then armed and dangerous.

When they first encountered Mr. Crudup, he was walking on the sidewalk in an apartment complex. There were no signs that Mr. Crudup was carrying a firearm, or any other signs of criminal activity. When the police officers approached Mr. Crudup, he stopped against a fence and told the police officers that they could not search his backpack. Mr. Crudup held his arms out and lifted his shirt to show that he did not have weapons on him. Despite Mr. Crudup's

---

previously arrested for transportation of narcotics, a drug detection dog indicated to his vehicle, and police engaged in counter surveillance and evasive or erratic driving on the freeway. *United States v. Jacob*, 377 F.3d 573, 577 (6th Cir. 2004).

insistent refusal, the police officers repeatedly asked him if they could search his backpack until Officer Choi illegally and abruptly grabbed the backpack while Mr. Crudup was still holding it. Mr. Crudup was clearly seized during this encounter. Multiple, armed MPD GRU officers approached Mr. Crudup, they immediately began asking him incriminating questions, refused to let him leave after he showed them he did not have any weapons and did not consent to a search of his backpack.

The government cites the Supreme Court case *Florida v. Bostick* as justification for this encounter as consensual. It is true police officers may approach individuals and ask questions regarding identification and consent to search without a seizure. However, the government fails to distinguish the key factor that proves this encounter was not consensual. A police officer cannot convey a message to an individual that compliance with their request is required. *See Florida v. Bostick*, 501 U.S. 429, 435 (1991). As soon as Mr. Crudup voluntarily lifted his shirt to reveal to the officers he had no weapons and did not give consent for the officers to search his backpack, the officers should have allowed him to walk away if this encounter was truly consensual.

Instead, two officers held Mr. Crudup to detain him and two officers pried the backpack out of Mr. Crudup's possession, searched it, and placed him in handcuffs. Notably, the government's motion mischaracterizes the Gerstein. The government justifies the officers having the legal right to search Mr. Crudup's backpack because they suspected there was marijuana in his backpack. However, the conversation about marijuana happens *after* the officers removed the backpack from Mr. Crudup's person. The *Gerstein* specifically notes that they believed he was in a possession of a firearm solely based on their observations that he was walking in a high crime area, moved his backpack from one shoulder to another, and when he shook the backpack it

sounded like an object was inside. Common sense dictates that many heavy objects could be contained in a backpack, like books, a computer, etc. At no point did Mr. Crudup ever say that marijuana was the *only* object in his backpack and he certainly did not admit that to the officers prior to them seizing his backpack. Because the firearm's incriminating character was not immediately apparent to the officers at the time, the plain view doctrine requires officers to conduct further investigation. By seizing Mr. Crudup without a basis to do so, the subsequent search was unreasonable and outside the scope of *Terry* and the plain-view doctrine. None of these factors rise to the level of suspicion necessary to stop and search Mr. Crudup.

 Further, there had been no reports of criminal activity in that location and no calls with a description of an individual matching Mr. Crudup's description. There were no signs of suspicious activity associated with Mr. Crudup that would give the impression to the officers that Mr. Crudup was involved in criminal activity or it was afoot. The officers were simply patrolling the area, saw Mr. Crudup, and decided to stop and search him without any reasonable suspicion. Though Mr. Crudup was present in an area with recent crime activity, being in an area associated with crime is not enough to establish reasonable suspicion. *See Jackson v. United States* 805 A.2d 979, 990 (D.C. 2002) (holding that the fact a person is present in an area known for a high concentration of illegal activity is insufficient to justify a *Terry* stop).

To the contrary, Mr. Crudup did not flee or run from the officers. He did not make any furtive gestures or movements to indicate he was engaged in criminal activity. He did not evade the officers' questions or try to flee the scene. Mr. Crudup gave the officer's no indication that he was hostile, and the officers even acknowledged his cooperation. *See Bennett v. United States*, 26 A.3d 745, 753 (D.C. 2011) (holding the officers lacked the requisite particularized and reasonable articulable suspicion that the defendant had committed a crime prior to the officers

immediately seizing him for a show-up when he did not match the lookout description and no meaningful connection was established.); *see also Singleton v. United States*, 998 A.2d 295, 299 (D.C. 2010) (Other factors that may warrant a conclusion that a stop was justified include "the time of day, flight, the high crime nature of the location, furtive movements, an informant's tip, a person's reaction to questioning, a report of criminal activity or gunshots, and viewing of an object or bulge indicating a weapon."). Since there was no indication that Mr. Crudup was involved in criminal conduct or suspicious activity was occurring, the officers had no justification or reasonable suspicion to immediately stop and seize him.

Although the officers allegedly saw Mr. Crudup turn his body away from them and lean against a fence before placing him in handcuffs, he did not make any gestures indicative of his intent to commit assault or possibly use the firearm, his hands were empty, and acted in a non-threatening manner prior to the stop. Contrary to the defendant in *Adams*, who was approached by a lone police officer, at night, in a high-crime area, and immediately searched for weapons. The observation of the Mr. Crudup holding a backpack and leaning against a fence, without any other articulable facts, does not rise to the level of suspicion needed to justify Mr. Crudup was involved in criminal activity and therefore warranted a search and seizure of his person.

      i.    **There was no suspicion Mr. Crudup was armed and dangerous prior to the officers seizing him in violation of his Fourth Amendment rights.**

Even if the officers believed Mr. Crudup was armed with a firearm and dangerous, the narrow exception of the *Terry* doctrine limits an officer to conduct a pat-down to find weapons that he reasonably believes or suspects are then in the possession of the person at the time of the stop. In *Adams*, the officer had knowledge prior to the stop that the defendant would be armed with a gun and narcotics and was therefore justified in conducting a protective pat-down for the

gun. In this case, the officers had no prior knowledge that Mr. Crudup may have had a firearm in his possession.

The officer's observation of the manner in which Mr. Crudup was walking, leaning against a fence, and holding his backpack without any other suspicious factors does not give officers the right to approach someone, unlawfully seize them, and search their person for weapons. *Compare Singleton v. United States,* 998 A.2d 295, 301 (D.C. 2010) (finding that the bulge in the defendant's pants pocket combined with his awkward walk, his apparent nervousness as he repeatedly looked over his shoulder, and his hand movements that suggested to be protective of his pants pocket gave the officer reasonable articulable suspicion that he was carrying a firearm). Unlike in *Singleton,* the officers did not observe a bulge in Mr. Crudup's pants, nor did they observe him appear to be protecting an object in his pants from moving. The officers stopped him solely based on the manner in which Mr. Crudup was holding his backpack and the fact that he leaned against a fence, a reaction considered normal when stopped and talking to people. The police officers had no reason to believe that Mr. Crudup was carrying a firearm. By placing Mr. Crudup in handcuffs without reasonable articulable suspicion, he was unlawfully seized because there was no reasonable articulable suspicion to search him for weapons. *Jackson v. United States* 805 A.2d 979, 988 (D.C. 2002) (holding that the defendant was unlawfully stopped even before he was placed in handcuffs when the police officers stopped and frisked him without reasonable grounds to believe that criminal activity was afoot).  In this case, the reason for the initial stop was to search Mr. Crudup's person for weapons, which is unconstitutional when not supported by specific articulable facts of suspicious criminal activity prior to the stop.

### 2.  Plaintiff Bell

Mr. Bell's Fourth Amendment rights were violated after the MPD GRU officers

unlawfully stopped and searched him without any reasonable articulable suspicion. When the

officers observed Mr. Bell, they were patrolling the area. The officers had not received a

"lookout" or an anonymous tip that criminal activity would be afoot. The officers were simply

driving through the area. In the fabricated *Gerstein*, the officers alleged they noticed a group of

individuals outside of an apartment building, and when they exited their vehicle Mr. Bell took

flight. Am. Comp. ¶ 212. Notably, the officers do not indicate if they observed Mr. Bell or the

group engaged in any criminal activity prior to their approach. *See Coghill v. United States*, 982

A.2d 802, 808 (D.C. 2009); *Howard v. United States*, 929 A.2d 839, 845-46 (D.C. 2007).

The government relies on *Wardlow* for justification of reasonable suspicion based on

unprovoked flight, but the Supreme Court acknowledged in that case that unprovoked flight "is

not necessarily indicative of [any particular] wrongdoing." *Wardlow*, 528 U.S. at 124 (2000).

Most recently, in *Posey v. United*, the D.C. Court of Appeals found a defendant's presence in a

high crime neighborhood coupled with his flight from uniformed officers is not enough to

overcome the reasonable suspicion of criminal activity needed to justify a stop. *Posey v. United*

*States*, 201 A.3d 1198, 1204 (D.C. 2019) ("Flight is not merely a box that, once checked,

automatically justifies a stop."); *see also Miles v. United States*, 181 A.3d 633, 641 (D.C. 2018)

("[A]n individual may be motivated to avoid the police by a natural fear or dislike of authority, a

distaste for police officers based upon past experience, an exaggerated fear of police . . . or other

legitimate personal reasons." (internal brackets and quotation marks omitted)). D.C. Circuit

Court has acknowledged there needs to be a combination of circumstances besides just the nature

of the neighborhood and provoked flight. *See United States v. Bridges*, 382 F. Supp. 3d 62 (D.C.

Cir. 2019) (finding the combination of the undisputed nature of the neighborhood, the officers'
understanding that they had been sent there due to recent gun violence, the steps the defendant
took to walk away from the direction of the officers were headed when he was alerted to their
presence, and the sudden flight of the defendant after the officers directly engaged with him as
they got out of the car was sufficient under *Terry* and *Wardlow* to create reasonable suspicion.).

     The fabricated *Gerstein* claims that after the officers chased Mr. Bell into the apartment
building, he was immediately stopped and surrounded by multiple armed officers. They
immediately detained him and searched his person. Am. Comp. ¶ 194. Mr. Bell did not consent
to any search or pat-down. Am. Comp. ¶ 195.  Mr. Bell was under no obligation to speak with
the officers or engage with them. *See Brown v. United States*, 590 A.2d 1008, 1019 (D.C. 1991)
("Citizens have no legal obligation to talk to police.").

     Significantly, the facts, as sworn in the *Gerstein* under oath, are fabrications. Am. Comp.
¶ 197. When the GRU officers exited the vehicle, there was no crowd. Am. Comp. ¶ 198. When
the GRU officers, exited the vehicle, Mr. Bell was nowhere in sight. Am. Comp. ¶ 199. The
GRU officers entered a building and ran up the steps. Am. Comp. ¶ 200. Mr. Bell was at the top
of the steps. He wasn't doing anything other than standing there. Am. Comp. ¶ 201. The GRU
officers surrounded him and backed him against the wall. Am. Comp. ¶ 202. The GRU officers
grabbed Mr. Bell and searched him without his consent. Am. Comp. ¶ 203. The actions by the
GRU were done in accordance with the custom, policy and procedures of MPD to manufacture
suspicion and arrests of African American men who otherwise were not engaged in suspicious
activity. Am. Comp. ¶ 209. On 10/3/2019, the judge granted the government's motion to dismiss
the case. Am. Comp. ¶ 208.

The officers in this case acted on a hunch and failed to complete the investigation stage before unlawfully stopping and seizing Mr. Bell without any reasonable suspicion. Officers are required to "make observations to develop their legitimate circumstantial hunches into articulable suspicion that the individuals they choose to stop are engaged in criminal activity." *See Posey*, 201 A.3d 1198 at 1202-03 (internal citations omitted). There was no evidence that Mr. Bell was engaged in criminal activity or criminal activity was afoot prior to detaining him. Thus, the officers violated his Fourth Amendment rights by knowingly stopping and searching him without reasonable suspicion.

### 3. **Plaintiff Burns**

Mr. Burns was unlawfully seized by the officers without reasonable articulable suspicion in violation of his Fourth Amendment rights. The officers approached the vehicle Mr. Burns was in for a purely investigatory basis without reasonable articulable suspicion. *See e.g. Johnson v. United States*, 468 A.2d 1325, 1327 (D.C. 1983) (concluding that "a situation in which persons unfamiliar to the police are parked in a car late at night in a high crime area does not, without more, present specific, articulable facts warranting suspicion of criminal activity). Mr. Burns was smoking a cigarette, which is not a crime, when several GRU members in three separate cars rolled into the lot. Am. Comp. ¶ 212. Instead of asking Mr. Burns questions related to smoking, Officer Joseph asked Mr. Burns and his girlfriend whether they had any weapons. Mr. Burns responded that he did not. Am. Comp. ¶ 214.

Even if the government argues that officers were merely having a consensual encounter with Mr. Burns and no articulable suspicion was needed, the encounter transformed into a seizure when Officer Joseph continued to ask him questions and Mr. Burns did not feel free to leave. *See e.g. In re J.F.*, 19 A.3d 304, 310 (D.C. 2011) (finding a seizure occurred when

defendant was confronted by uniformed police officers on a deserted street with multiple questions and a direct order to remove his hands from his pockets); *see e.g. also Hawkins v. United States*, 663 A.2d 1221, 1226 (D.C. 1995) (finding the repeated questioning about the possession of a weapon resulted in a seizure in violation of the Fourth Amendment); *Jackson v. United States*, 805 A.2d 979, 982, 988 (D.C. 2002) ("the fact that the officer remained unsatisfied and continued to question the defendant adds to the circumstances that would convey to a reasonable innocent person that he was not going to be permitted to leave until the officer was satisfied with the defendant's answers and found what he was looking for."); *Gordon,* 120 A.3d at 81 (concluding the officer seized the defendant by repeatedly questioning him before the police learned of his outstanding warrant.).

By the time Officer Joseph asked to see their waistbands, Am. Compl. ¶ 215, a seizure was effected. Even had no seizure had then yet been effected, the next officer's conduct surely created a seizure. "Before they could answer, Officer Wright, then approached the vehicle and ordered Mr. Burns to step out of the car." Am. Comp. ¶ 216.

In response to the intervention of a police officer physically opening a car door, Mr. Burns reacted with puzzlement, asking why the officer was doing that. Am. Compl. ¶ 217. He also conveyed a natural nervousness to being so-accosted, *id*. ¶ 218. There is nothing at this point in time giving rise to a reasonable articulable suspicion or belief that Mr. Burns was then armed and dangerous.

The District points to Mr, Burns' nervousness at being accosted as justifying what comes next: Officers Joseph and Wright physically pull Mr. Burns out of the car. Am. Compl. ¶ 219.

The District argues a somewhat different recitation of events.  The government argues that Mr. Burns' "nervousness" and "a puzzling-look on his face" while repeatedly telling them

he did not have a weapon on his person gave them the reasonable suspicion necessary to pull him

out of his vehicle, handcuff him, and search his person for weapons.

Though *Wardlow* indicates nervousness is a factor in determining reasonable suspicion,

that factor alone does not justify suspicion. In *Wardlow*, the nervous, evasive behavior was

headlong flight in a high-crime area. That type of nervousness was not present here. Mr. Burns

was cooperative with the officers and, according to the District, repeatedly answered "no" when

questioned if he had a weapon on his person. This "nervousness" or the "hesitation" that the

officer allegedly observed was more likely Mr. Burns annoyance with being asked the same

question repeatedly when he had done nothing wrong.

The government further justifies the officers' alleged suspicion by the fact that Mr. Burns

was sitting in his vehicle when the officers approached. Unlike in *United States v. Bullock*, the

officers did not stop Mr. Burns during the course of a traffic violation. The officers voluntarily

approached his vehicle without observing any criminal activity. Therefore that "inordinate risk"

an officer may have while approaching a vehicle was not present here. Officers cannot order

people out of their vehicles and search them without any justification. Merely being present in a

vehicle without being lawfully stopped for a crime, such as a traffic violation, does not give

officers the reasonable suspicion necessary to order them out of a vehicle and search them . *See

United States v. Bullock*, 510 F.3d 342, 345 (D.C. Cir. 2007) (The bright-line rule of *Mimms*

means that "a police officer may as a matter of course order the driver of a lawfully stopped car

to exit his vehicle."). The government's use of *Bullock* is misplaced.

By looking at the totality of the circumstances of Mr. Burns' one minute and thirty

seconds encounter with the officers, it is clear an unlawful seizure occurred before the discovery

of the gun. At no point during the seizure, did Mr. Burns admit to having a gun, consent to

getting out of the car, or consent to being searched. There was no evidence that criminal activity was afoot or that criminal activity had occurred before the officers approached the vehicle Mr. Burns was in and unlawfully detained him. Thus, without reasonable articulable suspicion of a crime, the stop, search, and seizure were unconstitutional.

### 4. Plaintiff Ramsey

Mr. Ramsey's Fourth Amendment rights were violated when the GRU officers unlawfully stopped and searched him in his home without a warrant and conducted a search for weapons inside his bathroom. According to the *Gerstein*, the officers were allegedly in the area due to knowledge that individuals were inside a vehicle with firearms. Am. Comp. ¶ 256. Officers falsely claimed that Mr. Ramsey was one of the vehicle's occupants. Am Comp. ¶ 259 ("Officer Tariq swore that Mr. Ramsey was 'one of the individuals Officers were looking for.'"), *Id.* ¶ 260 ("This statement was a fabrication."), ¶ 249 ("Many facts in the *Gerstein* were fabricated.").

Even referencing the *Gerstein*, without adopting its averments as true, it is noteworthy that the *Gerstein* does not give any description of this vehicle besides this vague assertion. Even though the officers did not have knowledge of any *claimed* make, model, color, etc. of the vehicle or a description of the individuals inside the vehicle, they allegedly chose to follow a SUV when Mr. Ramsey was supposedly a passenger. If there is a sufficient match, a lookout may justify a stop or even an arrest. *See*, *e.g.*, *Thompson v. United States*, 571 A.2d 192, 193 n.1 (D.C. 1990); *Smith v. United States*, 561 A.2d 468, 471 (D.C. 1989). In this case, the vague claimed information obtained by the officers was not sufficient to justify a stop of Mr. Ramsey, even were it accepted as true. *See In re A.S.*, 614 A.2d 534, 538-39 (D.C. 1992) (holding a

general description that matched at least five individuals in the area could not justify a *Terry* stop.).

What happened is that Mr. Ramsey was outside his house. Officers pulled up and asked "What's going on?" Mr. Ramsey declined the encounter and said "Nothing, I am going in the house." Am. Comp. ¶¶ 232 – 237. He walked into his house and shut the door. *Id.* ¶ 241. Officers had no reasonable articulable suspicion to seize Mr. Ramsey, much less to break into his house without a warrant in order to do so.

The government justifies this unlawful pursuit of Mr. Ramsey into his home by citing *United States v. Johnson* and the need to preserve evidence that may be lost or delayed as an exigent circumstance. However, the government's characterization of *Johnson* compared to the facts of Mr. Ramsey's case is misguided. In *Johnson*, the search took place *after* the officers obtained a search warrant of the building, told the defendant to "halt" and then observed the defendant throw a bag outside of the window. *See United States v. Johnson*, 802 F.2d 1459, 1461 (D.C. Cir. 1986). The police did not observe any similar suspicious activity before pursuing Mr. Ramsey, entering his home without a warrant, and conducting a search.

To the contrary, the pursuit the officers engaged in to illegally stop and search Mr. Ramsey is exactly the type of activity that is not permissible under the Hot Pursuit exception for a warrantless entry of a person's home. The Hot Pursuit exception is permissible only when (1) the police have probable cause to arrest a fleeing felon; (2) speedy apprehension is imperative to prevent completion of the crime, destruction of evidence, or the suspect's escape; and (3) the police have continuous knowledge of the accused's whereabouts. *See Warden v. Hayden*, 387 U.S. 294, 298 (1967) (holding a warrantless entry and search by officer who had probable cause to believe that an armed robber had entered a house less than five minutes earlier.). In this case,

the police had no knowledge or probable cause that Mr. Ramsey was a felon fleeing. Furthermore, there was nothing preventing the officers from obtaining a warrant to recover the evidence prior to the alleged hot pursuit. *See United States v. Carter*, 522 F.2d 666, 676 (D.C. Cir. 1975) (holding that hot pursuit did not justify entry of arrestee's home where the government did not establish why it failed to obtain an arrest warrant when it had the opportunity to do so.). It is clear the officers knew they could obtain a warrant to search Mr. Ramsey's home by the mere fact they obtained one *after* they unlawfully pursued and breached his home to unlawfully search him without reasonable articulable suspicion. Therefore, the officers willfully and knowingly violated Mr. Ramsey's Fourth Amendment rights.

## III.   PLAINTIFFS HAVE ALLEGED SUFFICIENT FACTS TO SUPPORT A *MONELL* CLAIM THAT THE VIOLATIONS OF THEIR FOURTH AMENDMENT RIGHTS WERE CAUSED BY CUSTOM OR PRACTICE.

To maintain a section 1983 action against the District of Columbia, the Court must first "determine whether the complaint states a claim for a predicate constitutional violation," and "then the court must determine whether the complaint states a claim that a custom or policy of the municipality caused the violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003), citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). In assessing the first prong, the Court addresses whether plaintiff has stated a claim for a constitutional violation.  "In order to establish this predicate violation, neither District of Columbia policy makers nor employees need be implicated. All that is being established at this stage is that there is some constitutional harm suffered by the plaintiff, not whether the municipality is liable for that harm." *Baker*, 326 F.3d at 1306–07.  As discussed *supra* in Argument Section II, Plaintiffs have sufficiently alleged factual allegations that, if true, establishes constitutional violations against each plaintiff and a plausible claim for relief.

Under the second prong, the Court must go on to determine whether the "complaint states a claim that a policy or custom of the District of Columbia caused the constitutional violation alleged under the first prong." *Id.*, citing *Monell*, 436 U.S. at 694. "The court must determine whether the plaintiff has alleged an 'affirmative link,' such that a municipal policy was the 'moving force' behind the constitutional violation." *Id.* (internal citations omitted).

There are several ways in which a plaintiff may successfully allege the existence of the necessary municipal policy or custom:

> Specifically, he may point to (1) "the explicit setting of a policy by the government that violates the Constitution," (2) "the action of a policy maker within the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" or (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations."

*Blue v. District of Columbia*, 811 F.3d 14, 18–19 (D.C. Cir. 2015), quoting *Baker*, 326 F.3d at 1306.

A plaintiff sufficiently pleads a section 1983 custom or policy claim when the complaint refers to specific incidents that plausibly show a custom or pattern of behavior. *See Warren v. District of Columbia*, 353 F.3d 36, 40 (D.C. Cir. 2004) (finding that the allegation that a prison official "stuck the same needles in everybody's arms to draw blood" was sufficient to allege a custom or policy of prisoner mistreatment); *see also Singh v. District of Columbia*, 881 F. Supp. 2d 76, 87 (D.D.C. 2012) (where the plaintiff was issued three traffic tickets over the span of eighteen days, and he reported the harassment on five separate occasions, he stated a claim for a section 1983 custom or policy claim); *Trimble v. District of Columbia*, 779 F. Supp. 2d 54, 59 (D.D.C. 2011) ("[M]erely speculating that an unidentified

policy and uncorroborated practice or custom exists without providing any factual heft to support the allegation is insufficient to state a claim under section 1983.").

In their First Amended Complaint (hereinafter "AC"), Plaintiffs have pleaded sufficient facts to sustain a *Monell* claim under 3 of the 4 *Baker* prongs.  As a result, the motion to dismiss must be denied.

### A) CHIEF NEWSHAM IS A POLICY MAKER WHOSE ACTIONS PROMULGATED THE UNCONSTITUTIONAL TACTICS OF THE GRU.

The District argues that its Chief of Police does not qualify as a policy maker for purposes of Section 1983, citing no prior court case so holding. The District argues that the D.C. Code does not grant the MPD Police Chief the "authority to promulgate rules for the administration of his respective department with regard to the conduct at issue" and therefore he cannot be found to be a policy maker.

The D.C. Code grants the Police Chief, without any express restriction, all authorities vested under existing law. *See* D.C. Code § 5-105.05 ("The said Metropolitan Police force shall consist of 1 Chief of Police, who shall continue to be invested with such powers and charged with such duties as is provided by existing law.").

The Police Chief exercises such authorities, including promulgating rules for the department through the Directives System, which includes general orders, special orders, standard operating procedures, among other forms of directive to the Department. As reflected in the Police Chief's General Order regarding the Directives System,

> The Chief of Police is authorized to issue orders, rules, and regulations governing conduct and controlling police activity. Written directives are the means to document and communicate these policies, rules, regulations, and procedures, and are necessary to establish clear limits to the broad discretionary authority of a police officer.

General Order GO-OMA-101-00 ("Directives System").

In the instant case, the MPD's GRU is alleged to act pursuant to widely established custom in disregarding the need for reasonable articulable suspicion to stop and frisk persons, including targeting persons on the basis of race. This widespread custom is in contravention of the U.S. Constitution and even MPD formal policies and rules. Nevertheless, it persists and causes injury. Although MPD rules prohibit this custom and practice formally, it cannot be denied that the Chief of Police possesses and exercises the authority to promulgate rules for the administration of his respective department with regard to stops, seizures, searches and protective pat downs or frisks. *See*, General Order GO-OPS-304.10 (rules regarding "Field Contacts, Stops, and Protective Patdowns" as promulgated by the Police Chief via the Directives System).

Former Chief Newsham was aware of these widespread customs and practices – so established as to effectively constitute policy -- including not only from his vantage of Police Chief, but because prior to that he headed up the Narcotics and Special Investigations Division (NSID), where he had close responsibility for and knowledge of the challenged practices. Am. Comp. ¶ 26 (head of NSID before Police Chief); *See also id.* ¶ 109 (as Police Chief, Newsham was responsible and testified regarding the Department's stop and frisk tactics and underlying data), ¶ 111-112 (Chief Newsham misrepresented the number of stop and frisks as 1,000 per annum when in reality the Department documented 19,000 per year), ¶ 275 ("Chief Newsham ha[s] falsely reported or underreported the annual quantity of stops and frisks by a factor of 1,800 percent.").

**B) PLAINTIFFS HAVE PLEADED SUFFICIENT FACTS TO ESTABLISH MUNICIPAL LIABILITY UNDER THE 3RD AND 4TH PRONGS OF *BAKER*.**

The facts pleaded in the AC establish a *Monell* claim based on a custom of the District on either of two independent theories: *Baker*'s third prong [(3)] the fact that a policymaker knowingly ignored a practice that was consistent enough to create a custom; or *Baker*'s fourth prong [(4)] the fact that the government failed to "respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Harris v. Gov't of the District of Columbia*, 2019 U.S. Dist. LEXIS 131297, *8 (D.D.C. 2019).  Plaintiffs, for purposes of this motion, "meld" these two theories and relies on proof of the same custom. *Hurd*, 2019 U.S. Dist. LEXIS 213060, *19.

The *Baker* Court's formulation of the third prong of *Monell* liability is: (1) a policymaker (2) knowingly ignored (3) a practice that was consistent enough to create a custom. *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C.Cir. 2003). The *Baker* Court's formulation is a summary of existing Supreme Court and Circuit law. *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (policymakers' "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity" can be the basis for section 1983 liability); *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (1997)(noting inaction giving rise to or endorsing a custom by a person or persons who have final policymaking authority under state law can be the basis for section 1983 liability). Both the Supreme Court, the D.C. Circuit, and this Court have traditionally used the term "acquiescence" instead of "knowingly ignored." *Jett*, 491 U.S. at 737; *Triplett*, 108 F.3d at 1454 (liability where final policymakers "acquiesced in a longstanding practice or custom which constitutes the "standard operating procedure' of the local governmental entity"); *Barnes v. District of Columbia*, 242 F.R.D. 113, 118 (D.D.C. 2007) (plaintiffs allege, in essence, *citing Jett* and *Triplett*, that the inefficient implementation of the District's release procedures is the result of

official "acquiescence in a longstanding practice or custom which constitutes the standard operation procedure of the local government entity). It does not appear that the *Baker* Court intended a change in the law by the change in formulation from "acquiesce" to "knowingly ignore."

Plaintiffs have alleged numerous instances…each of which will be discussed below…that collectively establish the existence of an unconstitutional custom of the GRU stopping and frisking black men in the absence of a reasonable articulable suspicion or wrongdoing and without consent.  There is no numerical standard which controls the determination whether incidents of wrongful behavior cumulatively show a pattern amounting to a custom or policy. *Carter v. District of Columbia*, 795 F.2d 116, 124 (1986). Egregious instances of misconduct, relatively few in number but following a common design, may support an inference that the instances would not occur but for municipal tolerance of the practice in question. *Id.* So an informal custom or usage can be proven not only by a large number of instances, but also by other evidence that it is routine practice. *See Davis v. Carter*, 452 F.3d 686, 692-94 (7th Cir. 2006) (plaintiff proved a municipal policy of excessive delay in providing methadone treatment, submitting evidence that administrative practices made delays inevitable and staff testimony that they were widespread; he was not required to cite other individuals who suffered from the delays); *Baron v. Suffolk County Sheriff's Dep't*, 402 F.3d 225, 237-38 (1st Cir. 2005) (plaintiff correction officer proved a municipal custom of condoning harassment to enforce the "code of silence" about staff misconduct with his testimony about several incidents and a deputy superintendent's testimony that officers were reluctant to report certain things, that a code of silence existed, and that the plaintiff had violated it and consequences were likely); *Wood v. Hancock County Sheriff's Dep't*, 354 F.3d 57, 66 (1st Cir. 2003) (jury finding that strip search

was pursuant to policy was supported by plaintiff's testimony that he was told it was "routine procedure," staff member testified that it was a "routine search," and it happened to the plaintiff twice at the hands of different officers); *Nicholson v. Scoppetta*, 344 F.3d 154, 165-66 (2d Cir. 2003) (citing testimony as well as an audit in support of finding that a municipal policy of deliberate indifference existed); *Barnes v. District of Columbia*, 242 F.R.D. 113, 119 (D.D.C. 2007)(denying motion to dismiss on claim where indiscriminate strip search policy routinely applied to detainees).

The well-pled allegations of the AC allege that in contravention of the law and formal MPD policy, "[t]he GRU has a pattern or custom of stopping, frisking and searching people, especially young, African-American men, without reasonable suspicion or probable cause." Am. Comp. ¶ 60; *Id.* ¶¶ 77, 271, 272.

The AC describes how the GRU's coercive and aggressive tactics denies individuals meaningful opportunity to decline such stops and frisks, as this unit's request for consent is inherently compulsive. *Id.* ¶273, ¶¶ 20, 35 (use of overwhelming numeric force), ¶ 21 (intimidation to compel individuals to "consent" to stop and frisk), ¶ 33 (highly aggressive and forceful deployment), ¶¶ 34, 36 (show of authority and force exceeds that of ordinary uniformed officers, including "tactical" gear and display of weapons), ¶ 38 (use of "jump outs" to convey force), ¶¶ 41 – 49 (cultivation of a perverse and arguably terroristic threat of force and authority to the Black community which is evidenced by the NSID's banner flag with the Death Head, threats of weapons loaded and at the ready, and the image of a skull with a bullet hole dead-center), ¶ 62 (even use of nominally permissive words to "request" consent is inherently compulsory, given the GRU's well known and intentionally cultivated images and reality of force and compulsion), ¶¶ 64 – 66 (t-shirt prominently worn by MPD officer evidences that the

co-called request "Let me see that waistband" is a request in which there is no choice in the matter, associating that request with use of force through images of an assault rifle and discriminatory targeting through the image of the Sun Cross, a racist hate symbol), ¶ 70 (despite any use of nominally permissive words, individuals have no real choice in the matter), ¶ 71 (Judge Brown observing that the GRU's approach lacks credibility as a "consensual" inquiry and approach).

The AC alleged how, should an individual decline to "consent," GRU officers manufacture or fabricate circumstances to justify their conduct. *Id. ¶* 22. ¶ 51 (GRU's cultivated image of terrorizing force as reflected in their banner flag and practices is a persistent background condition of duress that undermines the suggestion of meaningful "consent"), ¶¶ 74 - 76(documentation or exaggeration / fabrication of natural or "nervous" reactions to aggressive officer approach to justify compelled seizure and frisk), ¶ 78 (D.C. appeals court observing how such responses can be wrongly identified as indicating criminality).

The AC describes that the practice is so well established that there is awareness or knowledge of such practices, or elements of such practices, in… *Id. ¶* 38 (use of jump outs is well known in the community), ¶ 50 (Black community groups decrying the NSID's banner flag and the GRU's associated tactics is "designed to inflict terror on low-income communities of color"), ¶¶55 – 56 (Judge Janice Brown acknowledges the widespread practice of demanding "consent" in the absence of reasonable articulable suspicion and indicates this practice as inherently compulsive as well as racially discriminatory), ¶ 57 (D.C. Appellate Judge acknowledging GRU's practice of requesting "consent" in the absence of suspicion), ¶ 61 (community awareness that they have no meaningful choice upon approach of the GRU is so pervasive that young Black men grow up knowing they must raise their shirts upon approach so

GRU officers can visually search their bodies), ¶¶ 63 – 69 (racist and threatening "let me see that waistband" t-shirt openly and notoriously worn by an officer in the courthouse), ¶ 73 (widespread awareness that failure to comply with "request" from GRU may be compelled with dangerous or forceful consequences), ¶ 82 – 86 (MPD Sergeant Charlotte Djossou recounts how officers were comfortable speaking of illegal practices during roll call)

The AC describes how the custom is applied, in particular, to target Black men.  *Id.* ¶ 17 (targeted deployment of GRU in predominantly Black neighborhoods), ¶ 28, ¶¶ 29, 31 (targeted deployment evidences race-based discrimination), ¶ 56 (Judge Janice Brown describes the racial discrimination), ¶ 127 (alleging that statistics will show that the GRU's stop and frisks are even more racially targeted than ordinary MPD practices, which evidence significant racial disparities in law enforcement)

The AC alleges that the MPD, including specifically under Police Chief Newsham intentionally misled the D.C. Council and frustrated disclosure of its stop and frisk practices in order to evade accountability and perpetuate unlawful and discriminatory customs that were occurring in contravention of formal policy. *Id.* ¶¶ 95 – 125.

The District's arguments in its motion to dismiss do not succeed in negating the well-pled allegations of the AC.

### 1)   The U.S. Attorney's Felon in Possession (FIP) Gun Prosecutions.

The reference in the AC to federal gun prosecutions in paragraphs 29-30 was to the concession by the District of Columbia Attorney General Karl Racine that targeted enforcement of predominantly black neighborhoods manifests race-based discrimination.  The admission is particularly telling, given that Mr. Racine's office is defending this lawsuit.  And it stands as an admission that the District's policing of gun-related crimes is applied in a discriminatory manner,

from the targeted enforcement of black neighborhoods by the GRU to the prosecution of these offences in the City.  When taken collectively with the multiple allegations of an unconstitutional custom, and when interpreted in a light most favorable to Plaintiffs, it serves to strengthen those allegations and serves to sustain Plaintiffs' claims.

> **2)   The *Gross* ruling.**

Despite Defendants' arguments to the contrary, it is Defendants who misinterpret the meaning of *Gross, Robinson,* and the court opinions' relevance in establishing custom and practice.  *See,* AC, ¶¶ 54-58, 71-78.  Both Court rulings placed the District on notice that MPD and particularly the GRU were engaging in practices of suspicion-less searches.  There can be no stronger rebuke of a police department's practices than the suppression of evidence due to an unconstitutional search.  When those practices occur repeatedly, as they did here, and involve the suppression of evidence based upon a stop motivated by race and not by suspicion of criminal activity, MPD was on notice.  These court rulings evidence the widespread scope and widespread awareness of the tactics complained of herein, which among other things evidences that the municipality and its Police Chief knew of this widespread customs so pervasive as to constitute effective policy.

The District's argument that these cases predate the beginning of Chief Newsham's tenure in 2018 is non-sensical.  The fact that these rulings predate the events at issue in the AC is necessary for the notice to have arisen in advance of the events.  MPD was placed on notice by these Court rulings, and failed to act.

> **3)   GRU Pictures are Probative of Custom and Policy**

Plaintiffs have alleged sufficient facts that the GRU's manner of dress and public proclamations have put the District on notice of the unconstitutional custom and policy of the

GRU stops.  *See,* AC, ¶¶ 34-53, 60-75.  The AC has alleged several instances of GRU members wearing clothing that displays racist symbols such as the Sun Cross, and wearing clothing that promulgates over-aggressive policing.  GRU members have worn such clothing to Court, and this manner of dress has been documented in media coverage and court filings.  Defendants cannot argue that the top policymakers were not on notice. The open and notorious cultivation of a show of force so threatening, terroristic and racist (and widely known) forms the inevitable backdrop of every GRU police-citizen encounter and makes every nominal "request" to show be subject to "consensual" search fraught with compulsion and coercion.

Moreover, the allegations in the AC evidences that the GRU show of authority goes far beyond the traditional, such as a uniform and display of weapons in ordinary course.  Instead, the GRU manner of dress conveys an outward stance of aggressiveness, and stands for the unit's tacit approval and acceptance of conveying the threat of excessive force to the public.

Defendants' argument that there is no link between the GRU manner of dress and a custom or policy misses the mark entirely.  The fact that GRU members have been documented as repeatedly wearing clothing adorned with racist symbols and/or ideologies of aggressive policing with the outward threat of excessive force goes to the acknowledgement of MPD of these policies…and MPD policy makers' indifference to the aggressive, race-based policing by the GRU that results in unconstitutional stops of black citizens.  There are sufficient allegations in the AC from which to reasonably infer actual or constructive notice by policy makers and Chief Newsham specifically, given the prominence of circulation of these pictures.

### 4) Sgt. Djossou's testimony, Deanwood, and arrest statistics

Sgt. Djossou's testimony before the D.C. Council put the District on notice of the custom and policy of unconstitutional stops by the GRU.  AC ¶¶ 83-87.  Sgt. Djossou testified that she

suffered retaliation for complaining about these issues.  These averments go to direct knowledge of policy makers regarding the unconstitutional stops and their promulgation of it.  Likewise, the widely reported Deanwood arrest, as averred in ¶¶ 88-94 and statistical data from MPD arrests in ¶¶ 95-128 all collectively establish actual and/or constructive knowledge by the policy makers of the unconstitutional GRU practices.

The *Baker* panel did not expressly state whether the "knowing" in "knowingly ignores" refers to actual or constructive knowledge. The *Triplett* Court stated that "*Jett* left open the possibility of liability where final policymakers "acquiesced in a longstanding practice or custom which constitutes the "standard operating procedure' of the local governmental entity," again without stating whether "acquiesce" required actual or constructive knowledge. *Triplett v. District of Columbia*, 108 F.3d 1450, 1454 (1997). The purpose of the "knowingly ignores" element is to establish an affirmative link between a custom and the municipality. *Id.* ("The only acts that count (though they may include inaction giving rise to or endorsing a custom) are ones by a person or persons who have "final policymaking authority [under] state law.").

A consensus of the Circuits establishes that constructive knowledge as well as actual knowledge is sufficient to attribute a custom to a municipal policy-maker. *See Baron v. Suffolk County Sheriff's Dept.*, 402 F.3d 225, 236-237 (1st Cir. 2005) (municipality is liable if custom is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." (citation omitted)); *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989)(noting that "custom may be established by proof of knowledge and acquiescence."); *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (noting that "actual knowledge may be evidenced by recorded reports to or discussions by a municipal governing body… [and c]onstructive knowledge may be evidenced

by the fact that the practices have been so widespread or flagrant that in the proper exercise of its responsibilities the governing body should have known of them") (citing *Bennet v. Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (*en banc*)); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) ("Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." (citation omitted)); *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444.

At any rate, Plaintiffs alleged direct evidence that the District policymakers (the municipality, and the Chief of Police) had actual knowledge about the unconstitutional stops of the GRU, and the GRU policy of making these stops on black citizens without reasonable articulable suspicion. *See* AC. ¶ 276 ("the municipality and its Police Chief have known of should have known" of unlawful practices), ¶ 292 (the District and its Police Chief "knowingly ignored this practice, which is consistent enough as to constitute custom."), ¶ 299 (same).

### 5) **Deliberate indifference**

Plaintiffs have alleged sufficient facts to also move forward on a claim of deliberate indifference, which is the 4th *Baker* prong.  Deliberate indifference is an objective inquiry: courts ask whether the municipality "'knew or should have known of the risk of constitutional violations,' but did not act." *Harris*, 2019 U.S. Dist. LEXIS 131297, *9. Deliberate indifference means that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the [municipality] may not adopt a policy of inaction." *Id.* In other words, "Plaintiffs do not have to show that the District subjectively knew about the [enforcement] problem: the question is whether the [District] knew or should have known of the risk of

constitutional violations, an objective standard.'" *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 283 (D.D.C. 2011) (summary judgment) citing *Baker*, 326 F.3d at 1307.

A plaintiff can establish deliberate indifference by several means including by demonstrating: (1) the municipality's failure to train its employees, *Page v. Mancuso*, 999 F. Supp. 2d 269, 282-83 (D.D.C. 2013); (2) a municipality's failure to respond to repeated complaints about misconduct, *See Singh v. District of Columbia*, 881 F. Supp. 2d 76, 87 (D.D.C. 2012) (finding deliberate indifference where plaintiff reported harassment by a police officer on five separate occasions); *Muhammad v. District of Columbia*, 584 F. Supp. 2d 134, 139 (D.D.C. 2008) (finding plaintiff stated claim for deliberate indifference where the District failed to take action against a police officer who had been the subject of at least fourteen previous complaints); a municipality's inaction in the face of a longstanding problem such as failing to release inmates from a jail whey they are entitled to release. *Harris v. Gov't of the D.C.*, 2019 U.S. Dist. LEXIS 131297, *9-10.

Common methods of establishing that the government was aware of its longstanding problem include: (1) litigation about the claim at issue gives rise to knowledge, (2) D.C. Council hearings, (3) annual oversight reports, (4) CCRB/ OPC reports, and (5) outside consultant reports. *Harris v. Gov't of the D.C.*, 2019 U.S. Dist. LEXIS 131297, *13. Plaintiffs pleaded facts about several of these methods in the FAC.  The large number of instances detailed above establish the plausible claim that how the GRU was unconstitutionally stopping black citizens without probable cause was sufficiently longstanding and pervasive enough to itself put the District on notice of the problem. *See Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 283 (D.D.C. 2011) (large numbers of over-detentions shows District deliberately indifferent to over-detentions); *Barnes v. District of Columbia*, 242 F.R.D. 113, 118 (D.D.C. 2007).

IV.   **PLAINTIFFS HAVE PLEADED SUFFICIENT FACTS TO ESTABLISH MUNICIPAL LIABILITY FOR THE VIOLATIONS OF PLAINTIFFS' EQUAL PROTECTION RIGHTS.**

A)  **THE EQUAL PROTECTION VIOLATIONS**

The Equal Protection Clause, which applies to the District of Columbia via the Fifth Amendment, *see Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (applying Fourteenth Amendment's Equal Protection Clause to D.C. through Fifth Amendment's Due Process Clause); *see also Dixon v. District of Columbia*, 666 F.3d 1337, 1339 (D.C. Cir. 2011), requires state actors to treat similarly situated persons alike. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). The clause protects against intentional and arbitrary discrimination, "whether by express terms of a statute or by its improper execution through duly constituted agents." *Sunday Lake Iron Co. v. Twp. of Wakefield*, 247 U.S. 350, 352 (1918).

To succeed on an equal protection claim, a plaintiff must show that "[he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citations omitted). The Supreme Court has "made clear that proof of [ ] discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (internal quotation marks and citation omitted); *Snowden v. Hughes*, 321 U.S. 1, 8 (1944) ("The unlawful administration by [government] officers of a [law] fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is . . . a denial of equal protection [only if] there is shown to be present in it an element of intentional or purposeful discrimination.").

Plaintiff has pleaded sufficient facts alleging racial disparities in MPD and the GRU's enforcement of the District's laws.  AC ¶¶ 95-128.  These factual allegations, taken together,

state a claim for a violation of the Equal Protection Clause that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *see Grissom v. District of Columbia*, 853 F. Supp. 2d 118, 126 (D.D.C. 2012); *Cf. Atherton v. District of Columbia Office of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009) (dismissing equal protection claim based on race discrimination in jury service when a juror was excused because he had alleged only that he was half Mexican and that he had openly thanked a witness in Spanish).

### B)   THE DISTRICT'S CUSTOMS AND POLICIES LED TO THE VIOLATIONS.

The Court must now consider whether plaintiff has sufficiently alleged that the District of Columbia was the "moving force" behind the constitutional violation. *See Baker*, 326 F.3d at 1306.  The focus in claims of racially selective law enforcement is on the difference in treatment between African Americans and other races, not other types of "similarly situated" factors. *See e.g.*, *United States v. Armstrong*, 517 U.S. 456, 463-66 (1996); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1166 (10th Cir. 2003). The plaintiff must demonstrate that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose. *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003) *citing  Armstrong*, 517 U.S. at 465 *and cases involving traffic stops challenged on equal protection grounds Chavez v. Ill. State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533-36 (6th Cir. 2002).

Because direct evidence of police motivation is usually unavailable Plaintiffs usually rely on circumstantial evidence such as statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population. *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168. This requires a reliable measure of the demographics of the relevant population, a means of telling whether the

data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population. *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003) *citing Armstrong*, 517 U.S. at 469-70.

Plaintiff has pleaded sufficient facts alleging racial disparities in MPD and the GRU's enforcement of the District's laws.  AC ¶¶ 95-128.  These allegations are sufficient to support a claim for municipal liability.   *See, e.g.*, *Byrd  v. Dist. of Columbia*, 297 F. Supp. 2d 136, 139 (D.D.C. 2003) (stating deliberate indifference is "determined objectively, by analyzing whether the municipality knew or should have known of the risk of . . . violations, and yet failed to respond as necessary") (citations omitted)

Plaintiffs have alleged multiple instances where black male citizens were arrested without probable cause, and Plaintiffs allege that they are disproportionately arrested under this policy of stopping black males without probable cause, even though there are Caucasian and Asian individuals who engage in similar conduct. These allegations, taken together, are sufficient to show a pattern of behavior that is consistent enough to become a custom. *See M.J. v. District of Columbia*, 401 F. Supp. 3d 1, 15 (D.D.C. 2019) (finding that plaintiffs have stated a section 1983 municipal liability claim where the complaint identified numerous occasions of constitutional violations).  Accordingly, Defendants' motion to dismiss should be denied.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Respectfully submitted,

By:    /s/ Michael Bruckheim /s/
MICHAEL BRUCKHEIM [455192]
Bruckheim & Patel
401 East Jefferson Street, STE 201
Rockville, Maryland 20850
(ph): 240-753-8222

(fax): 240-556-0300
(E-mail): michael@brucklaw.com


By:      /s/ Sweta Patel /s/
         Sweta Patel [1013010]
         Bruckheim & Patel
         1100 H Street NW, STE 830
         Washington, DC 20005
         (ph): 202- 930- 3464
          (fax): 240-556-0300
         (E-mail): Patel@brucklaw.com


By:      /s/ Carl Messenio /s/
         Carl Messineo [450033]
         717 D Street NW, Suite 310
         Washington, DC 20004
         (ph): 202-277- 4625
         (E-mail): CM@messineolegal.com