**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DALONTA CRUDUP, *et al.*,<br><br>                    Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>                    Defendants. | Civil Action No. 20-1135 (TSC) |

<u>**DEFENDANTS' REPLY IN SUPPORT OF MOTION
TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**</u>

## INTRODUCTION

Plaintiffs admit that they illegally possessed handguns in the District of Columbia, but allege that the individual defendants, who are members of MPD's Gun Recovery Unit (GRU), violated their constitutional rights because the stops and searches that discovered the illegal handguns were not based on reasonable suspicion and were instead based on plaintiffs' race.[1] Plaintiffs are wrong, and their claims in the First Amended Complaint should be dismissed.

First, plaintiffs' allegations show that each stop and search was supported by reasonable suspicion. Second, even assuming plaintiffs' individual claims survive, plaintiffs fail to allege that the District should be held liable for any unconstitutional acts under 42 U.S.C. § 1983 (Section 1983). To hold the District liable, plaintiffs must

---

[1]     Plaintiffs assert claims against the District of Columbia (the District), as well as MPD Officers Sherman Anderson, Eddie Choi, Brandon Joseph, Christina Laury, Mark Minzak, Justin Rogers, Iatezaz Tariq, Nelson Torres and John Wright.

allege that a policy or custom exists of performing unconstitutional stops because of race, but plaintiffs identify no comparable examples beyond their own situations. Third, plaintiffs fail to allege a violation of their equal protection rights. Plaintiffs' allegations concerning citywide stops by MPD officers, which say nothing about whether any of those stops were unconstitutional, do not support their claim that GRU officers subjected them to unconstitutional searches because of their race.

Finally, plaintiffs failed to respond to the individual defendants' argument that they are entitled to qualified immunity. Under well-established D.C. Circuit law, plaintiffs have conceded the issue. Even if the Court does not treat the issue as conceded, the individual defendants are entitled to qualified immunity.

## ARGUMENT

### I.  Plaintiffs Fail To Allege That Their Fourth Amendment Rights Were Violated Because the Officers Had Reasonable Suspicion To Stop and Search Them (Counts 3-6).

In their motion to dismiss, defendants explained why plaintiffs' allegations fail to allege a violation of their Fourth Amendment rights. *See* Motion [22] at 10–18. Nothing in plaintiffs' opposition alters the conclusion that, based the allegations in the Amended Complaint, the individual defendants had reasonable suspicion to stop and search plaintiffs. Therefore, Counts 3 through 6 should be dismissed.

Initially, plaintiffs object to defendants' limited use of *Gerstein* affidavits in the motion to dismiss. *See* Opp'n [24] at 3–5. But it was plaintiffs who repeatedly relied on the *Gersteins* in their Amended Complaint. *See, e.g.*, Am. Compl. ¶¶ 180, 181–83, 186, 197, 224, 248–49. Defendants discuss the *Gersteins* to ensure that the

Court has a complete picture of what is stated in the *Gersteins* as opposed to plaintiffs' more limited presentation. Defendants' use of the *Gersteins* was therefore proper and does not require the Court to treat the motion as one for summary judgment. *Marshall v. Honeywell Technology Solutions, Inc.*, 536 F. Supp. 2d 59, 65 (D.D.C. 2008) ("[W]here a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion [to dismiss] to one for summary judgment."). Regardless of plaintiffs' objection, as discussed below, defendants' motion does not turn on the discussion of the *Gersteins*. The Amended Complaint itself justifies dismissal of plaintiffs' claims.

## A.   MPD Had Reasonable Suspicion To Stop and Search Plaintiff Crudup.

Plaintiff Crudup does not dispute that he was in a high crime area late at night or that Officer Laury approached him and asked him a question. Opp'n at 9–10. Rather, Mr. Crudup argues that officers seized him under the Fourth Amendment by simply approaching him on the sidewalk. *Id.* But police officers do not seize a person "by merely approaching an individual on the street or in another public place," "by asking him if he is willing to answer some questions," or "by putting questions to him if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 497 (1983).

Mr. Crudup concedes that Officer Laury simply asked him a question but argues that while it was "nominally phrased as an inquiry" it was "in reality a directive" because of the "cultivated reputation of GRU." Opp'n at 10. The standard, however, for when a seizure occurs is not a subjective one. It is an objective standard

that asks whether a reasonable person would have believed he was free to leave. *United States v. Jordan*, 951 F.2d 1278, 1282 (D.C. Cir. 1991). Mr. Crudup does not allege that, prior to being asked a question by Officer Laury, the officers drew their weapons or engaged in a similar show of authority that would have conveyed to a reasonable person that he was not free to leave. *See* Am. Compl. ¶¶ 144–49. The argument in the opposition goes much further. Mr. Crudup essentially argues that *every* time a GRU officer poses a question to a person on a sidewalk it is a *per se* seizure because of GRU's "cultivated reputation." *See* Opp'n at 10. But "reputation" is inherently subjective and, if his argument was accepted, then plaintiffs could presumably extend it to all police officers everywhere based on "reputation." Assessing the situation objectively, Mr. Crudup was asked a question and in response he voluntarily lifted his shirt to show that he did not have a weapon in his waistband. Am. Compl. ¶ 149. Posing a single question to Mr. Crudup did not constitute a seizure. *See Royer*, 460 U.S. at 497.

Mr. Crudup next argues that, even if he was not seized through the initial encounter, he was seized when the officers asked follow-up questions and formed a "semi-circle" around him. Opp'n at 10. But, despite summarily concluding in his opposition that he was not free to leave, *see id.*, Mr. Crudup alleges in the Amended Complaint only that the officers formed a semi-circle around him. Am. Compl. ¶¶ 153–55. He does not allege the officers told him he was not free to leave, nor does he allege that he attempted to walk away. *Id.* Given that the officers were talking to Mr. Crudup and he was voluntarily talking with them, the officers' alleged formation

of a semi-circle around him is entirely consistent with normal, consensual conversation.

In response to Officer Laury's question about what was in his backpack, Mr. Crudup told her that it contained marijuana. Am. Compl. ¶ 154. While Mr. Crudup argues that he never expressly stated that marijuana was the only item in his bag, he does not dispute that the only item he mentioned to the officers was marijuana. *See* Opp'n at 12–14. Instead, he posits that "[c]ommon sense dictates that many heavy objects could be contained in a backpack, like books, a computer, etc." *Id.* at 14. But Mr. Crudup did not identify any of those *legal* items as being in his bag. Therefore, when the officers learned that Mr. Crudup had, at best, overlooked the fact that he had a heavy object in his bag when he described the contents of it, they were justified in viewing his failure to mention the heavy object as suspicious and they were justified in detaining Mr. Crudup briefly to ask him follow-up questions.

After Mr. Crudup voluntarily shook his backpack and the officers heard a heavy object inside of it, the officers proceeded to conduct a pat down of his bag. Am. Compl. ¶ 172. Mr. Crudup argues that the pat down of his bag was improper because the officers had no basis to infer how much marijuana he had in his backpack, *see* Opp'n at 13, but the officers did not conduct the pat down to see how much marijuana was in the bag. They conducted the pat down for their safety. *See* Motion at 14 (citing *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). And, in conducting the pat down, Officer Choi immediately discovered that the bag contained more than two ounces of

marijuana, which then justified a search of the backpack itself, and that search revealed the illegal firearm. *See id.*

In sum, the officers are not alleged to have prevented Mr. Crudup from leaving until after they knew that he was in a high crime area, late at night, and in possession of an unknown amount of marijuana; therefore, they had reasonable suspicion to detain him briefly for questioning. As a result of that questioning, the officers gained additional information that supported a pat down of his bag and based on the additional information obtained from the pat down, they searched his backpack. Each step of defendants' interaction with Mr. Crudup satisfies the requirements of the Fourth Amendment. Count 3 should be dismissed.

**B.** <u>**MPD Had Reasonable Suspicion To Stop and Search Plaintiff Bell.**</u>

Plaintiff Bell does not dispute that the *Gerstein* contains facts sufficient to show reasonable suspicion for the search that discovered the illegal firearm. *See* Opp'n at 17–19; *see also* Am. Compl. ¶¶ 190–208. Instead, Mr. Bell alleges only that Officer Minzak's description in the *Gerstein* of what happened is false. *See id.* But the Amended Complaint does not contain any alleged facts that would support Mr. Bell's claim that Officer Minzak intentionally fabricated what happened, and therefore the Court should ignore Mr. Bell's conclusory allegation. The *Gerstein* supports a finding of reasonable suspicion. *See* Motion at 15–16 (explaining that Mr. Bell's unprovoked flight, his lack of responsiveness, and his blank stare provided officers with a basis to pat him down for weapons). Count 4 should be dismissed.

C.   <u>MPD Had Reasonable Suspicion To Stop and Search Plaintiff Burns.</u>

Plaintiff Burns alleges that he was sitting in the passenger seat of a car and Officer Joseph asked him if he had any weapons. Am. Compl. ¶¶ 212–14. Officer Joseph followed up by asking Mr. Burns if he could take thirty seconds to check. *Id.* ¶ 215. Mr. Burns argues in his opposition that he was unconstitutionally seized at that point. Opp'n at 19 (asserting that "the encounter transformed into a seizure when Officer Joseph continued to ask him questions and [he] did not feel free to leave"). But Officer Joseph's two questions to Mr. Burns did not constitute a seizure, and the cases cited by Mr. Burns do not hold otherwise.

For example, in *In re J.F.*, 19 A.3d 304, 309–10 (D.C. 2011), the court found a seizure based in part on the officer ordering the defendant to remove his hands from his pockets and the officer's continued holding of the defendant's friend even though no contraband was found on his friend. But the court also explained that "[t]he fact that [the officer] posed a few questions to [plaintiff] by itself would not have led to a seizure." *Id.* Similarly, in *Jackson v. United States*, 805 A.2d 979, 988 (D.C. 2002), the court found a seizure when the officer asked the defendant to turn around because the reasonable expectation in that situation was that a frisk would follow.

According to Mr. Burns, his entire encounter with the officers lasted only 90 seconds. Opp'n at 21. His allegation that Officer Joseph asked him two questions pertaining to his potential possession of a weapon was not the type of persistent questioning over an extended period that transforms a consensual stop into a seizure. *See In re J.F.*, 19 A.3d at 309–10. Based on Mr. Burns's nervousness and his presence

in an automobile, the officers had reasonable suspicion to pat him down for weapons.[2] Count 5 should be dismissed.

### D.  MPD Had Reasonable Suspicion To Stop and Search Plaintiff Ramsey.

Like plaintiff Bell, plaintiff Ramsey does not dispute that the *Gerstein* contains facts sufficient to show reasonable suspicion for the search that discovered the illegal firearm. *See* Opp'n at 22–24; *see also* Am. Compl. ¶¶ 256–59. Instead, Mr. Ramsey alleges only that Officer Tariq's description in the *Gerstein* of what happened is false. *See id.* But the Amended Complaint does not contain any alleged facts that would support Mr. Ramsey's claim that Officer Tariq intentionally fabricated what happened, and therefore the Court should ignore Mr. Ramsey's conclusory allegation. Here, too, the *Gerstein* supports a finding of reasonable suspicion. *See* Motion at 17–18 (explaining that because Officer Tariq was looking for a vehicle believed to be in possession of firearms, that he knew Mr. Ramsey, and that he knew Mr. Ramsey was one of the occupants of the vehicle he was looking for, the officers had sufficient basis to pursue Mr. Ramsey into his house and search him). Count 6 should be dismissed.

---

[2]    Mr. Burns misconstrues defendants' reliance on *United States v. Bullock*, 510 F.3d 342 (D.C. Cir. 2007). *See* Opp'n at 21. Defendants do not argue that the officers' interaction with Mr. Burns was a traffic stop as was the case in *Bullock*. *See* Motion at 16. But *Bullock* supports a finding that an individual in a vehicle presents a greater potential risk to the officers than an individual who is not in a vehicle. Therefore, even though Mr. Burns was not searched in connection with a traffic stop, his presence in a vehicle is still a factor that the officers should be able to consider when assessing risks to their safety.

## II.  Plaintiffs Fail To Allege That the Purported Fourth Amendment Violations Were Caused by a Municipal Policy, Custom or Practice (Count 1).

To sustain plaintiffs' claims against the District, plaintiffs must properly plead that their injuries resulted from a District policy, custom or practice. *See Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 690–92 (1978). In their opposition, plaintiffs maintain that former MPD Chief Newsham is a final policymaker for the police department, and that his actions, or, alternatively, his failure to properly monitor GRU officers, caused plaintiffs' alleged constitutional injuries. Opp'n at 26–27; *see also* Am. Compl. ¶ 274. Plaintiffs also base their municipal liability claim on GRU officers' purported custom of unlawfully stopping and frisking black men, and the District's alleged indifference to GRU officers' purportedly unconstitutional conduct in conducting stops and frisks. Opp'n at 28–36. Plaintiffs characterize their claim as a "meld" of the policymaker and deliberate indifference theories and conclude that their Complaint alleges a "large number of instances" to support municipal liability. *Id.* at 28–29, 37. Plaintiffs' arguments are wrong.

### A.  Plaintiffs Fail To Identify Any Unconstitutional Actions by an Official Policymaker.

Plaintiffs contend that former Chief Newsham is a District policymaker "whose actions promulgated the unconstitutional tactics of the GRU." *Id.* at 26. Plaintiffs note that the D.C. Code grants the Chief of MPD authority over the police department, including to promulgate rules governing police conduct. *Id.* at 26. Even if the Chief may qualify as a policymaker for certain areas of police conduct, however, plaintiffs do not allege any connection between former Chief Newsham and the

specific alleged unconstitutional stop and search policies of the GRU. As plaintiffs note, preexisting MPD rules make clear that unconstitutional searches and seizures are contrary to MPD policy. Opp'n at 27 ("This widespread custom is in contravention of … MPD formal policies and rules."); *see also Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (rejecting a claim of custom based on actions of a policymaker when the District had established training in constitutional procedures, and "policymakers intended that District officers abide by the municipality's stated policy"). Plaintiffs do not allege that former Chief Newsham personally ordered their own unconstitutional searches and seizures, or promulgated policies that were facially unconstitutional. Opp'n at 27.

Because plaintiffs cannot point to any such regulation or decision by Chief Newsham that facially establishes an unconstitutional practice, they instead argue that the alleged unconstitutional practices of the GRU were so widespread that former Chief Newsham must have acquiesced to them. *Id.* at 27. This claim is unavailing. Although plaintiffs note that Chief Newsham formerly headed the Narcotics and the Special Investigations Division (NSID), they do not allege his actual order, authorization or ratification of any unconstitutional stop and frisk by the GRU. *See Sheller-Paire v. Gray*, 888 F. Supp. 2d 34, 40 n.6 (D.D.C. 2012). And his subsequent position as Chief does not support a claim that Chief Newsham "adopted" an allegedly unconstitutional policy of his line-level subordinates for the same reasons that the District itself was not deliberately indifferent. *See* Motion at 31–32. Plaintiffs, in essence, are attempting to equate allegedly unconstitutional

10

actions by line-level officers to an affirmative policy of the MPD Chief simply based on his general supervisory authority over them, and then leverage the Chief's purported status as a policymaker to support a municipal claim against the District. This circuitously amounts to an imposition of liability on the District on a *respondeat superior* basis. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (plurality opinion) ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability); *see also id.* at 127 (indicating that a subordinate's action is only attributable to a municipality through ratification by a policymaker "[i]f the authorized policymakers approve a subordinate's decision and the basis for it ...").  Such an outcome is clearly forbidden by *Monell*. 436 U.S. at 691. Plaintiffs' claim of municipal liability based on a policymaker should be dismissed

### B.   <u>Plaintiffs Fail To Allege That the Purported Fourth Amendment Violations Were Caused by Deliberate Indifference.</u>

Plaintiffs contend they have alleged a "large number of instances" that establish the existence of a custom of GRU officers unlawfully stopping black men. *See* Opp'n at 29–32. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [his or her] action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotation omitted). Negligence does not suffice to demonstrate deliberate indifference, and "[i]t does not require the District government to take reasonable care to discover and prevent constitutional violations." *Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011) (quotation omitted). Here, none of plaintiffs' allegations demonstrate a practice "so

persistent and widespread as to practically have the force of law." *Ryan v. District of Columbia*, 306 F. Supp. 3d 344, 342–43 (D.D.C. 2018) (quoting *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013); *see also Sheller-Paire*, 888 F. Supp. 2d at 40 ("These incidents do not even provide equivocal evidence of constitutional violations, much less a 'persistent, pervasive practice of the city officials.'") (quoting *Carter v. District of Columbia*, 795 F.2d 116, 125 (D.C. Cir. 1986)).[3]

Plaintiffs' custom or practice theory has at least two fundamental flaws. First, plaintiffs ignore that the 20 to 30 officers who comprise GRU, *see* Am. Compl. ¶ 25, are only a small fraction of the nearly 4,000 officers employed by MPD. *See* MPD Statistics, https://mpdc.dc.gov/page/statistics (last visited Feb. 26, 2021). Plaintiffs do not allege that MPD writ large has a policy of performing unlawful stops; plaintiffs allege only that GRU has such a policy. But plaintiffs cite no authority for the proposition that a small, discrete group of a much larger organization can become *de facto* policy setters for the entire organization through their alleged unconstitutional acts. If members who make up less than one percent of an organization could set policy, it would eviscerate the requirement that plaintiffs allege a "persistent and widespread" practice.

Second, plaintiffs identify at most four examples of the allegedly unconstitutional practice, *i.e.*, the alleged violations of their rights. But plaintiffs also

---

[3]     Although plaintiffs make passing reference to "annual oversight reports," and "CCRB/OPC reports," Opp'n at 37 (citing *Harris v. Gov't of D.C.*, Civil Action No. 18-2390, 2019 WL 3605877 (Aug. 6, 2019 D.D.C. 2019)), their complaint contains no allegations pertaining to any such reports. *See generally* Am. Compl.

allege that the practice has existed since at least 2011. Am. Compl. ¶¶ 32, 55–56 (citing *United States v. Gross*, 74 F.3d 784 (D.C. Cir. 2015)). If the alleged practice actually was "persistent and widespread" for more than ten years, then plaintiffs should be required to allege more than four isolated examples.

While plaintiffs attempt to buttress their custom or practice theory, the other "examples" they cite are not actually examples at all and have no relevance to plaintiffs' claim, as discussed below.

### 1.    The U.S. Attorney's "Felon in Possession" Gun Prosecutions Have Nothing To Do With GRU Policies.

In the Amended Complaint, plaintiffs discuss the federal government's prosecution of gun crimes in the District as well as a statement by D.C. Attorney General Karl Racine commenting on the federal government's prosecution of gun crimes. Am. Compl. ¶¶ 29–30. In their opposition, plaintiffs curiously argue that Attorney General Racine's comments on the *federal* prosecution of gun crimes "stands as an admission that the District's policing of gun-related crimes is applied in a discriminatory manner." Opp'n at 32. But a complaint must state facts "from which a link between the alleged misconduct and a D.C. policy, custom, or practice may reasonably be inferred." *Mancuso*, 999 F. Supp. 2d at 284 (quoting *Brown v. Wilhelm*, 819 F. Supp. 2d 41, 44 (D.D.C. 2011)). Here, plaintiffs have not alleged a plausible link between the policy of the federal government and unlawful GRU stops and frisks. Instead, they simply suggest that "it serves to strengthen [plaintiff's] allegations," when "taken collectively" with plaintiffs' other allegations. Opp'n at 33. The Court need not accept "inferences drawn from [the] plaintiff if those inferences are not

supported by the facts set out in the complaint." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012). Simply asserting that a completely different governmental entity may have evinced racial bias does not support an inference that the GRU also has a racially discriminatory policy. Because the prosecution of gun crimes by the U.S. Attorney's Office has absolutely no connection to whether members of GRU have a custom or practice of performing unconstitutional stops and searches, *see* Motion at 22–23, the Court should wholly disregard plaintiffs' allegations regarding the federal government and its prosecution of gun crimes when considering whether plaintiffs have alleged a custom or practice.

2.    The D.C. Circuit Did Not Hold in *Gross* That GRU Was Engaging in Unconstitutional Stops and Searches.

As explained in defendants' motion, the D.C. Circuit held in *Gross* that the defendant was *not* unlawfully seized in 2011 by a GRU officer. *See* Motion at 23–24. Plaintiffs do not address that point in their opposition. *See* Opp'n at 33. Instead, plaintiffs assert that *Gross* "evidence[s] the widespread scope and widespread awareness of the tactics complained of herein." *Id.* A court opinion finding no constitutional violation in 2011 is not evidence of a custom or practice of unconstitutional stops, nor could it have provided notice in 2018 of widespread constitutional violations.

Further, plaintiffs ignore the temporal problem with their reliance on *Gross*. While plaintiffs are tautologically correct that notice must be premised on an event prior in time, *see* Opp'n at 33, that does not mean that notice one time is notice for all time. Even assuming that *Gross* was relevant (and it is not), plaintiffs must allege

14

a "persistent and widespread" practice. *Ryan*, 306 F. Supp. 3d at 342–43. Absent allegations that other examples of the alleged custom or practice continued to occur after 2011, *Gross* cannot be relied on as one of the "concentrated, fully packed, precisely delineated scenarios," *see id.*, that plaintiffs must allege to state a custom or practice claim.

### 3. Pictures of GRU Officers Are Not Probative of Any Custom or Practice.

In the Amended Complaint, plaintiffs spend many paragraphs discussing clothing worn and symbols displayed by certain GRU members. *See* Am. Compl. ¶¶ 34–53, 60–75. In the motion, defendants explained why it would not be reasonable to infer a widespread course of conduct from those allegations. *See* Motion at 24–25. In response, plaintiffs argue that their allegations show that (i) unnamed "MPD policy makers" were aware of the alleged instances; (ii) the unnamed MPD policy makers were indifferent to the instances; and (iii) the indifference of the unnamed MPD policy makers caused GRU to develop its practice of performing unconstitutional searches. *See* Opp'n at 34. But plaintiffs' allegations hardly support their theory. Plaintiffs' allegations are based on speculation and a partial presentation of the media reports discussed by plaintiffs.

Plaintiffs highlight two photographs. First, plaintiffs identify a photograph of a group of GRU officers posing around a flag. Am. Compl. ¶ 41. The flag reads in part "vest one up in the chamber." *Id.* Plaintiffs point to media coverage of the photograph as evidence that "MPD policy makers" were indifferent to the picture's content. Opp'n at 34. But the media also reported that MPD launched an immediate investigation

15

into the picture and issued a statement that "[t]he image is not representative of our officers' connection to, countless positive interactions with, and trust built among our residents and visitors." Rachel Kurzius, *MPD Is Now Investigating Another Violent Logo Worn By Police Officers*, DCist (Aug. 15, 2017), https://dcist.com/story/17/08/15/mpd-now-investigating-another-logo/ (last visited Feb. 26, 2021).

Second, plaintiffs identify a photograph of one MPD officer wearing a t-shirt in 2017. *Id.* ¶ 64. The officer is not alleged to be a part of GRU. As plaintiffs note, the picture generated significant media coverage. Opp'n at 34. But, again, the same media coverage does not reflect indifference by MPD but rejection of the conduct engaged in by one officer out of thousands. Chief Newsham commented that "this is disgraceful and does not represent the hard working and committed officers of the Seventh District." Rachel Sadon, *D.C. Police Officer Under Investigation After Allegedly Wearing Shirt With White Supremacist Symbol To Court*, DCist (July 28, 2017), https://dcist.com/story/17/07/28/activists-call-for-police-officers/ (last visited Feb. 26, 2021).

These photographs, and especially the photograph of the non-GRU officer, do not support an inference that GRU officers have a custom or practice of engaging in unconstitutional stops.

4. **The D.C. Court of Appeals' Discussion in 2013 of One GRU Officer's Actions in 2011 Is Not Probative of Custom or Practice in 2018.**

Plaintiffs do not respond to defendants' discussion of *Robinson v. United States*, 76 A.3d 329 (D.C. 2013), *see* Motion at 25–26, in their opposition. *See* Opp'n at 33. As explained in the motion, *Robinson* involved a finding by the D.C. Court of Appeals that an officer's judgment in 2011 of whether he had reasonable suspicion to conduct a search was mistaken. It does not support plaintiffs' claim that GRU officers have a custom or practice of intentionally conducting unconstitutional stops based on race.

5. **The Statements of Sgt. Charlotte Djossou Contradict Plaintiffs' Allegations and Confirm That MPD Had a Strict Policy Against Tactics Meant To Avoid the Reasonable Suspicion Standard.**

Here, plaintiffs allege that MPD policymakers were aware of GRU's unconstitutional custom or practice and in fact caused it through their indifference. *See* Opp'n at 33. In the Amended Complaint, plaintiffs allege that MPD Sgt. Charlotte Djossou's experience supports their claim of indifference. Am. Compl. ¶¶ 82–86. In their motion, defendants explained that Sgt. Djossou's experience does not, in fact, support plaintiffs' claim, citing Sgt. Djossou's allegations in her lawsuit against MPD. *See* Motion at 26–28.

Contrary to plaintiffs' assertion, defendants do not ask the Court to treat Sgt. Djossou's allegations as true. *See* Opp'n at 5. Defendants ask only that the Court treat them as Sgt. Djossou's allegations. Plaintiffs do not dispute that defendants have accurately portrayed the relevant portion of her allegations. As alleged by Sgt.

Djossou, MPD was not indifferent to potentially unconstitutional practices and instead took strong action to prevent them from happening. *See* Motion at 26–28 (summarizing Sgt. Djossou's allegations).

> ### 6. Plaintiffs' Allegations Concerning the Deanwood Barbershop Incident Are Wholly Unsubstantiated.

Defendants explained why plaintiffs' reliance on an incident at a barbershop that involved an allegedly planted undercover agent was not probative of whether GRU officers engaged in the entirely different practice of performing unconstitutional stops based on race. *See* Motion at 28–29. Plaintiffs offer no response other than to assert that the incident supports their theory. *See* Opp'n at 34–35. It does not.

> ### 7. Citywide Data on All Stops and Searches Is Not Probative of Whether GRU Is Engaging in Unconstitutional Stops and Searches.

In the Amended Complaint, plaintiffs allege that evidence that African Americans are stopped citywide at a higher rate based on their proportion of the population than individuals of other races supports their claim that GRU officers discriminate against African Americans by conducting unconstitutional stops. Am. Compl. ¶¶ 95–128. But, as defendants explained, plaintiffs' comparison is misguided. *See* Motion at 29–30. Plaintiffs do not allege that the statistics they cite show that African Americans are stopped at a disproportionately higher rate in the communities patrolled by GRU officers. *Id.* And, even if they had, evidence of racial disparities in stops is not evidence that any of the stops were unconstitutional. *Id.*

III.   **Plaintiffs' Equal Protection Claim Should Be Dismissed Because Plaintiffs Do Not Plausibly Allege a Discriminatory Impact or Intent (Count 2).**

Plaintiffs' Fifth Amendment equal protection claims should be dismissed. Equal protection "protects against intentional and arbitrary discrimination." Opp'n at 38; *see also id.* at 39 ("The plaintiff must demonstrate that the defendant's action had a discriminatory effect and were motivated by a discriminatory purpose.") (quoting *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003)). But plaintiffs fail to show that there was any disparate racial impact in the GRU's tactics, because the Amended Complaint's proffered statistics do not provide a proper statistical comparison of other racial groups' exposure to the same conduct that the plaintiffs allege they were subjected to. *See* Motion at 33–36. Even if the GRU's tactics have a discriminatory effect, plaintiffs also fail to show that it was "intentional and arbitrary," because they do not plausibly allege that the District or any of the individual officer defendants had an invidious discriminatory purpose. *Id.* at 36–38.

Plaintiffs note that many equal protection claims based on purportedly discriminatory law enforcement actions rely on statistical analysis, rather than direct evidence of police motivation. *See* Opp'n at 39 (citing *Marshall*, 345 F.3d at 1168). Such an analysis requires, among other things, "a reliable measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population." *Id.* (quoting *Marshall*, 345 F.3d at 1168). Plaintiffs do not even attempt to provide data regarding the background demographics of the relevant population affected by the

GRU or the actual incidence of crime among various racial groups encountered by the GRU. Am. Compl. ¶¶ 112–128.

More importantly, the statistics that plaintiffs do provide are inapplicable because they plainly do not represent similarly situated individuals. Plaintiffs' equal protection claim alleges that the GRU applies a policy of searching suspects without reasonable articulable suspicion of criminal activity on a racially discriminatory basis. Am. Compl. ¶ 298; *see also* Opp'n at 40 ("Plaintiffs allege that they are disproportionately arrested under this policy of stopping black males without probable cause … ."). But plaintiffs' statistics only pertain to, at most, the racial division of all stop and frisks, not stop and frisks without reasonable articulable suspicion of criminal activity. Am. Compl. ¶¶ 113–15, 117, 120–21, 123. In other words, plaintiffs wholly fail to distinguish between people of other races stopped without probable cause, who are similarly situated to plaintiffs, and those stopped with probable cause, who are not. *See* Motion at 35.

Against this, plaintiffs merely state that they "have alleged multiple instances where black male citizens were arrested without probable cause," and that "there are Caucasian and Asian individuals who engage in similar conduct" but are not arrested. Opp'n at 40. The Court should reject these "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," and dismiss plaintiffs' equal protection claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008).

## IV.   Plaintiffs Fail To Rebut the Individual Defendants' Assertion of Qualified Immunity.

Plaintiffs do not address the District's showing that the individual officer

defendants are entitled to qualified immunity. *See* Motion at 38–40. Under well-established D.C. Circuit precedent, plaintiffs' failure to respond concedes that individual officer defendants are entitled to qualified immunity because they failed to even address that argument in their opposition. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) (citing Local Civ. R. 7(b) and noting that "if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded").

Even if the Court does not dismiss the claims against the individual defendants because of plaintiffs' failure to respond, once the defense of qualified immunity is asserted, "the burden of proof then falls to the plaintiff to show that the official is not entitled to [it]." *Winder v. Erste*, 905 F. Supp. 2d 19, 28 (D.D.C. 2012) (citation omitted); *see also Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015). Plaintiffs fail to meet this burden.

As the District has outlined, plaintiffs fail to show that the individual officer defendants violated their constitutional rights. Even if they had, however, the second prong of the qualified immunity analysis requires a plaintiff to show that "existing precedent [places] the lawfulness of the particular action beyond debate." *City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019). It is "not enough that the rule is suggested by then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 557, 589, 590 (2018). Applying this standard, the District noted that the most direct case cited in plaintiffs' Amended Complaint, *Gross*, actually undermines plaintiffs' case rather than bolstering it because the court there held that GRU tactics do not violate

the Constitution. *See* Motion at 39. In response, all that plaintiffs can offer is to state that "it is Defendants who misinterpret the meaning of *Gross*," concluding that "MPD and particularly the GRU were engaging in practices of suspicion-less searches." Opp'n at 33. But *Gross* did not hold that the GRU engaged in a suspicion-less search; instead, it held that the officers questioned the plaintiff rather than seizing him, and that once the plaintiff attempted to flee, the officers had ample authority to stop and search him. 784 F.3d at 788.

Similarly, the effect of a case like *Robinson*, a criminal case in which a gun retrieved from the defendant was suppressed, is limited to its own specific facts. The "clearly established law" for purposes of the qualified immunity analysis cannot be defined "at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). In *Robinson*, the plaintiff's "back and forth or side to side movements" were properly ascribed to his drunken state rather than any potential criminal behavior, and so the court held that the officers lacked objective, particularized suspicion entitling them to search him. 76 A.3d at 337–339. No similar conduct is at issue here.

In sum, plaintiffs' assertion that "[t]here can be no stronger rebuke of a police department's practices than the suppression of evidence due to an unconstitutional search" oversteps the mark. Opp'n at 33. The Supreme Court has explicitly recognized that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and [the Court has] indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson v. Creighton*,

483 U.S. 635, 641 (1987). Therefore, even if the individual GRU officers at issue here were mistaken about their authority to search the plaintiffs in this case, plaintiffs have failed to carry their burden of demonstrating that such mistakes were unreasonable, and the officers should be granted qualified immunity and dismissed from this case.

## CONCLUSION

For the foregoing reasons, and the reasons stated in defendants' motion to dismiss, the Court should grant the motion and dismiss plaintiffs' First Amended Complaint with prejudice.

Dated:  February 26, 2021.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

/s/ Fernando Amarillas
FERNANDO AMARILLAS [974858]
Chief, Equity Section

/s/ Duane Blackman
DUANE BLACKMAN*
RICHARD SOBIECKI [500163]
BRENDAN HEATH [1619960]
Assistant Attorneys General
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
Phone: (202) 805-7640; (202) 805-7512;

---

* Admitted to practice only in the State of New York. Practicing in the District of Columbia under the direct supervision of Fernando Amarillas, a member of the D.C. Bar, pursuant to LCvR 83.2(f).

(202) 442-9880
Fax: (202) 703-0646
duane.blackman@dc.gov; richard.sobiecki@dc.gov;
brendan.heath@dc.gov

*Counsel for the District of Columbia Defendants*