**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DALONTA CRUDUP, *et al.*,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil Action No. 20-cv-1135 (TSC) |
| | ) |
| **DISTRICT OF COLUMBIA, *et al.*,** | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Dalonta Crudup, Dontrey Bell, David Burns, and Joevantae Ramsey bring this case, individually and on behalf of all others similarly situated, against the District of Columbia and District of Columbia Metropolitan Police Department ("MPD") Officers Sherman Anderson, Eddie Choi, Brandon Joseph, Christina Laury, Mark Minzak, Justin Rogers, Iatezaz Tariq, Nelson Torres, and John Wright. Plaintiffs, who are all Black males, seek to hold the MPD officers individually liable, and the District municipally liable, pursuant to 42 U.S.C. § 1983, for violating Plaintiffs' constitutional rights and for alleged injuries from the District's so-called "stop and frisk" policy of searching young Black males for guns, without reasonable suspicion or probable cause. Defendants have moved to dismiss all claims. Defs. Mot. to Dismiss, ECF No. 22. For reasons set forth below, Defendants' motion to dismiss will be DENIED.

## I.    BACKGROUND

Plaintiffs claim that MPD's Gun Recovery Unit (GRU), tasked with recovery of illegal firearms and apprehending individuals involved in gun related crime, unlawfully targets predominantly Black neighborhoods and young Black males specifically. *See* Am. Compl. ¶¶

16–19, 23, 27–28, ECF No. 14.  They claim that the District has "established practices and procedures of several armed officers surrounding Black suspects without reasonable suspicion of a crime" to "intimidate suspects into consenting to a search that otherwise lacks reasonable suspicion for a stop."  *Id*. ¶¶ 20–21 (internal quotation marks omitted).  Plaintiffs further accuse the GRU of "fabricating the reasonable suspicion or probable cause" required to conduct a search or seizure.  *Id*. ¶ 22.

Plaintiffs claim the GRU consists of twenty to thirty officers, one or more detectives, and three sergeants, who report to the Narcotics and Special Investigations Division (NSID), which was headed by former MPD Chief Peter Newsham when he was Assistant Chief.  *Id*. ¶¶ 5, 25–26.  Plaintiffs allege that GRU officers are "highly aggressive" and forceful in their policing approach and are "deployed in a manner calculated to convey force and authority well beyond that of an ordinary officer deployed in uniform."  *Id*. ¶¶ 33–34.  GRU deploys "with numerosity of force," they wear "tactical gear" instead of a "standard uniform," their "[w]eapons are on display" when they engage with civilians, and they use "jump outs" to convey force.  *Id*. ¶¶ 35–38.  The GRU banner and flag displays an image of skull and crossbones with a "bullet hole quite literally, dead-center in the forehead of the skull, with two handguns and two handcuffs on either side above the head," and a ribbon that says, "VEST UP ONE IN THE CHAMBER."  *Id*. ¶¶ 41–48.  These images depict the GRU's intentionally cultivated image, designed to "inflict terror on low-income communities of color," especially Black communities.  *Id*. ¶ 50.  The GRU officers "celebrate their abusive authority over young [B]lack men," as depicted by a MPD officer t-shirt that says, in part, "Let me see that waistband jo" and has a Sun Cross, "a racist hate symbol."  *Id*. ¶¶ 63–69.

Plaintiffs allege that "[a]s a matter of policy and practice, the GRU does not require its officers to possess reasonable articulable suspicion in order to approach and engage civilians," and the policy is so "overt that it has been repeatedly acknowledged by District of Columbia Courts." *Id.* ¶¶ 53–58 (citing *United States v. Gross*, 784 F.3d 784, 789 (D.C. Cir. 2015) (J. Brown concurring); *Robinson v. United States*, 76 A.3d 329 (D.C. 2013)).  To the extent that officers bother to "formulate a request for a search in words nominally providing cover as a consensual request," suspects have "little choice" but to comply.  Am. Compl. ¶¶ 62, 70. Refusing an officer can lead to "dangerous or forceful consequences," and ultimately the GRU "will compel the search anyways justifying the compelled search based on natural reactions to the aggressive officer approach or based on fabrications." *Id.* ¶¶ 73–74.

Plaintiffs claim that in testimony before the D.C. Council on January 16, 2020, MPD Sergeant Charlotte Djossou confirmed MPD's policy, practice, or custom of racially targeting Black men. *Id.* ¶¶ 82, 84.  Sergeant Djossou testified that she reported NSID's "illegal tactics" to her supervisors—including that officers were "violating 4th Amendment rights"—and was met with retaliation. *Id.* ¶ 85.  In June 2018, she escalated her complaints to then Assistant Chief Robert Contee, who also retaliated against her. *Id.* ¶ 86.

Plaintiffs further claim that a June 13, 2018 GRU operation in the Deanwood neighborhood is an "illustrative example" of the GRU's "modus operandi of stop and frisk." *Id.* ¶ 88.  They contend that on that day, the GRU "staged a fake search and find operation" on a group of Black men who were sitting outside a barbershop. *Id.* ¶¶ 89, 91.  GRU officers searched a man "who was ostensibly a member of the group but was in fact a plant . . . so they could find a gun and thus manufacture reasonable suspicion to search the other men." *Id.* ¶ 91.

Plaintiffs allege that despite the fact that from 2013 to 2017 forty-seven percent of D.C.'s population was Black, Black individuals made up eighty-six percent of total arrestees, seventy-eight percent of arrestees for driving without a permit, were arrested at ten times the rate of White individuals, and disproportionately arrested in over ninety percent of census tracts.  *Id.* ¶¶ 120–22.  Plaintiffs encountered difficulty ascertaining stop and frisk data because "MPD has sought to avoid disclosure even of basic statistics" regarding its stop and frisk practices, but "[a]s additional data has been produced from the Neighborhood Engagement Achieves Results ("NEAR") Act of 2016, the racial disparity is clear."  *Id.* ¶¶ 95, 123.  Plaintiffs contend that the NEAR Act requires MPD to "collect detailed and comprehensive data about stops and frisks the police carry out on the streets of the District," including fourteen categories of data for every stop.  *Id.* ¶¶ 96–98.  And they allege that to the extent NEAR Act data is available, it confirms "extraordinary racial disparities in the MPD's stop and frisk practices," *id.* ¶ 110:

- From July 22, 2019 to August 18, 2019, ninety-three percent of frisks and eighty-seven percent of non-ticket (i.e., non-traffic) stops were conducted on Black individuals.  *Id.* ¶¶ 113–14.

- From July 22, 2019 to December 31, 2019, two White individuals were stopped and frisked daily compared to forty-five Black individuals.  However, police discovered a gun in two percent of searches, and the gun recovery rate was the same regardless of whether the individual being searched was Black or White.  *Id.* ¶ 123.

- From August 1, 2019 to January 31, 2020, eighty-eight percent of documentable stops and ninety-four percent of documentable searches were of Black individuals.  *Id.* ¶ 115.

Plaintiffs also claim that television station WUSA9 and the American Civil Liberties Union have conducted their own analysis of NEAR Act data and/or body worn camera footage and "found similar racial disparities in arrest data" going back as far as 2013.  *Id.* ¶¶ 117–19.  On information and belief, Plaintiffs allege that "the statistics for the GRU's reported stops and frisk are even more extreme than the Department generally."  *Id.* ¶ 127.

A.  **Dalonta Crudup**

Plaintiffs claim that on January 12, 2020, at around 11:30 p.m., Crudup was "walking alone" in the 2400 block of 14th Street, N.E., wearing a coat, a hooded sweatshirt, and a backpack with one strap over his shoulder.  *Id*. ¶¶ 131, 133–35.  Officers Choi, Minzak, Joseph, and Laury were driving an unmarked Chevy Malibu and approached Crudup from behind.  *Id*. ¶¶ 136–39.  The officers were not responding to a call but claim they were "seeking to match an individual with a recently reported crime" when, after observing Crudup for only a "moment," they drove up behind him and "jumped out of their vehicle," dressed in "tactical gear and display[ing] firearms and handcuffs."  *Id*. ¶¶ 140–42, 144–46.

Plaintiffs claim that Crudup lifted "his shirt and show[ed] his waistband" because Black men in his neighborhood have no other choice when approached by GRU officers.  *Id*. ¶148.  Laury asked Crudup, "'you don't got no weapons on you?'"  *Id*. ¶ 149.  Crudup did not respond but submitted to a visual search and noticed that the officers had "formed a semi-circle in front and around him."  *Id*. ¶¶ 149–53.  Laury asked Crudup, "'Nothing in your bag?'" to which Crudup responded, "weed," and refused to give Laury permission to search his bag.  *Id*. ¶¶ 154–57.  At this point, Crudup was no longer "free to leave," but he nonetheless "pivoted and took steps slowly backwards on the sidewalk away from the officers that were in the way of his path."  *Id*. ¶¶ 158–59.  Choi then "extended his arm to block" Crudup's movement and continued to "intimidate[e]" Crudup.  *Id*. ¶¶ 160–61.  Choi asked if the officers could check for weapons and Crudup refused, but Laury "[m]anufactur[ed] a basis to justify" a search and said, "'You see the way you are acting is real strange, the way you are bent back across the fence back here.'"  *Id*. ¶¶ 163, 165.

Having surrounded Crudup with "no objectively reasonable basis to suspect [he] was in possession of contraband," Officer Choi told Crudup that his backpack looked heavy.  *Id*. ¶¶ 166,

168, 170.  Crudup responded by shaking his bag, and Choi said, "'I heard an object inside'" and "took the backpack and conducted an illegal search, a pat down of the exterior of the bag." *Id*. ¶¶ 170–72.  Choi claimed to have felt more than two ounces of marijuana, searched the bag further, and found a pistol.  *Id*. ¶¶ 173–75.

Crudup was presented in D.C. Superior Court on January 13, 2020, preventively detained, and then released on High Intensity Supervision with GPS monitoring until March 3, 2020, when the government dismissed the case.  *Id*. ¶¶ 176–77.

Plaintiffs claim that the "facts and the narrative the officers wove . . . in sworn statements and sworn testimony are fabrications."  *Id*. ¶ 179.  These allegedly false statements include Choi's testimony at Crudup's preliminary hearing that Crudup's "actions in switching his backpack to both shoulders was suspicious" and Choi's Gerstein statement[1] asserting that Crudup's "actions in backing up to the fence was a cause of concern for the officers because he was trying to hide his backpack."  *Id*. ¶¶ 182–83.

**B.  Dontrey Bell**

According to the Amended Complaint, at approximately 10:00 p.m. on April 29, 2019, Officers Choi, Minzak, Anderson, and Rogers were driving, pulled into a parking lot at the 1500 block of Butler Street, S.E., and saw a group of Black men standing in front of a building.  *Id*. ¶¶ 190–91.

Plaintiffs reference the Gerstein in Bell's case for the arresting officer's version of events: The officers got out of the car to "make contact with the group," Bell "took unprovoked flight up the stairs" of the building and stopped at the top of the stairs.  *Id*. ¶¶ 192–93.  Anderson

---

[1] Gerstein statements are usually prepared by an officer for use in pretrial detention decisions prior to a preliminary hearing.  Pretrial detention "traditionally ha[s] been decided by a magistrate in a non-adversary proceeding on hearsay and written testimony" using "informal modes of proof."  *Gerstein v. Pugh*, 420 U.S. 103, 120 (1975).

asked him if he had any weapons, and officers then conducted a "pat down for weapons" because of Bell's "nervousness." *Id.* ¶¶ 193–95.  During the pat down, Anderson "felt a hard metal object" in Bell's pants pocket and recognized it as a firearm. *Id.* ¶ 196.

Plaintiffs allege that the Gerstein is false and that there was no crowd when the officers exited their car, and Bell was "nowhere in sight." *Id.* ¶¶ 197–99.  Instead, when "GRU officers entered the building and ran up the steps," Bell was "at the top of the steps." *Id.* ¶¶ 200–01.  "He wasn't doing anything other than standing there," the "GRU officers surrounded him" and "searched him without his consent." *Id.* ¶¶ 201–03.

On April 30, 2019, Bell was presented in D.C. Superior Court on a carrying a pistol without a license ("CPWL") charge, preventively detained based on Minzak's Gerstein and released on High Intensity Supervision pending grand jury action. *Id.* ¶¶ 205–07.  The charges against him were dismissed on government motion on October 2, 2019. *Id.* ¶ 209.

**C.   David Burns**

Plaintiffs claim that on February 12, 2018, at about 10:30 p.m., Burns and his girlfriend were sitting in a car in a parking lot at the 2600 block of Douglas Pl., S.E. *Id.* ¶ 210.  Burns was smoking a cigarette when Officers Anderson, Henderson, Joseph, Wright, Ashley, and Hiller and Detective Del Po, driving in three cars, pulled into the lot. *Id.* ¶ 212.

Plaintiffs claim that Joseph approached the passenger side of Burns' car and "asked to see their waistbands." *Id.*  ¶¶ 213–15.  Before Burns or his girlfriend answered, Wright ordered Burns to step out of the car and opened the door. *Id.*  ¶ 216.  "Burns reacted with puzzlement," and the officers concluded that they had a basis to seize Burns based on his "obvious nervousness and puzzlement," and Joseph and Wright "pulled" Burns out of the car, searched him, and recovered a firearm. *Id.* ¶¶ 217–20.

Plaintiffs claim the Gerstein in Burns' case was fabricated, that Burns did nothing to create reasonable suspicion or probable cause, that the officers were armed and in uniform, and that they "manufactured" Burns' "nervousness . . . by surrounding [his] vehicle for no reason, and ordering him to exit." *Id.* ¶¶ 224–28.

Burns was presented in D.C. Superior Court on a CPWL charge, "preventively detained . . . on the basis of the probable cause statement in the Gerstein," and the government dismissed the indictment on April 8, 2018, after Burns filed a motion to suppress the firearm. *Id.* ¶¶ 221–23.

### D.  <u>Joevantae Ramsey</u>

Plaintiffs claim that on June 4, 2019, at around 2:00 p.m., Ramsey was standing on the sidewalk outside his home on Douglas Street N.E., talking on the phone. *Id.* ¶¶ 230, 232. Officers Wright, Torres, and Tariq pulled up in front of his house in a white Chevy Impala, and an officer asked Ramsey "'What's going on?'" *Id.* ¶¶ 233, 235.  Ramsey responded, "'Nothing, I am going in the house.'" *Id.* ¶ 236.  As Ramsey walked into his house, the officers (in full tactical gear) exited their car and "rushed" toward him, but he was able to enter his home and close the door. *Id.* ¶¶ 238–39, 241.  The officers pushed the door open, forced themselves into the home, discovered a firearm, and arrested Ramsey. *Id.* ¶¶ 242–45.

Plaintiffs claim the Gerstein falsely states that officers were pursuing a SUV with individuals believed to have firearms, lost sight of the vehicle but believed "Ramsey was one of the individuals" for whom they were searching. *Id.* ¶¶ 256–59.  Plaintiffs allege that the officers "forced their way into his house without a warrant and without any suspicion of a crime" based on their "prior knowledge" of Ramsey. *Id.* ¶¶ 260–67.

Ramsey was presented in D.C. Superior Court on June 5, 2019 and held without bond. *Id.* ¶¶ 247–48.  He was ordered detained following a preliminary hearing on June 7, 2019 and

was indicted on September 25, 2019.  *Id.* ¶¶ 250, 252.  The government moved to dismiss the indictment on October 2, 2019, and Ramsey was released the same day.  *Id.* ¶¶ 254–55.  He had been held for 119 days.  *Id.* ¶ 269.

Plaintiffs allege that in each of their cases, the GRU's actions were "done in accordance with the custom, policy and procedures of MPD to manufacture suspicion and arrests of Black men who otherwise were not engaged in suspicious activity."  *Id.* ¶¶ 189, 209, 229, 270.

## II.     LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  To survive a motion to dismiss, a complaint must contain factual allegations that are "enough to raise a right to relief above the speculative level," and must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  When considering a motion under Rule 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiffs and "must assume the truth of all well-pleaded allegations."  *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004).

## III.     ANALYSIS

### A.  **Defendants' Exhibits**

In considering a motion to dismiss, a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice."  *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  "[T]o go beyond testing the adequacy of the allegations of the complaint, a district court must follow the procedures for converting a motion to dismiss into one

for summary judgment." *Hurd v. District of Columbia, Gov't*, 864 F.3d 671, 686–87 (D.C. Cir. 2017).  Federal Rule of Civil Procedure 12(d) states:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

The D.C. Circuit has warned "that the conversion by the district judge" of a 12(b)(6) motion to one for summary judgment "should be exercised with great caution and attention to the parties' procedural rights."  *Hurd*, 864 F.3d at 687 (citation omitted).

Defendants have attached three exhibits to their motion to dismiss: (1) the Gerstein statement for Crudup signed by Choi, Defs. Ex. 1, ECF No. 22-2; (2) the Gerstein statement for Bell signed by Minzak, Defs. Ex. 2, ECF No. 22-3; and (3) the Gerstein statement for Burns signed by Anderson, Defs. Ex. 3, ECF No. 22-4.  Although Plaintiffs did not attach the Gersteins as exhibits to their Complaint, they allege that the facts attested to in the Gersteins for each Plaintiff are false.  *See* Am. Compl. ¶¶ 179, 197, 224, 260.  Defendants suggest that the court can consider their exhibits—without converting their 12(b)(6) motion into a summary judgment motion—because their authenticity is not disputed, they are "official public records," they are "central" to Plaintiffs' claims, and they are "sufficiently referred to in the complaint."  Defs. Mem. at 9, ECF No. 22-1 (quoting *Newman v. Lehman Bros. Holdings Inc.*, 901 F.3d 19, 25 (1st Cir. 2018)).  Plaintiffs counter that the court ought not consider Defendants' extrinsic evidence on a motion to dismiss.  They argue that although they referenced the Gersteins in their Amended Complaint, the Gersteins were not "central to their claims or as presenting the truth."  Pls. Opp'n at 4, ECF No. 24.  They referenced the Gersteins merely to "draw attention to the false statements . . . and in doing so, ple[a]d the averments therein to be disputed."  *Id*. at 4.

The court agrees with Plaintiffs and will not consider Defendants' exhibits in assessing the sufficiency of the allegations in the Amended Complaint.  *See Menoken v. Dhillon*, 975 F.3d 1, 8 (D.C. Cir. 2020) (finding that the district court "erred by relying on two documents outside the complaint as dispositive evidence of the nature of [plaintiff's] accommodation request."); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) (holding that "it is improper to assume the truth of an incorporated document if such assertions only serve to dispute facts stated in a well-pleaded complaint").  Even were the court to consider the proffered exhibits, the court's ruling would remain unchanged.  Plaintiffs have alleged that these statements are false, and in considering a motion to dismiss, the court accepts Plaintiffs' factual allegations as true.  *See Menoken*, 975 F.3d at 8.

## B. <u>Individual Fourth Amendment Claims</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV. Although warrantless searches are presumptively unreasonable, *see Katz v. United States*, 389 U.S. 347, 357 (1967), a police officer may briefly stop someone to investigate if the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  *Terry* stops must be based on "reasonable suspicion" that is a "particularized and objective basis for suspecting the particular person stopped of breaking the law."  *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quotation marks and citation omitted); *see United States v. Abdus-Price*, 518 F.3d 926, 929 (D.C. Cir. 2008).  An officer may "conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted" for "his own protection and safety," but he may not conduct "a generalized cursory search for weapons." *Ybarra v. Illinois*, 444 U.S. 85, 93–94 (1979) (quotation marks and citation omitted).

Plaintiffs claim the individual Defendants violated Plaintiffs' Fourth Amendment rights to be free from unreasonable searches or seizures by stopping and searching them without reasonable suspicion and acting with deliberate indifference.  *See* Am. Compl. ¶¶ 308, 310, 315, 317, 322, 324, 329, 331.

### 1. Claim III: Crudup's Claims Against Officers Choi, Joseph, Laury, and Minzak

Defendants argue that the MPD officers had reasonable suspicion to search Crudup because (1) he was in a "high crime area," (2) he admitted that he had marijuana in his backpack, and (3) Choi could tell there was a heavy object inside the bag when Crudup shook it.  Defs. Mem. at 12–14.[2]

The Supreme Court has held that mere presence in a high crime neighborhood, without more, cannot establish reasonable suspicion to conduct a *Terry* stop.  *See Brown v. Texas*, 443 U.S. 47, 52 (1979).  And under D.C. law it is legal for anyone older than twenty-one to possess up to two ounces of marijuana for personal use.  *See* D.C. Code § 48-904.01.  Accordingly, the facts alleged—that Crudup was in a high crime neighborhood, admitted to having marijuana in his bag, and an object inside his bag made a sound—cannot form the basis for reasonable suspicion that Crudup was involved in criminal activity.  *C.f., Gordon v. United States*, 120 A.3d 73, 83 (D.C. 2015) (explaining that "the government implicitly acknowledges" that the smell of burnt marijuana in a high crime area, coupled with loitering in an area in which the defendant did not live, is not enough to provide reasonable suspicion of criminal activity in the District of

---

[2] Several of Defendants' arguments are based on information in their exhibits.  *See e.g.*, Defs. Mem at 12 (citing Defs. Ex. 1 at 1 (alleging that Crudup "switched the location of his backpack from the front of his body to over both of his shoulders")).  Because the court accepts, for purposes of this motion, the allegations pleaded in the Complaint as true and will not consider Defendants' exhibits, *see* Supra Section III.A, it likewise will not consider Defendants' arguments that are based solely on their own exhibits.

Columbia).  Consequently, Plaintiffs have adequately pleaded that Defendants did not have reasonable suspicion to stop and search Crudup.

### 2.   Claim IV: Bell's Claims Against Officers Choi, Anderson, Rogers, and Minzak

Defendants argue that they were justified in stopping and searching Bell because of his unprovoked flight up the stairs, *see* Defs. Mem. at 16, but Plaintiffs plead that the officers' sworn statements that Bell fled up the stairs are "fabrications," Am. Compl. ¶¶ 192–97.

Plaintiffs claim Bell was already at the top of the stairs of the Butler Street building when officers approached, and "wasn't doing anything other than standing there." *Id.* ¶ 201.  They allege that the officers "surrounded" Bell, "backed him against the wall," and then "searched him without his consent." *Id.* ¶¶ 202–03.  Assuming the truth of these allegations, as the court must, Defendants did not have reasonable suspicion that Bell was engaged in criminal activity, nor did they have a reasonable basis to be concerned for their safety.  Consequently, Plaintiffs have pleaded sufficient facts to establish that Bell was unlawfully stopped and searched.

### 3.   Claim V: Burns' Claims Against Officers Joseph and Wright

Again citing only to facts provided in their exhibits, Defendants argue that "[w]hen examined in totality, Burns' actions gave the officers sufficient suspicion to stop and search him for weapons."  Defs. Mem. at 16–17 (citing Defs. Ex. 3).  But on a motion to dismiss, the court assesses only whether the plaintiff has pleaded sufficient facts to state a claim, and Plaintiffs claim that Burns was merely sitting in a car with his girlfriend smoking a cigarette when Joseph approached the passenger side of the vehicle and asked if there were weapons inside.  *See* Am. Compl. ¶¶ 210–14.  Wright then approached the car, ordered Burns to step out, and proceeded to open the door.  *See id.* ¶¶ 216–17.  Plaintiffs allege that at this point, Burns reacted with "puzzlement." *Id.* ¶ 218.

Defendants argue that "when the officers asked" Burns if he "would mind if they checked the car" he "became visibly nervous," which justified the stop under *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).  Defs. Mem. at 16.  But in *Wardlow*, the Supreme Court found that "it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. . . . [N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.  Headlong flight—wherever it occurs—is the consummate act of evasion." *Id*. at 124 (internal citations omitted).  There is no allegation that Burns was in a high drug trafficking area, he did not flee upon seeing the officers, and while his "puzzled" reaction may be a pertinent factor—though he may well have been puzzled upon being told to exit his vehicle under those circumstances—it was not, without more, enough to constitute reasonable suspicion that he was engaged in criminal activity.  Plaintiffs have therefore pleaded sufficient facts to establish that Defendants did not have reasonable suspicion to stop and search Burns.

### 4.  Claim VI: Ramsey's Fourth Amendment Claim Against Wright, Torres, and Tariq

Defendants, relying almost exclusively on Tariq's Gerstein, argue that the officers were searching for individuals with weapons who had been in an SUV, and that "Ramsey's actions gave the officers sufficient suspicion to stop and search him."  Defs. Mem. at 17.  But, as noted above, the court cannot consider Defendants' proffered Gerstein statements.  Defendants also argue that exigent circumstances allowed them to enter Ramsey's home without a warrant because "officers could reasonably believe that if they did not pursue Ramsey into the home and search him, Ramsey could destroy evidence."  Defs. Mem. at 18 (citing *United States v. Johnson*, 802 F. 2d 1459, 1462 (D.C. Cir. 1986)).  This argument presupposes that the officers had

reasonable suspicion that Ramsey was one of the individuals for whom they were searching, but, assuming the truth of the facts alleged in the Complaint, the court cannot draw this inference.

In *Johnson*, the D.C. Circuit reaffirmed that "[w]arrantless entry of premises is justified only when exigent circumstances make an immediate search imperative," and in determining if those circumstances exist, the court must consider "whether the police had an urgent need or an immediate major crisis in the performance of duty affording neither time nor opportunity to apply to a magistrate."  802 F.2d at 1461 (internal quotations marks and citations omitted).  In *Johnson,* the Court found exigent circumstances where the police were searching for narcotics, the defendant was observed dropping a brown paper bag from an apartment window to a lower portion of the roof, then went inside and closed the window despite the officer's order not to move.  *Id*.  Thus, the officers had a reasonable, "common sense" belief that the defendant might destroy evidence.  *Id*.  Here, Plaintiffs allege that Ramsey was merely present outside his residence and decided that he did not want to engage with the police officers; there were no exigent circumstances to justify forcibly entering his home and searching him.  Consequently, Plaintiffs have pleaded sufficient facts to establish that Ramsey's Fourth Amendment rights were violated.

### 5.   Qualified Immunity on Individual Claims

The Civil Rights Act of 1871 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, or the District of Columbia, subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42. U.S.C. § 1983.  Although Section 1983, on its face, does not provide government officials immunity, the Supreme Court has held that "certain government officials" have "either absolute

or qualified immunity from suit." *Wyatt v. Cole*, 504 U.S. 158, 163 (1992).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law" from Section 1983 claims.  *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11 (2021) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).  In determining if officials are protected by qualified immunity, the court looks to: (1) whether the officials "violated a federal statutory or constitutional right," and (2) whether "the unlawfulness of their conduct was clearly established at the time." *Wesby*, 138 S. Ct. at 589 (quotation marks and citation omitted).  A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks omitted).  Once a defendant asserts a qualified immunity defense, the plaintiff "has the 'burden to show that the particular right in question was clearly established'" at the time of the violation.  *Daugherty v. Sheer*, 891 F.3d 386, 390 (D.C. Cir. 2018) (quoting *Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015)).

Showing that the unlawfulness of an officer's actions is clearly established "does not 'require a case directly on point.'" *Id*. (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  "Regardless of whether a court expressly has declared certain conduct unlawful, a government official is not entitled to qualified immunity where every reasonable official would have understood that what he is doing violates the right." *Id*. (internal quotation marks and citation omitted).  Indeed, the Supreme Court has acknowledged that "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

Defendants argue that they are entitled to qualified immunity because the unlawfulness of their actions is not clearly established, *see* Defs. Mem. at 38–40, and because Plaintiffs did not respond to their qualified immunity argument, *see* Defs. Reply at 20–21, ECF No. 25.  The court disagrees.

Plaintiffs allege that they were minding their own business and not engaging in any conduct that would give rise to suspicion of criminal activity, *see supra* Section III.B.1–4, and the individual Defendants nonetheless stopped them, searched them, and prepared false Gersteins to cover up the unlawful stops and searches.  These allegations set forth the kind of conduct against which the Fourth Amendment protects: a "generalized cursory search for weapons" where no probable cause exists.  *Ybarra*, 444 U.S. at 93–96 (quotation marks and citation omitted).  In *Ybarra*, the officers had a warrant to search a tavern and the tavern bartender for narcotics.  *Id*. at 88.  Operating under an Illinois statute authorizing officers to "detain and search any person found on premises being searched pursuant to a search warrant," the officers twice searched Ybarra, who "made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature." *Id*. at 87, 91.  Ultimately, the Supreme Court held that the search of Ybarra was unconstitutional because the officers had no reasonable suspicion that "he was armed and presently dangerous," nor probable cause that he was committing a crime.  *Id*. at 92–93.

Here, as in *Ybarra,* there were no "articulable facts" arousing suspicion "that criminal activity [was] afoot."  *Terry*, 392 U.S. at 21, 30.  Although Plaintiffs do not cite any precedent squarely demonstrating that the unlawfulness of individual Defendants' conduct was clearly established, it defies credulity that a law enforcement officer would not know that stopping and searching a citizen with no reasonable articulable suspicion or probable cause was plainly

unlawful.  Moreover, Plaintiffs' allegation that the officers then swore to Gersteins they knew were false supports the inference that the officers were aware that they had violated a clearly established right.  Under the circumstances Plaintiffs allege, the "law [is] sufficiently clear that every reasonable official would understand that what he is doing is unlawful," *Wesby*, 138 S. Ct. at 589 (quotation marks and citation omitted), and consequently the officers are not entitled to qualified immunity.

**C.  <u>Municipal Liability</u>**

    **1.  Claim I: Fourth Amendment Violations**

Municipal liability on a Section 1983 claim is only appropriate where a plaintiff can demonstrate that a government policy or custom was the "moving force" behind the alleged constitutional injury.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91, 694 (1978).  To state a claim for municipal liability, plaintiffs must state (1) "a predicate constitutional violation" and (2) "that a custom or policy of the municipality caused the violation."  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  There are four ways to identify an official municipal policy: (1) "the explicit setting of a policy by the government," (2) "the action of a policy maker within the government," (3) "adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" and (4) "failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations."  *Id.* (internal citations omitted).  Each theory has its "own elements" which must be established by plaintiff's allegations.  *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015), *cert. denied*, 137 S. Ct. 77 (2016).

Defendants argue that Plaintiffs' Claim I does not satisfy any of the four *Baker* prongs, and Plaintiffs respond that they have adequately pleaded at least three. The court finds that Plaintiffs have at least pleaded *Baker* prongs three and four. Accordingly, the court need not address whether Plaintiffs have satisfied the elements of alternative municipal liability theories. *See Goodwin v. District of Columbia*, 579 F. Supp. 3d 159, 168 (D.D.C. 2022) ("A showing under *any* of these four theories suffices to sustain a claim on *Monell* liability." (citation omitted)).

i.   *Knowing Failure to Act*

To establish a knowing failure to act by a policy maker, Plaintiffs must show that a "District policymaker's ignoring of a practice was 'consistent enough to constitute custom.'" *Harvey v. District of Columbia*, 798 F.3d 1042, 1052–53 (D.C. Cir. 2015) (quoting *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004)). To clear this high hurdle, plaintiffs ordinarily base "custom or practice" liability on allegations of "practices so persistent and widespread as to practically have the force of law." *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). Plaintiffs must also show that the policymaker at least had constructive knowledge of the alleged constitutional violations, *see Baker*, 326 F.3d at 1306–07, and officers acted pursuant to the custom or policy, *see Page*, 999 F. Supp. 2d at 284.

Plaintiffs plead numerous facts asserting that District policymakers either knew or should have known that the GRU was engaged in widespread Fourth Amendment violations. Plaintiffs allege that MPD Sergeant Djossou complained to her command staff that "NSID officers at roll call were openly conversing about ways to violate [body worn camera] orders/directives," and testified at a January 16, 2020 D.C. Council hearing that NSID used "illegal tactics" and was violating individuals' Fourth Amendment rights, and that then Assistant Chief Contee retaliated

against her for reporting that "large groups of people" were being targeted "without probable cause." Am. Compl. ¶¶ 82–89. Moreover, Plaintiffs point to the D.C. Court of Appeals' decision in *Robinson v. United States*, 76 A.3d 329 (D.C. 2013) (internal citations omitted), as providing notice to Defendants that at least one GRU officer had targeted civilians for unlawful searches without reasonable articulable suspicion. Am. Compl. ¶¶ 57, 76, 78. In *Robinson*, which also involved the GRU, the D.C. Court of Appeals found that

> Officer Katz admitted he and his colleagues had no particularized information that Mr. Robinson might be carrying a gun when they entered the area, and Officer Katz developed no such thought until after he asked if Mr. Robinson had a gun and he observed Mr. Robinson engage in conduct[—back and forth or side to side movement on the outside of Robinson's jacket in front of his chest area—]which, as we have explained, did not give rise to reasonable, articulable suspicion that Mr. Robinson was armed and dangerous.

76 A.3d at 340. Furthermore, Plaintiffs claim the GRU openly displayed flags, banners, and t-shirts, depicting or alluding to their reputation for stopping and searching residents of the areas in which they operated, *see* Am. Compl. ¶¶ 41–43, 51, 64 (showing photographs of these items), which would establish that policymakers were aware of their practices. Lastly, Plaintiffs have alleged causal links between the GRU's unconstitutional practices and the injuries Plaintiffs suffered from their interactions with the individual Defendants. *See* Am. Compl. ¶¶ 189, 209, 229, 270.

### ii.   *Failure to Train as to Show Deliberate Indifference*

A municipality can be held liable for its "decision not to train certain employees about their legal duty to avoid violating citizens' rights." *Connick*, 563 U.S. at 61. To establish liability, a plaintiff must show that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S.

378, 390 (1989).  Because a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," a plaintiff needs to show "practices so persistent and widespread as to practically have the force of law."  *Connick*, 563 U.S. at 61 (citation omitted).  At the motion to dismiss stage, a plaintiff must allege specific facts that would show deliberate indifference toward constitutional violations on the part of the municipal officers responsible for the policy, ordinance, custom, decision, or absence of policy.  *See Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 411 (1997).  "Deliberate indifference is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, an objective standard."  *Baker*, 326 F.3d at 1307 (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)).

Defendants argue that Plaintiffs cannot proceed on their failure to train theory because they have not shown: "(1) a pattern of similar constitutional violations, (2) that the final policymaker was aware of the pattern of similar constitutional violations, and (3) that the final policymaker failed to properly train employees despite awareness of the constitutional violations."  Defs. Mem. at 32.  This argument is unavailing in light of "[P]laintiffs' many well-pleaded allegations supporting their assertion of municipal liability against the District."  *Goodwin*, 579 F. Supp. 3d at 169.

The court has found that Plaintiffs have adequately alleged that policymakers either knew or should have known of the GRU's unconstitutional 'stop and frisk' practices.  *See* Supra Section III.C.1.i.  Plaintiffs also claim that they were searched by GRU officers without reasonable suspicion, that the District provided "inadequate screening, training and supervision of the GRU," and that their injuries are a direct result of that failure to train.  Am. Compl. ¶¶ 274–79.  Because Plaintiffs have stated predicate Fourth Amendment violations, *see supra*

Section III. B., and pleaded sufficient facts to establish that the District knew or should have known that GRU officers routinely violated citizens' Fourth Amendment rights, Plaintiffs have made out a claim for municipal liability based on failure to train.  Therefore, Defendants' motion to dismiss as to Claim I is denied.  *See Matthews v. District of Columbia*, 730 F. Supp. 2d 33, 38 (D.D.C. 2010) (holding that "given the variety of abuses, the number of officers, and time period during which these abuses allegedly took place, plaintiffs have raised an inference that the combination of these factors can demonstrate that the District of Columbia was deliberately indifferent to plaintiff's constitutional rights." (internal punctuation and citation omitted)); *Moreno v. District of Columbia*, 925 F. Supp. 2d 93, 101 (D.D.C. 2013) (holding that plaintiff stated a failure to train claim where the District failed to address plaintiff's "specific allegations").

### 2.   Claim II: Equal Protection and Due Process Violations

The Equal Protection Clause applies to the District of Columbia via the Fifth Amendment, *see Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), and requires state actors to treat similarly situated persons alike, *see City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  "The central purpose of the Equal Protection Clause . . . is the prevention of official conduct discriminating on the basis of race."  *Washington v. Davis*, 426 U.S. 229, 239 (1976).  When legislation or official action explicitly draws classifications on the basis of race, "no inquiry into legislative purpose is necessary," and strict scrutiny applies.  *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999).  However, when the official action is facially neutral, a trial court must "perform a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Id.* (internal quotation marks and citation omitted).

To prevail on an equal protection claim, a plaintiff must allege more than "racially disproportionate impact"—"[p]roof of racially discriminatory intent or purpose is required."

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  A plaintiff can show discriminatory intent or purpose by presenting "evidence of discriminatory intent in the polic[y's] enactment" or "a current pattern of disparate outcomes from which unconstitutional discriminatory intent could be inferred." *In re Navy Chaplaincy*, 738 F.3d 425, 429 (D.C. Cir. 2013).  But "[a]bsent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative." *Id.* (quoting *Vill. of Arlington Heights*, 429 U.S. at 266); *see Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Yick Wo. v. Hopkins*, 118 U.S. 356, 373–74 (1886).

In *Yick Wo*, the Supreme Court held that a facially neutral law granting a board of supervisors "naked and arbitrary power" to determine who could operate certain laundry businesses violated the Equal Protection Clause because its effect was to prevent 200 Chinese persons from obtaining necessary permits, while eighty non-Chinese individuals were able to obtain permits.  118 U.S. at 366, 373–74.  Similarly, in *Gomillion*, the Supreme Court held that plaintiffs had properly stated a claim where the challenged redistricting law had the effect of removing all but four or five of 400 Black voters from Tuskegee's city boundaries "while not removing a single [W]hite voter or resident."  364 U.S. at 341–42.

Plaintiffs argue that they have sufficiently alleged discriminatory intent by offering statistical comparisons of the rates of stops and arrests for Black individuals versus White individuals in the District.  *See* Pls.' Opp'n at 39 (citing *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003)).

In *Marshall*, the Tenth Circuit explained that Section 1983 claims are often "based on statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population."  345 F.3d at 1168.  It noted that reliance on statistical evidence to show discriminatory intent "requires a reliable

measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population." *Id.* (citing *United States v. Armstrong*, 517 U.S. 456, 469–70 (1996); *Chavez v. Illinois State Police*, 251 F.3d 612, 640–45 (7th Cir. 2001)).

Here, Plaintiffs have alleged statistics of the type described in *Marshall*, showing the disparities between MPD's arrest and stop rates of White individuals versus Black individuals. They allege that ninety-three percent of stop and frisks and eighty-seven percent of non-traffic stops were of Black individuals, Black individuals were disproportionately arrested in ninety percent of census tracts and were arrested at ten times the rate of White individuals, and MPD searches were more likely to be conducted in Wards 7 and 8. *See* Am. Compl. ¶¶ 110, 113–14, 120–21. Moreover, Plaintiffs have alleged that the GRU "is not deployed generally throughout all neighborhoods of Washington, D.C., which has a population that is approximately 43% White. The GRU is mainly deployed in Black or African-American neighborhoods." *Id.* ¶ 17. These statistics demonstrate a pattern of behavior from which an unconstitutional policy of discriminatory intent or purpose can be inferred.

In *Smith v. Henderson,* 982 F. Supp. 2d 32, 50 (D.D.C. 2013), the court examined circumstances similar to those alleged here and found that the plaintiff had properly alleged an equal protection claim because the "legal and factual allegations [] track the holdings of *Yick Wo* and *Gomillion*." *Smith* involved the closure of fifteen public schools in the District, all of them in "majority-minority neighborhoods east of Rock Creek Park," where "residents are generally poorer and overwhelmingly black and Hispanic." *Id*. at 39. Plaintiff also alleged that no schools in majority-White parts of the city were closed. *See id*.

Here too, Plaintiffs have pleaded "a pattern as stark as that in *Gomillion* or *Yick Wo*;" consequently, their equal protection claim survives. *In re Navy Chaplaincy*, 738 F.3d at 429; *see Smith*, 982 F. Supp. 2d 32, 50 (D.D.C. 2013).

## IV.    CONCLUSION

Having found that Plaintiffs have pleaded sufficient facts at this juncture to state their claims, the court will therefore DENY Defendants' Motion to Dismiss: ECF No. 22.


Dated: March 29, 2023




*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge